**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Laurence K. Libberton,       )  No. CIV 97-1881-PHX-EHC
                       )
              Petitioner,  )  <u>DEATH PENALTY CASE</u>
                       )
      v.                   )
                       )  **MEMORANDUM OF DECISION**
Dora B. Schriro,[1] et al.,     )  **AND ORDER**
                       )
             Respondents.  )
                       )

      Laurence K. Libberton (Petitioner) has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 alleging that he is imprisoned and sentenced to death in violation of the United States Constitution.  (Dkt. 1.)[2]  In this order, the Court reviews the merits of Petitioner's remaining claims and his requests for an evidentiary hearing and expansion of the record.

## BACKGROUND

      The Arizona Supreme Court summarized the facts surrounding the crime and Petitioner's arrest as follows:

---

    [1]     Dora B. Schriro, Director of the Arizona Department of Corrections, is substituted pursuant to Fed. R. Civ. P. 25(d)(1).

    [2]     "Dkt." refers to the documents in the Court's file.  "ROA" refers to the record on direct appeal (CR 82-5701-AP).  "ROA-PCR" refers to the record from the post-conviction proceedings (CR 84-0310-PC; CR 89-0079-PC; and CR 97-0180-PC).  "RT" refers to the reporter's transcript.  The state record was filed on May 8, 2000, and supplemented on June 27, 2007. (Dkts.  43, 91.)

In the early morning hours of November 17, 1981, the victim, Juan Maya, picked up a hitchhiker, Martin Norton. Norton, a 14-year-old, lived with a friend, Steven James, in a mobile home trailer located in Phoenix. Maya drove to the trailer and, according to Norton, made homosexual advances. Norton resisted and told Maya he should go in the trailer because there was a homosexual there who could satisfy Maya's desires. Maya entered the trailer, which was occupied at the time by James and the [Petitioner], Libberton. Norton told James that Maya was gay and to get rid of him. James then kicked Maya in the crotch, and Maya left the trailer and ran. James and [Petitioner]  pursued Maya and brought him back to the trailer. Norton testified that Maya's nose and mouth were bleeding when he was brought back to the trailer.

Once again in the trailer, Norton, James, and [Petitioner] took turns hitting Maya in the face. Maya pleaded with them to take his car and credit cards and quit hitting him. James had a gun in his hand and took Maya's wallet. From the wallet, [Petitioner] obtained the title to Maya's car, and forced Maya to sign the title over to [Petitioner]. James took Maya's bracelet and ring. [Petitioner] put on Maya's belt, which had Maya's name engraved on the back, and said, "[n]ow that I own Juan Maya's car I might as well be Juan Maya."

The three assailants then discussed, in Maya's presence, what to do with Maya. James said, "[t]he only thing we can do is kill him." [Petitioner] agreed. Next, James suggested the three could hide the body in a mine shaft on his parents' property in Salome. [Petitioner] agreed, and at gunpoint forced Maya into Maya's car. [Petitioner] kept the gun pointed at Maya all the way to Salome, approximately a two-hour drive from the trailer. On the way, James bought gas and cigarettes with one of Maya's credit cards. Later, along the highway to Salome, a police officer stopped the car for speeding. James, the driver, got out of the car and talked with the officer. [Petitioner] threatened to shoot Maya if he said anything. James got back in the car and the group proceeded to Salome.

The group arrived at James' parents' property shortly before daybreak. [Petitioner] handed the gun to James who ordered Maya to walk up the side of a small mountain to the mine shaft. Maya requested and was allowed to smoke a cigarette. The assailants stood by Maya, allowing him to finish his cigarette, before beginning the final assault. When Maya finished his cigarette, James ordered Maya to step to the shaft, a hole about five feet in diameter with a beam across the top. Maya screamed "[d]on't kill me." James fired at Maya twice from less than five feet. (Only sparks and no bullets came out of the gun because, as established at trial, the gun was filled with debris.) Maya ran at James, grabbed the gun, struggled with James, and fell to the ground. [Petitioner] grabbed a five-pound rock and began beating Maya on the back of the head and shoulders with it. Maya was still struggling with James for the gun. Norton handed [Petitioner] a board, with which [Petitioner] struck Maya on the back, forcing Maya to let go of the gun. James then shot in the direction of Maya's head. As before, only sparks came out of the gun. Maya was still conscious, making "gurgling sounds," and moaning. [Petitioner] grabbed the gun from James and fired it at Maya's head. Again, the gun malfunctioned. Maya was still not dead, so all three assailants picked up large rocks and slammed them on the back of Maya's head as Maya lay face down. After about five blows Maya lay unconscious. [Petitioner] and James dragged Maya to the mine shaft and threw him in.

1

2

3

4

> Back in the car [Petitioner] and James told Norton that if he told anyone they would kill him.  The three then returned to Phoenix.  James told Norton to clean the trailer and remove Maya's blood from the couch.  That morning [Petitioner] and James picked up David McIntosh in Maya's car.  The three assailants drove McIntosh around. [Petitioner] bought some shoes with one of Maya's credit cards.  At noon the three assailants were captured when [Petitioner] attempted to get a cash advance of $20 on Maya's MasterCard.

5    *State v. Libberton*, 141 Ariz. 132, 135-36, 685 P.2d 1284, 1287-88 (1984).

6    On June 30, 1982, a jury found Petitioner guilty of first degree murder, aggravated

7    robbery, kidnapping, and theft.  The trial court sentenced Petitioner to death for the murder

8    conviction, and consecutive prison terms of fifteen years for aggravated robbery, twenty-one

9    years for kidnapping, and five years for theft.  The Arizona Supreme Court affirmed

10   Petitioner's convictions and sentences on appeal.  *Id.*

11   On July 26, 1984, Petitioner filed a petition for post-conviction relief ("PCR"),

12   pursuant to Arizona Rule of Criminal Procedure 32.  The Rule 32 court dismissed the PCR

13   petition on October 16, 1984.  The Arizona Supreme Court denied the petition for review.

14   On January 31, 1985, Petitioner filed a petition for writ of habeas corpus in this Court.

15   The federal proceedings were stayed on April 7, 1985, pending exhaustion of Petitioner's

16   claim of ineffective assistance of appellate counsel.  On April 26, 1985, Petitioner filed a

17   second PCR petition.  The Rule 32 court summarily dismissed the second PCR proceeding

18   on March 13, 1986 .  On December 1, 1986, Petitioner filed an amended habeas petition in

19   this Court.  A second stay of federal proceedings was granted for failure to exhaust state

20   remedies.

21   On September 14, 1987, Petitioner filed a third PCR petition.  The Rule 32 court

22   summarily dismissed the proceeding on February 10, 1988, and the Arizona Supreme Court

23   denied the petition for review.  On September 8, 1991, Petitioner filed a second amended

24   habeas petition in this Court.  On January 15, 1993, the parties stipulated to the filing of a

25   third amended habeas petition.  On February 10, 1994, based on Petitioner's allegations of

26   newly discovered evidence, this Court dismissed the third amended petition, without

27   prejudice, to allow Petitioner to return to state court to exhaust the claim.

28   On September 12, 1994, Petitioner filed a fourth PCR petition in state court. The Rule

32 court dismissed the proceeding, and on June 24, 1997, the Arizona Supreme Court denied the petition for review.

On September 9, 1997, Petitioner filed a new petition for writ of habeas corpus, which he amended on February 17, 1998. The amended petition raised forty-two claims for relief. (Dkt. 13.)

On July 17, 2000, the Court filed an order finding Claims 27 and 42 (in part) procedurally barred. (Dkt. 45 at 1.) The Court also found Claims 28-30, 37 and 42 (in part) meritless. The Court stated that Claims 1-26, 31-36, and 38-41 would be subject to review on the merits and ordered further briefing. (*Id.* at 1, 18.) The briefing is now complete. (Dkts. 65, 70, and 83.)

### AEDPA STANDARD FOR HABEAS RELIEF

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous,

1   but "objectively unreasonable." *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)

2   (per curiam).

3          Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

4   court decision was based upon an unreasonable determination of the facts. *Miller-El v.*

5   *Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005) (*Miller-El II*).   A state court

6   decision "based on a factual determination will not be overturned on factual grounds unless

7   objectively unreasonable in light of the evidence presented in the state-court proceeding."

8   *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366

9   F.3d 992, 999 (9th Cir. 2004).   In considering a challenge under 2254(d)(2), state court

10  factual determinations are presumed to be correct, and a petitioner bears the "burden of

11  rebutting this presumption by clear and convincing evidence."   28 U.S.C. § 2254(e)(1);

12  *Miller-El II*, 545 U.S. at 240, 125 S. Ct. at 2325.   However, it is only the state court's factual

13  findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness.

14  *Miller-El I,* 537 U.S. at 341-42. ("The clear and convincing evidence standard is found in §

15  2254(e)(1), but that subsection pertains only to state-court determinations of factual issues,

16  rather than decisions.").

17         As the Ninth Circuit has noted, application of the foregoing standards presents

18  difficulties when the state court decided the merits of a claim without providing its rationale.

19  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,

20  1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).   In those

21  circumstances, a federal court independently reviews the record to assess whether the state

22  court decision was objectively unreasonable under controlling federal law.   *Himes*, 336 F.3d

23  at 853; *Pirtle*, 313 F.3d at 1167.   Although the record is reviewed independently, a federal

24  court nevertheless defers to the state court's ultimate decision.   *Pirtle*, 313 F.3d at 1167

25  (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.   Only when a state

26  court did not decide the merits of a properly raised claim will the claim be reviewed de novo,

27  because in that circumstance "there is no state court decision on [the] issue to which to

28  accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,

1  1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

2                                    **DISCUSSION**

3  **I. Applicability of the AEDPA**

4         As a threshold matter, Petitioner argues that his operative amended petition is not

5  governed by the strictures of the AEDPA because, although filed in September 1997, the

6  amended petition effectively relates back to an earlier habeas petition, filed prior to the

7  AEDPA's effective date of April 24, 1996.  This earlier habeas proceeding was dismissed

8  by the Court in 1994 to permit Petitioner to file a fourth PCR petition in state court.

9         Petitioner asserts that the stipulation for dismissal of his prior habeas petition was

10  effectively a stay rather than a dismissal and, therefore, the new amended petition related

11  back to a pre-AEDPA petition.  (*See* Dkt. 83 at 3-7.)  Petitioner raised this issue in his reply,

12  and Respondents have not sought to respond.

13         In dismissing Petitioner's previous federal habeas proceeding on February 10, 1994,

14  the Court stated that it did so pursuant to a stipulation from the parties for dismissal without

15  prejudice.  (*See Libberton v. Lewis* (*Libberton I*), CIV 85-249-PHX-RGS, Dkt. 156; *see also*

16  Dkt. 14, Ex. 2.)  The stipulation filed in *Libberton I* requested dismissal without prejudice

17  rather than staying and abeying and cited as precedent the Court's order of January 27, 1994,

18  in the case involving Petitioner's accomplice in the crime, Steven James.  In James's case,

19  the Court ordered dismissal without prejudice, declining to stay and abey the proceedings.

20  (Dkt. 14, Ex. 1 at 20.)  Because Petitioner's prior case was dismissed and the current habeas

21  proceeding was filed after the effective date of the AEDPA, it is subject to the Act's statutory

22  provisions.  *See Mancuso v. Herbert*, 166 F.3d 97, 101 (2d Cir. 1999) ("We conclude that the

23  AEDPA applies to a habeas petition filed after AEDPA's effective date, regardless of when

24  the petitioner filed his or her initial petition and regardless of the grounds for dismissal of

25  such earlier petition."); *see also Henry v. Lundgren*, 164 F.3d 1240, 1241 (9th Cir. 1999)

26  (holding that a second habeas petition does not relate back to the date of the filing of the

27  initial petition under Rule 15(c)(2) of the Federal Rules of Civil Procedure where "the district

28  court did not expressly or impliedly retain jurisdiction over [the petitioner's] original petition

1   when the court dismissed for failure to exhaust.")

2   **II.  Merits Analysis**

3          Petitioner exhausted all of his claims, with the exception of Claims 1-3 and 6, by

4   raising them in his 1987 PCR petition.  The state court summarily rejected all of the claims

5   in that petition, stating that Petitioner "has failed to raise any colorable claim whatsoever,"

6   and "no material issue of fact or law exists which would entitle [him] to relief."  (ROA-PCR,

7   Vol. 1 of 1, ME 2/10/88 at 1.)  The Arizona Supreme Court denied review without comment.

8   Because the PCR court provided no rationale for its determination, on habeas review this

9   Court will review the record independently to assess whether the court's decision denying

10  relief on these claims was objectively unreasonable under controlling federal law.  *Himes*,

11  336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.  The state court decisions regarding Claims 1-3 and

12  6 are set forth within the discussion of those claims, and reviewed under 28 U.S.C. § 2254(d).

13  *A.  CLAIMS IN MERITS BRIEF (CLAIMS 1-3, 4, 6-7, 9, 11, 16, 20-22, 24, 36 AND 41)*

14          **Claims 1 and 2 – State Failed to Disclose Leniency Promise to Norton and
            Failed to Correct Norton's False Testimony That He Received No Deals**

15
16          In Claim 1, Petitioner asserts the State violated his right to due process of law and a

17  fair trial guaranteed by the Fourteenth Amendment when the State failed to disclose that it

18  had promised Norton something of value –  namely, to try him as a juvenile – in return for

19  his December 29, 1981 statement to prosecutors.  (Dkt. 13 at 34; *see also* Dkt. 65 at 25-27.)

20  In Claim 2, Petitioner contends that the State violated his federal due process rights when it

21  failed to correct Norton's false testimony that there was no deal between himself and the

22  State in return for his December statement.  (Dkt. 13 at 34; *see also* Dkt. 65 at 27-29.)

23          Background

24          *Trial Testimony*

25          Martin Norton was a fourteen-year-old friend of Petitioner at the time of the murder.

26  He admitted his own involvement in the  killing of Juan Maya, and was arrested along with

27  Petitioner several hours after Maya's murder.  Norton was the chief witness against Petitioner

28  at trial.  He testified that Petitioner participated in the beating and kidnapping of the victim

at Steven James's trailer on the evening of November 16, 1981.  He further testified that Petitioner forced Maya to sign the title to Maya's car over to Petitioner and that Petitioner personally forced Maya into the car and held a gun on Maya during the drive up to Salome, Arizona.  (*See* RT 6/28/82 at 13-16, 20-22, 24, 27-31.)

Norton testified that when they arrived at the murder scene near Salome, Petitioner and James forced Maya out of the car.  He testified that they both attempted to shoot Maya (the gun misfired each time), then bludgeoned him with rocks and threw his body into a mine shaft.  Norton stated that he also participated in beating Maya at the trailer and bludgeoning him to death at the murder scene.  He indicated that both Petitioner and James threatened to kill him if he told anyone what they did to Maya.  (*See* RT 6/28/82 at 37-41.)  This testimony was substantially consistent with his December 29 statement to authorities.  (*See* Dkt. 14 at Ex. 15.)

Norton admitted on direct examination that he was not truthful in his initial pre-trial interviews with police.  He also stated that he was offered no deal in return for any of his pre-trial statements to police and/or prosecutors, including his December 29 statement:

[PROSECUTION]: Were you questioned by police [when first detained in the parking lot of Valley National Bank on November 17, 1981]?

[NORTON]: Yes, I was.

[PROSECUTION]: Did you tell them the truth?

[NORTON]: No.

[PROSECUTION]: Why?

[NORTON]: Because I was scared.

.   .   .

[PROSECUTION]: . . . were you picked up again and questioned?

[NORTON]: Yes.

[PROSECUTION]: By Detective Davis?

[NORTON]: Yes.

[PROSECUTION]: Did you tell him everything that had happened at that time?

1    [NORTON]: No, I didn't.

2    [PROSECUTION]: And why?

3    [NORTON]: I was scared.

4    [PROSECUTION]: Then you were interviewed again by Detective
     Hackworth; weren't you?

5
     [NORTON]: Yes.
6
                                    .    .    .
7
     [PROSECUTION]: When you were interviewed at Durango by Detective
8    Hackworth [on November 26, 1981], did he promise you anything?

9    [NORTON]: No, he didn't.

10   [PROSECUTION]: At that point you knew you were being charged with
     murder, robbery, kidnapping and theft –
11
     [NORTON]: Yes.
12
                                    .    .    .
13
     [PROSECUTION]: Did you agree to talk with Detective Hackworth?
14
     [NORTON]: Yes, I did.
15
     [PROSECUTION]: And you told him what happened to Juan Maya at that
     point?
16
     [NORTON]: Most of it.
17
     [PROSECUTION]: Did you admit your part in the crimes?
18
     [NORTON]: No.
19
     [PROSECUTION]: Not all of it; is that correct?
20
     [NORTON]: Yes.
21
     [PROSECUTION]: Now, when you talked to Detective Hackworth, did you
22   know whether or not you would be treated as a juvenile or adult in
     prosecution?
23
     [NORTON]: No.
24
     [PROSECUTION]: Did you indicate that you would testify against Libberton
25   and Steven James?

26   [NORTON]: No.

27   [PROSECUTION]: Now, subsequently you were – you had an attorney and
     you were interviewed by me [on December 29, 1981]; is that correct –
28

1    [NORTON]: Yes.

2    [PROSECUTION]: – with Detective Davis?

3    [NORTON]: Yes.

4    [PROSECUTION]: You weren't offered any plea agreements at that time; were you?

5    [NORTON]: No.

6
7    [PROSECUTION]: You were charged with first degree murder, kidnapping, robbery and theft; correct?

8    [NORTON]: Yes.

9    [PROSECUTION]: You were told that I wanted you to tell the truth?

10   [NORTON]: Yes.

11   [PROSECUTION]: And did you talk to me?

12   [NORTON]: Yes, I did.

13   [PROSECUTION]: Did you tell me the truth?

14   [NORTON]: Yes, I did.

15   [PROSECUTION]: Did you tell me what you told the jury here today?

16   [NORTON]: Yes, I have.

17   (RT 6/28/82 at 49-53.)

18        Petitioner acknowledged at trial that he subsequently entered into a plea agreement

19   with the State, which was admitted at trial as exhibit 149.  (RT 6/28/82 at 53-54.)  The plea

20   agreement provided that in return for admitting guilt to first degree murder, kidnapping,

21   armed robbery, and receiving something of value through fraudulent use of a credit card, the

22   State agreed to try and sentence Norton as a juvenile.  (Dkt. 14, Ex. 17.)  The plea agreement

23   also contained the following "consistency" clause:

24        (1) Martin David Norton agrees to testify fully and truthfully in any
          proceedings determined to be necessary by the State of Arizona regarding the

25        victim Juan Maya and/or in any criminal prosecution of Lawrence Keith
          Libberton or Steven Craig James.  On December 29, 1981, Martin David

26        Norton provided information to Deputy Maricopa County Attorney Myrna
          Parker and represented that information to be true.  *If Martin David Norton's*

27        *testimony is not substantially consistent with the information that he provided
          in the December 29, 1981 interview, the State of Arizona shall have the option*

28        *of withdrawing from this agreement and the agreement shall be void.*

- 11 -

(*Id.*) (emphases added).

On cross-examination, defense counsel challenged Norton's credibility by attacking the motive for his testimony, in particular, whether his testimony against Petitioner was prompted by a favorable plea which allowed him to be prosecuted as a juvenile and serve just three years for his role in the murder, robbery, and kidnapping of Maya:

[COUNSEL]: You're now 15-years old Mr. Norton?

[NORTON]: Yes.

.　　.　　.

[COUNSEL]: You'll be out age 18; won't you?

[NORTON]: Yes.

[COUNSEL]: In other words, you're going to do about three years?

[NORTON]: Yes.

[COUNSEL]: Is that the reason you agreed to testify?

[NORTON]: No.

[COUNSEL]: Would you have agreed to testify had they prosecuted you as an adult?

[NORTON]: Yes.

[COUNSEL]: And charged you with first degree murder?

[NORTON]: Yes.

[COUNSEL]: And face a life sentence?

[NORTON]: Yes.

[COUNSEL]: You would still come here and testify?

[NORTON]: Yes, I would.

(RT 6/28/82 at 55.)

Defense counsel returned to this topic later:

[COUNSEL]: Did you have an attorney before you talked to Detective Hackworth?

.　　.　　.

[NORTON]: I probably did.

1   [COUNSEL]: You were being held as a juvenile at that time; were you not?

2   [NORTON]: Yes.

3   [COUNSEL]: Did you know about the difference between juvenile prosecution and adult prosecution?

4   [NORTON]: A little bit.

5
6   [COUNSEL]: What do you know about the difference between juvenile prosecution and adult prosecution?

7   [NORTON]: Adults get hard time.

8   [COUNSEL]: If you were prosecuted as an adult you could be sent to prison; couldn't you?

9   [NORTON]: Yes.

10  [COUNSEL]: Do you know what the penalty for murder in the first degree is?

11  [NORTON]: Life.

12  [COUNSEL]: Is there an alternative to life?

13  [NORTON]: The death penalty.

14
15                              .    .    .

16  [COUNSEL]: And if you were prosecuted as an adult you could get one or the other; is that right?

17  [NORTON]: Yes.

18  [COUNSEL]: If you were prosecuted as a juvenile what do you get?

19  [NORTON]: Until I'm 18.

20                              .    .    .

21  [COUNSEL]: In other words, your maximum time that you would do is three years; is that correct?

22  [NORTON]: Yes.

23  [COUNSEL]: There is a definite advantage to being prosecuted as a juvenile; is that true?

24  [NORTON]: Yes.

25

26  [COUNSEL]: So it's to your benefit to be prosecuted as a juvenile; isn't it?

27  [NORTON]: Yes.

28  [COUNSEL]: Does the fact that you were being prosecuted as a juvenile affect

1    your story in any way?

2    [NORTON]: No.

3    [COUNSEL]: Are you certain of that?

4    [NORTON]: Yes.

5    [COUNSEL]: You have no reason to tell anything that isn't true; is that right?

6    [NORTON]: Yes.

7    [COUNSEL]: And you agreed to cooperate with the police not knowing that
     you would get a deal?

8

9    [NORTON]: Yes.

10   [COUNSEL]: Did you feel you would get a deal if you cooperated with
     police?

11   [NORTON]: No.

12   [COUNSEL]: You didn't feel that you were going to get a deal?

13   [NORTON]: No.

14   [COUNSEL]: You voluntarily came out knowing that you probably would be
     prosecuted as an adult?

15

16   [NORTON]: Yes.

17   (RT 6/29/82 at 178-80.)

     *PCR Proceedings*

18

19         Petitioner raised Claims 1 and 2 in his 1994 PCR petition.  To support his contention

20   that the State failed to disclose that a deal had been made to try Norton as a juvenile in return

21   for his December 29, 1981 statement against Petitioner (Claim 1), as well as his claim that

22   the State failed to correct Norton's trial testimony that he had not received any deal for that

23   statement (Claim 2),  Petitioner  included  a 1993 affidavit from Norton's pre-trial attorney,

24   Robert Wertsching.  Wertsching was appointed to represent Norton on December 4, 1981.

25   (ROA-PCR, Vol. 6, State's Exs. in Resp. to 1994 PCR pet., Ex. H.)  In his affidavit,

26   Wertsching attests, in pertinent part:

27         2) As counsel for a minor charged with murder, it was essential for me
           to make all reasonable efforts to assure that my client would not be remanded
           to adult court.  The prosecution had made a formal transfer request on the
28         petition filed against my client.

3) On my client's behalf, I had at least two conversations with the head prosecutor of the juvenile division of the Maricopa County Attorney's office on the subject of whether the County Attorney would agree not to seek transfer of Mr. Norton to adult court.

.   .   .

5) At some point in time the head of the juvenile division indicated orally that if Mr. Norton would give a full and accurate statement to the County Attorney and would testify consistently with that statement at the trial of the adults who participated in the homicide offense, the County Attorney would not seek to have my client transferred to adult court.

6) Thereafter, in expectation that these contingencies would be met by debriefing my client, I was present at the jail when my client gave a statement to Ms. Parker, Deputy County Attorney [and the prosecutor in Petitioner's case], in the presence of an investigator.

7) At the time of the formal jail interview with Ms. Parker, my client and I expected that if my client was truthful in the debriefing and cooperated fully with the prosecution of the adult defendants, he would not be remanded to adult court. I have no information whether Ms. Parker was aware of my oral communications with the head of the juvenile division.

8) Subsequent to the formal jail interview with Ms. Parker, my client and I signed a formal written agreement that conformed with the oral understanding I had previously reached with the juvenile division head.

(Dkt. 14, Ex. 16.)

To counter Wertsching's affidavit, Respondents submitted affidavits from the prosecuting attorney, Myrna Parker, as well as Warren K. Smoot, Chief of the Juvenile Division of the Maricopa County Attorney's office during the time in question, and William F. Molner, an attorney in the juvenile division. (ROA-PCR, Vol. 6, State's Exs. in Resp. to 1994 PCR Pet., Exs. B, C, D.) Ms. Parker flatly denies that any deal was made with Norton in return for his December 29 statement. She attests, "[o]nly after I heard Norton's statement of December 29, 1981, did I determine whether the State would be willing to enter into a plea agreement with him." (*Id*., Ex. B.) Parker further attests that no one at the juvenile division spoke to her about a deal with Norton. (*Id.*) Likewise, both Smoot and Molner deny making any deal with Norton in return for his December 29 statement and/or his testimony against Petitioner. (*See id.,* Exs. C, D.)

In denying relief, the PCR court stated:

The Court finds it unnecessary to weigh the credibility of these

competing affidavits because in two other respects, the State should prevail. First, the Court finds that the disclosure of the alleged promise probably would not have changed the jury's verdict. As the State's response recites, the jury heard other evidence strongly circumstantial of Defendant's guilt. Second, Norton gave a consensual statement to the police on November 16, 1981,[3] which fully incriminated Defendant before Wertsching was appointed to represent Norton and before Wertsching could have been promised anything by a member of the prosecutor's office. Also, because the November 16, 1981, statement would have been admissible to counteract the effect of a claim by Defendant that the December 29, 1981, statement was incredible because of a promise to Wertsching, it is improbable the verdict would have been different.

(ROA-PCR, Vol. 1 of 1, ME 11/21/96 at 9.)  The Arizona Supreme Court denied review without comment.

<u>Merits</u>

Petitioner argues that the PCR court's determination is contrary to the holding of the United States Supreme Court in both *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959), and that the facts in this case are legally indistinguishable from the facts in those cases.

Petitioner cites *Giglio* in support of Claim 1.  In *Giglio*, the Court described a witness, Taliento, as a "coconspirator in the offense and the only witness linking [Giglio] with the crime." 405 U.S. at 151.  During cross-examination, Taliento denied he was promised a deal exempting him from prosecution if he testified against Giglio.  On appeal, however, an Assistant United States Attorney averred in an affidavit that he told Taliento that if he testified against Giglio before the grand jury and at trial, he would not be prosecuted. *Id.* at 152.  This evidence was not disclosed to either the court or jurors at trial.

The Supreme Court reversed Giglio's conviction.  The Court noted that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule" and due process requires a new trial.  *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 269).  However,

---

[3]     The interview in question with Detective Hackworth took place on November 26, 1981, not November 16, 1981. (*See* Dkt. 14, Ex. 14.) The crimes against Maya did not take place until the late evening/early morning hours of November 16/17, 1981.

1   the failure to disclose does not "automatically require a new trial" unless "the false testimony

2   could . . . in any reasonable likelihood have affected the judgement of the jury." *Id.* (quoting

3   *Napue*, 360 U.S. at 271).  Applying these principles, the Court determined that, because the

4   case against Giglio depended almost entirely on Taliento's testimony, "evidence of any

5   understanding or agreement as to future prosecution would be relevant to his credibility and

6   the jury was entitled to know it." *Giglio*, 405 U.S. at 155.

7        To support his allegation in Claim 2 that the prosecution violated due process when

8   it failed to correct Norton's false testimony that there was no deal, Petitioner cites *Napue v*

9   *Illinois*, 360 U.S. 264 (1959).  Hamer, Napue's accomplice in a murder, testified against

10  Napue at trial and stated that he had received nothing in return for his testimony.  *Id.* at 265.

11  After Napue was convicted, the attorney who prosecuted the case filed a petition on Hamer's

12  behalf stating "he had promised Hamer that if he would testify against Napue, 'a

13  recommendation for a reduction of his (Hamer's) sentence would be made and, if possible

14  effectuated.'"[4] *Id.* at 266.  Napue eventually learned of the prosecutor's action on behalf of

15  Hamer and unsuccessfully sought relief in the Illinois state courts.

16        The Supreme Court reversed, stating the general principle "that a conviction obtained

17  through the use of false evidence, known to be such by representatives of the State, must fall

18  under the Fourteenth Amendment." *Napue,* 360 U.S. at 269.  The Court further stated, "[t]he

19  same result obtains when the State, although not soliciting false evidence, allows it to go

20  uncorrected when it appears." *Id.*  The Court characterized the evidence against Napue as

21  "consist[ing] largely of Hamer's testimony," and noted that Hamer "clearly testified that no

22  one offered to help him except an unidentified lawyer from the public defender's office."

23  *Id.* at 266, 270.  The Court also determined that:

> [h]ad the jury been apprised of the true facts . . . it might well have concluded that Hamer had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which Hamer was

---

27     [4]    Hamer had also been convicted of the same murder Napue was involved in and was sentenced to 199 years in prison, the same sentence Napue received after he was convicted. *Napue*, 360 U.S. at 265-66.

1  testifying, for Hamer might have believed that such a representative was in a
2  position to implement (as he ultimately attempted to do) any promise of
   consideration . . . .

3  *Id.* at 270. The Supreme Court applied a prejudice standard, noting a new trial is not required

4  if the false testimony could not in reasonable likelihood have affected the verdict. *Id.* at 271.

5  The Court concluded that Hamer's false testimony "may have had an effect on the outcome

6  of the trial." *Id.* at 272.

7      This Court concludes that the holdings in *Giglio* and *Napue* do not entitled Petitioner

8  to habeas relief. First, although the state court cited neither decision in rejecting Petitioner's

9  claims, its analysis is consistent with and not contrary to the governing principles set forth

10 in those cases. A decision is contrary to Supreme Court law only if (1) it arrives at an

11 opposite conclusion on a question of law or (2) arrives at a different result when faced with

12 materially identical facts. *Williams*, 529 U.S. at 405. The PCR court held that the allegedly

13 withheld information about a deal and Petitioner's false denial of same "probably would not

14 have changed the jury's verdict." (ROA-PCR, Vol. 1 of 1, ME 11/21/96 at 9.) This is

15 consistent with the Supreme Court standard that a petitioner is not entitled to relief unless

16 there is a "reasonable likelihood" that the non-disclosure impacted the verdict. *Giglio*, 405

17 U.S. at 154; *Napue*, 361 U.S. at 271. Additionally, the facts of *Giglio* and *Napue* are not

18 materially identical because, in Petitioner's case, Norton's plea agreement with the

19 government was presented to the jury.

20     Second, the state court's decision was not an unreasonable application of *Giglio* or

21 *Napue*. The Court agrees with the PCR court that it is not necessary to resolve whether

22 Wertsching or the State's attorneys were telling the truth. Even accepting Wertsching's

23 claim that juvenile division attorneys orally promised Norton a favorable plea for his

24 December 29, 1981 statement, and that the State failed to disclose the deal and failed to

25 correct Norton's testimony denying its existence, Petitioner cannot show a "reasonable

26 likelihood" that disclosure of Wertsching's information to the jury would have resulted in

27 Petitioner's acquittal. *Giglio*, 405 U.S. at 154; *see also Napue*, 360 U.S. at 271-72.

28     Unlike the situation in either *Giglio* and *Napue*, the jury was aware of the

accomplice's plea agreement, which was admitted into evidence at trial. (RT 6/28/82 at 53-54; *see also* Dkt. 14 at Ex. 17.) The agreement informed the jury that Norton's trial as a juvenile was conditioned on testimony against Petitioner "substantially consistent" with his December 29 statement. On cross-examination, defense counsel vigorously attacked Norton's credibility, highlighting the benefit he would receive if tried as a juvenile. (*See* RT 6/28/82 at 55; 6/29/82 at 178-80.) Thus, in addition to knowing that Norton was an active participant and accomplice in Maya's murder, the jury knew that he had executed a plea agreement which contained the essence of the deal Petitioner claims was "undisclosed;" namely, that the State agreed to try Norton as a juvenile (with a sentence lasting no more than three years) in return for a truthful statement on December 29, 1981, and testimony consistent therewith at Petitioner's trial. The jurors were therefore aware of a deal between Norton and the State in return for his testimony. Nevertheless, they credited his testimony and convicted Petitioner.

Moreover, prior to any contact between his attorney and juvenile prosecutors, Norton recounted to police essentially the same facts regarding Petitioner's involvement in the killing of Juan Maya as those provided in his December statement and trial testimony. Detective Jack Hackworth's report of a November 26, 1981 interview with Norton recounts that Norton told him he "lured" Maya to James's trailer in the late evening of November 16, 1981. (Dkt. 14, Ex. 14 at 2.) He further recounts that Norton stated that upon his arrival at James's trailer he told James and Petitioner that Maya was a "queer" and all three of them then proceeded to savagely beat Maya. Hackworth recounts that Norton stated they then forced Maya into his car and drove to the murder scene in Salome with Petitioner holding a gun on Maya for the entire duration (several hours), and that Petitioner and James discussed killing Maya. Further, Norton told him Petitioner agreed with James they had to kill Maya so he wouldn't "snitch us off." (*Id.*) Hackworth also recounts that Norton told him that once they got to the abandoned mine shaft, Maya was forced out of the car and both James and Petitioner attempted to shoot Maya but failed because the gun misfired. James, Petitioner, and Norton then proceeded to bludgeon Maya to death with rocks. James and Petitioner

1   dragged Maya's lifeless body to the entrance of the mine shaft and threw it in.  (*Id.* at 3.)  The

2   Court agrees with the PCR court's conclusion that Hackworth's report, and any supporting

3   testimony, could have effectively countered a claim by Petitioner that Norton's December

4   29, 1981 statement and trial testimony were not credible because they were prompted by a

5   favorable plea deal.

6          For these reasons, the Court does not believe Petitioner can establish a "reasonable

7   likelihood" that the information in Wertsching's affidavit, if disclosed to the jury, would have

8   changed the verdict.  As a result, the PCR court's denial of relief on Claim 1 was not contrary

9   to or an unreasonable application of the principles enunciated in *Giglio* and *Napue*.

10         In addition, with respect to Claim 2 (alleging the State failed to correct false testimony

11  by Norton that there was no deal in return for his statement), Wertsching's affidavit does not

12  contradict Prosecutor Myrna Parker's claim that she made no deal with Norton or his

13  attorney prior to his December 29 statement, or her claim she was unaware of any oral deal

14  offered by her office.  (*See* ROA-PCR, Vol. 6,  State's Exs. in Resp. to 1994 PCR Pet., Ex.

15  B at 1.)  Wertsching specifically states, "I have no information whether Ms. Parker was

16  aware of my oral communications with the head of the juvenile division."  (Dkt. 14, Ex. 16

17  at 2, ¶ 7.)  Thus, the Wertsching affidavit does not support Petitioner's claim that the

18  prosecutor knowingly permitted Petitioner to testify falsely.  *See Napue*, 360 U.S. at 269.

19  Additionally, as discussed above, Petitioner cannot establish prejudice.  In sum, the PCR

20  court's denial of relief on Claim 2 was not contrary to or an unreasonable application of the

21  principles enunciated in *Giglio* and *Napue*.

22         Claims 1 and 2 will be denied.

23                 **Claim 3 – Consistency Clause of Norton Plea Agreement**

24         Petitioner asserts that Martin Norton's trial testimony, pursuant to a plea agreement

25  containing a "consistency clause," denied him a fair trial and due process of law.  (Dkt. 13

26  at 34-35; Dkt. 65 at 23-25; Dkt. 83 at 51-52.)  This claim was raised in Petitioner's 1994 PCR

27  petition (ROA-PCR, Vol. 7, Reply in Supp. of Rule 32 Pet. at 1-6), and denied on the merits

28

1   (ROA-PCR, Vol. 1 of 1, ME 11/21/96 at 6-8).[5]  The Arizona Supreme Court denied review

2   without comment.  To the extent Petitioner is reiterating the arguments of Claims 1 and 2

3   (*see* Dkt. 65 at 22), those issues are without merit for the reasons discussed above.

4            Petitioner does not cite (*see* Dkt. 65 at 23-25; Dkt. 83 at 51-52), and the Court has not

5   identified, any Supreme Court or federal law holding that testimony by accomplice witnesses

6   pursuant to consistency clauses in plea agreements violates the Due Process Clause of the

7   Fourteenth Amendment.  Because there is no clearly established Supreme Court law holding

8   that accomplice testimony predicated on "consistency clause" provisions in plea agreements

9   violates federal due process under the Fourteenth Amendment, Petitioner cannot obtain

10  habeas relief on this claim.  *Musladin*, 127 S. Ct.  at 654 (denying habeas relief in absence

11  of clearly established federal law); *Williams*, 529 U.S. at 381 (noting that habeas relief

12  cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a

13  constitutional principle advanced by a petitioner); 28 U.S.C. § 2254(d)(1).

14           In bringing this claim, Petitioner appears to be seeking relief on a state law issue,

15  which is not reviewable by this Court.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

16  Additionally, he is not entitled to relief based on the state law he cites.  When he raised this

17  claim in his fourth PCR petition, Petitioner argued that it was appropriate for a successive

18  PCR petition because *State v. Fisher*, 176 Ariz. 69, 859 P.2d 179 (1993), constituted a

19  change in the law that he contended should apply retroactively.  (ROA-PCR, Vol. 7, Reply

20  in Supp. of Rule 32 Pet. at 1-6.)  In *Fisher*, the Arizona Supreme Court determined that

21  "'consistency provisions' in plea agreements are unenforceable" because they "undermine

22  the reliability and fairness of the trial and plea bargaining processes and taint the truth-

23  seeking function of the courts by placing undue pressure on witnesses to stick with one

24  version of the facts regardless of its truthfulness."  176 Ariz. at 73, 74, 859 P.2d at 183, 184.

25

26           [5]       Petitioner first raised this claim in his third PCR petition filed in 1987.  (Dkt.

27  26, Attach. at 29-30.)  The 1987 PCR court denied relief in summary fashion.  (ROA-PCR,
    Vol. 1 of 1, ME 2/10/88 at 1.)  Petitioner raised the claim again in his 1994 PCR petition

28  arguing a change in the law supported reconsideration.

1    The PCR court held that *Fisher* could not be applied retroactively; therefore, consistency

2    clauses were legal in Arizona prior to *Fisher*. (ROA-PCR, Vol. 1 of 1, ME 11/21/96 at 6-8.)

3    The Arizona Supreme Court summarily denied review. Petitioner does not refute the PCR

4    court's statement that consistency clauses in plea agreements were legal in Arizona at the

5    time he was tried.[6] Thus, even if a state prohibition on consistency clauses could violate

6    federal due process, it did not do so here. Petitioner is not entitled to relief on Claim 3.

7                    **Claims 4 and 16 – Petitioner's Right to Remain Silent**

8            In Claim 4, Petitioner asserts that his right to remain silent under the Fifth, Sixth, and

9    Fourteenth Amendments was violated when police detectives questioned him after he told

10   them he did not wish to answer questions. (*See* Dkt. 13 at 35.) In Claim 16, Petitioner

11   asserts these constitutional rights were again violated when the prosecutor commented during

12   her closing argument that Petitioner failed to deny involvement in Maya's murder to the

13   police. (*Id.* at 38.)

14           Petitioner contends that he made it clear to officers after his arrest that he did not want

15   to answer questions. He asserts that the officers nevertheless continued to question him and,

16   as result, he "eventually made incriminating statements on which the State relied at trial."

17   (Dkt. 83 at 54.) He contends that any statements made during these interrogations "were

18   involuntary and should have been inadmissible" because he told officers he did not want to

19   answer questions.  (Dkt. 13 at 35; Dkt. 83 at 54.)

20           <u>Suppression Hearing in State Court</u>

21           Just prior to trial, the state court held a suppression hearing to consider whether the

22   statements made by Petitioner during post-arrest interrogations on November 17 and 18,

23   1981, were voluntary. Detective Thomas Neus and Officer Gordon Costa testified that they

24   _____

25           [6]    The Court disagrees that *Fisher* determined consistency clauses in plea

26   agreements violate federal due process. In fact, the court avoided this question altogether,
     holding simply that such provisions are "unenforceable" under Arizona law. *See Fisher*, 176

27   Ariz. at 73, 859 P.2d at 183.  Regardless, under the AEDPA, there must be clearly
     established Supreme Court law on point for Petitioner to obtain relief. *See Musladin,* 127

28   S. Ct. at 654; *Williams*, 529 U.S. at 381.

questioned Petitioner separately on November 17, 1981.  Officer Michael Butler stated that he was present with Detective Neus during one interview with Petitioner.  Each testified that Petitioner was informed of his *Miranda* rights, stated that he understood these rights, and agreed to talk.  Each stated that Petitioner did not appear intoxicated.[7]  (RT 6/23/82 at 8-14, 16-23, 36-39.)  Officer Butler testified that Petitioner did not request an attorney at any time he was present during questioning and did not refuse to answer any questions.  (*Id*. at 12, 20.) Officer Costa also testified that Petitioner never requested an attorney or refused to answer any questions.  (*Id.* at 38-39.)  Officers Butler and Costa also stated that Petitioner was not coerced into answering questions.  (*Id.* at 12, 38.)

Detective Neus testified Petitioner did not request a lawyer during his questioning. (RT 6/23/82 at 20.)  Neus stated that he made no threats or promises to get Petitioner to answer questions.  (*Id*.)  He also testified that Petitioner never told him he did not wish to talk to him, but did tell him he did not want to answer any questions concerning Juan Maya's disappearance or how he came into possession of Maya's car because he was fearful of others who were involved in these matters. (*Id.* at 21.)  Neus testified that Petitioner continued to answer other questions.  (*Id.*)

Officer David Owen testified that he was present during an interview conducted by Detective Bob Brunansky on November 18, 1981.  Owen testified that Petitioner was Mirandized and stated he understood his rights.  He also testified that Petitioner did not appear to be intoxicated or under the influence of drugs and that no threats or promises were made to get him to answer questions.  (RT 6/23/82 at 31-32.)  Owen testified that Petitioner was "annoyed" and "evasive" during questioning.  He stated that Petitioner did not refuse to answer any questions but told them to ask Detective Neus if they wanted to know about the forgery charge because he had answered those questions the day before when questioned by Neus.  (*Id.* at 32.)  Owen testified that at one point during questioning Petitioner stated he had

---

[7]      Petitioner himself stated he was not under the influence of drugs or alcohol when he was interviewed by Detective Neus.  (RT 6/23/82 at 41.)

1    not talked to an attorney and did not want to talk to them any more.  At that point, all
2    questioning stopped.  (*Id.* at 33.)

3          Petitioner testified last.  He noted that Detective Neus first questioned him about the
4    forgery.  He stated Neus then asked questions "about the whereabouts of the person whose
5    car it was [he had]" and he told him he didn't want to talk about it.[8]  (RT 6/23/82 at 40.)  On
6    cross-examination, Petitioner acknowledged that he never asked to cease all questioning:

7          [Prosecutor]: You didn't indicate to [Neus] that you didn't absolutely want to
           talk to him?
8
9          [Petitioner]: Well, I'm not very well versed in these procedures.  But I really
           didn't want to answer any questions pertaining to the vehicle . . .

10         [Prosecutor]: But you would answer other questions, you answered questions
           about the forgery?
11
12         [Petitioner]: Yes.

13         [Prosecutor]: And you didn't ask for an attorney?

14         [Petitioner]: No.

15         [Prosecutor]: And you didn't just shut up?

16         [Petitioner]: Well, at certain points I wouldn't say anything for awhile, but
           they would just proceed asking me questions.

17         [Prosecutor]: And then you would answer them?

18         [Petitioner]: Well, if they asked me a question that I felt should be answered
           I would answer it.
19
20         [Prosecutor]: So when you're saying you didn't want to answer some questions
           you would answer part of the questions, you wanted to pick and choose which
           question that you wanted to answer; correct?
21
22         [Petitioner]: I wanted to answer the questions that I felt I should answer.

23         [Prosecutor]: I see.  And you wanted to be the one in control of which ones
           you were going to answer?
24
           [Petitioner]: Not necessarily.  Just certain questions I didn't want to answer.
25
           [Prosecutor]: But others you would?
26

27
           _____
28         [8]    Petitioner was originally arrested on forgery charges relating to trying to cash
      a convenience check in Juan Maya's name.  The other charges were brought subsequently.

1    [Petitioner]: Yes.

2  (RT 6/23/82 at 42-43.)

3       Following all testimony, the trial court ruled from the bench, stating simply that it

4  found the statements made by Petitioner to officers during these post-arrest interviews "to

5  be made voluntarily."  (RT 6/23/82 at 46.)

6       Analysis

7       In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that any prisoner

8  in custodial interrogation must be informed of his right to remain silent, as well as his right

9  to an attorney and to have the attorney present during questioning.  In addition:

10         Once warnings have been given, the subsequent procedure is clear.  If the
           individual indicates in any manner, at any time prior to or during questioning,
11         that he wishes to remain silent, the interrogation must cease . . . .  If the
           individual states that he wants an attorney, the interrogation must cease until
12         an attorney is present.

13  *Miranda*, 384 U.S. at 473-74.  In *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), the Court

14  held that "after being advised of his *Miranda* rights, the accused may himself validly waive

15  his right and respond to interrogation."  Any waiver must be voluntary, knowing, and

16  intelligent.  *Id.* at 483.

17       Butler, Neus, and Costa testified Petitioner was advised of his rights during interviews

18  conducted by them on November 17, 1981, seemed to understand them, agreed to answer

19  questions, and at no time requested an attorney.  (RT 6/23/82 at 12, 19-20, 38-39.)  Officer

20  Owen testified that Petitioner did request an attorney during the course of an interview

21  conducted on November 18, 1981, and that when the request was made all questioning

22  ceased.  (*Id.* at 32-33.)  Petitioner conceded he was Mirandized prior to his interviews with

23  police.  (*Id.* at 39-40.)  He also stated he was not intoxicated at the time of the interviews.

24  (*Id.* at 41.)  Although Petitioner indicated he did not wish to answer certain questions, he

25  conceded he did not categorically refuse to answer all questions, only questions related to

26  Maya's disappearance and how he came into possession of Maya's car.  (*See id.* at 42-43.)

27  He stated he did not want to answer questions on these latter topics because he was fearful

28  of those who were involved.  (*Id.* at 12, 20, 42.)  He does not dispute Officer Owen's

- 25 -

1  testimony that all questioning ended once he told Owen and Brunansky he wanted to talk

2  with an attorney and stop talking to them.  (*Id.* at 33.)

3       In light of the officers' testimony and Petitioner's own statements at the suppression

4  hearing, the PCR court's denial of relief was not objectively  unreasonable in light of the

5  principles outlined in *Miranda* and *Edwards*.  Based on this testimony, the PCR court could

6  reasonably have concluded Petitioner did not indicate a desire to cease all questioning prior

7  to the time he told Brunansky and Owen he wanted to talk to a lawyer and stop the

8  questioning and that his statements to police up to that point were knowing, voluntary, and

9  intelligent.  *See Edwards*, 451 U.S. at 483; *see also Davis v. United States*, 512 U.S. 452,

10  459 (1994) (holding that an "ambiguous or equivocal" desire for an attorney did not invoke

11  right to silence requiring cessation of questioning).

12       In Claim 16, Petitioner alleges that the state violated his constitutional right to remain

13  silent when the prosecutor remarked during closing that he remained silent and did not deny

14  involvement in the crime.  (Dkt. 13 at 38; Dkt. 83 at 60.)  During closing argument, the

15  prosecutor stated as follows:

16           And then he was arrested and taken downtown and he was talked to by
            detectives, and he was told that because he had Juan Maya's possessions and
17           personal belongings, and Juan Maya was missing, that he could be charged
            with homicide.
18
              What did he respond?  Did he say: Hey, I didn't do it?  No, it wasn't me.
19           You've got the wrong person.  I may have his credit cards, I may have had his
            car, and I may have had his clothes and his belt, but I did not do it.  No.  He
20           didn't say that.

21              What did he say?  He said, "You've got to prove it in Court.  You've got
            to have the body."  Why did he say that? . . . .
22
(RT 6/30/82 at 18.)

23
         Upon review of the record, the Court does not believe the state PCR court's denial
24
  of relief on this claim was objectively unreasonable in light of pertinent Supreme Court
25
  precedent.  *See Griffin v. California*, 380 U.S. 609 (1965) (holding that the Fifth and
26
  Fourteenth Amendments prohibit the prosecution from commenting on an accused's
27
  silence).  Petitioner did not remain silent during pre-trial interviews with police and the
28

prosecutor did not comment on Petitioner's silence; rather, she recounted one of his statements to police. The prosecutor's reference to one of those statements did not violate Petitioner's federal constitutional rights.

### Claim 6 – Prosecution References to Petitioner's Prior Felony Convictions and Alleged "Escapee" or "AWOL" Status

Petitioner contends that on several occasions at trial the prosecution either referred to or elicited testimony about his prior convictions. He asserts "[t]he admission and the State's repeated references [to] [his] prior felony convictions denied [him] his right to a fair trial under the Fifth, Sixth and Fourteenth Amendments." (Dkt. 13 at 35; *see also* Dkt. 65 at 31-34.) Petitioner cites the following examples: the prosecutor's reference in her opening statement to Petitioner being "AWOL from the [Maricopa County Jail] Work Furlough Program" at the time of Maya's murder (Dkt. 65 at 32); the prosecutor's comment during her closing argument that police would have been looking for Petitioner at the time of the murder due to his AWOL status (*id.* at 32-33); trial testimony from Detective Thomas Neus elicited by the prosecution wherein Neus stated Petitioner told him during an interview that he wanted Maya's car so he could get out of state because he was a "walk-away" from the work furlough program (RT 6/23/82 at 39); and Daniel McIntosh's testimony, both on direct examination and on cross-examination, that Petitioner wanted the car so he could leave the state because "he escaped from the Durango facility" (*see* RT 6/28/82 at 13, 37).

On direct appeal, the Arizona Supreme Court, citing *State v. Ferguson*, 120 Ariz. 345, 586 P.2d 190 (1978), and Arizona Rule of Evidence 404(b), agreed that references to Petitioner's escape status were tantamount to informing the jury of his prior convictions. *Libberton*, 141 Ariz. at 137, 685 P.2d at 1289. However, the court held that the references were nevertheless admissible to show motive – specifically, to show that Petitioner wanted the car and money to leave the state and avoid capture, and that he killed the victim to hinder detection of the theft. *Id.* at 138, 685 P.2d at 1290.

This Court may only grant habeas relief on a claim alleging erroneous admission of evidence if the error "so infected the entire trial that the resulting conviction violates due

process." *Estelle*, 502 U.S. at 72.  Rule 404(b) of the Arizona Rules of Evidence provides that evidence of other "crimes, wrongs or acts" is admissible to show "proof of motive."  The witnesses testified that Petitioner told them he wanted Maya's car so he could leave the state because of his escapee status.  (*See* RT 6/23/83 at 39; RT 6/28/82 at 13.)   Therefore, the court's conclusion that references to Petitioner's escapee status from the prison work furlough program established a motive for Petitioner's participation in the crimes against Maya was reasonable and the admission of the evidence was not erroneous.  Under these circumstances, Petitioner has not established that the references to his escapee status violated his right to due process of law under the federal constitution.

### Claim 7 – Trial Court Failed to Give Cautionary Instructions About Petitioner's Prior Convictions and AWOL Status

Petitioner contends that his due process right to a fair trial under the Fifth and Sixth Amendments was violated when the trial court failed "to give an immediate cautionary instruction and an instruction at the conclusion of the evidence that evidence of Petitioner's prior convictions was admissible only to show motive."  (Dkt. 13 at 36; Dkt. 65 at 34.) Petitioner concedes that defense counsel did not request such an instruction, but argues the trial court should have provided the instruction *sua sponte.*  (*See* Dkt. 65 at 34.)

Petitioner has failed to cite any clearly established federal law holding that the trial court's failure to give such a motive instruction, *sua sponte*, violated due process of law.  In the absence of such authority, Petitioner's conclusory assertion is without merit and will be denied. *Musladin*, 127 S. Ct. at 654; *Williams*, 529 U.S. at 381.

### Claim 11 – Trial Court Failed to Instruct on Lesser Included Offenses

Petitioner contends the trial court violated his federal constitutional rights by failing to instruct the jury on the lesser-included offense of second degree murder.  (Dkt. 13 at 37.) Specifically, he contends that evidence at trial, including evidence of the circumstances surrounding the crime as testified to by Martin Norton, and evidence of Petitioner's intoxication, negates the element of premeditation.  (*See* Dkt. 65 at 29-30; Dkt. 83 at 58-59.)

A capital defendant is entitled to an instruction on a lesser-included offense "if the

1   evidence would permit a jury rationally to find him guilty of the lesser offense and acquit

2   him on the greater." *Beck v. Alabama*, 447 U.S. 625, 635 (1980) (quoting *Keeble v. United*

3   *States*, 412 U.S. 205, 208 (1973)).  The Supreme Court held that this safeguard is necessary

4   because "when evidence unquestionably establishes that the defendant is guilty of a serious,

5   violent offense – but leaves some doubt with respect to an element that would justify

6   conviction of a capital offense – the failure to give the jury the 'third option' of conviction

7   on a lesser included offense would seem inevitably to enhance the risk of an unwarranted

8   conviction."  *Id.* at 637.  An instruction on a lesser-included offense is required by due

9   process only if warranted by the evidence.  *Hopper v. Evans*, 456 U.S. 605, 611 (1982).

10   At the outset, the Court notes that the trial court instructed the jury on two theories of

11   first-degree murder: premeditated murder and felony murder.  *See State v. Tucker*, 205 Ariz.

12   157, 167, 68 P.3d 110, 120 (2003) ("There is only a single crime of first degree murder. . .

13   . Felony murder is not a separate offense  . . . rather they are simply two forms of first degree

14   murder.")  Because "[n]o lesser-included homicide offense exists for felony murder . . . the

15   trial court did not err by failing to so instruct on the felony murder theory."  *State v. Lopez*,

16   163 Ariz. 108, 112, 786 P.2d 959, 963 (1990).

17   Under Arizona law, second degree murder is a lesser-included offense of premeditated

18   first degree  murder.  Only premeditation distinguishes this crime from the lesser-included

19   offense of second degree murder.  *See State v. Marvin*, 124 Ariz. 555, 557, 606 P.2d 406, 408

20   (1980); *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986).  A defendant kills with

21   premeditation if he "acts with either the intention or the knowledge that he will kill another

22   human being, when such intention or knowledge precedes the killing by a length of time to

23   permit reflection.  An act is not done with premeditation if it is the instant effect of a sudden

24   quarrel or heat of passion."  A.R.S. § 13-1101(1).  A period of reflection of "any length of

25   time" after forming the intent to kill is sufficient to show premeditation.  *Clabourne v. Lewis*,

26   64 F.3d 1373, 1380 (9th Cir. 1995).

27   Petitioner cites evidence at trial indicating he was intoxicated during the relevant time

28   period.  Even assuming evidence was presented of his voluntary intoxication at the time of

the crimes, this is not sufficient, as a matter of law, to negate premeditation.  In *State v. Schurz*, 176 Ariz. 46, 54-55, 859 P.2d 156, 164-65 (1993), the Arizona Supreme Court noted that under A.R.S. § 13-503, "the jury may consider voluntary intoxication in determining culpable mental state only when the culpable mental state of 'intentionally or with the intent to' is a necessary element of the offense."  *See also State v. Ramos*, 133 Ariz. 4, 5, 648 P.2d 119, 120 (1982) (in light of the passage of § 13-503 "the jury may consider [voluntary] intoxication only if the crime charged requires the culpable mental state of intentionally or with the intent to.")  The *Schurz* court further noted that under A.R.S. § 13-1105(A)(1) the culpable mental state for murder in the first degree is "[i]ntending or knowing that his conduct will cause death."  176 Ariz. at 54-55, 859 P.2d at 164-65.  These statutory provisions were passed in 1980 and were in effect at the time of Maya's murder.  *See Ramos*, 133 Ariz. at 5, 648 P.2d at 120.  Prior to the passage of these laws, "the jury could consider voluntary intoxication on the question of malice aforethought which was then an essential element of murder."  *Schurz*, 176 Ariz. at 54, 859 P.2d at 164.  However, as noted  in *Schurz*, A.R.S. §§ 13-503 and 13-1105(A)(1), "have changed all that."  *Id.*  In light of these statutory changes, the court stated:

> The question before us is whether voluntary intoxication is material because the charge against the defendant is "intending or knowing rather than merely 'knowing.'"  Knowing is a less culpable mental state  than intent but is included within it so that whenever a jury determines that a defendant has acted intentionally, it has necessarily concluded that he acted knowingly.  A.R.S. § 13-202(C).  *Having concluded that the defendant acted knowingly, the jury may not consider voluntary intoxication with respect to the defendant's culpable mental state.  It follows that the giving of a voluntary intoxication instruction in a murder case in which both intent and knowing are alleged would be improper.*  It would be plainly violative of A.R.S. § 13-503.  In short the "intending" component of an allegation of "intending or knowing" is superfluous.  The jury should never reach the question of intent and, thus, the voluntary intoxication instruction would always be erroneous.  As a matter of logic and statutory construction, an allegation of "intending or knowing" is indistinguishable from an allegation of "knowing."  An inexorable  result of the statute, then, is that voluntary intoxication under A.R.S. § 13-503 will be considered by the jury only when intent is alleged and knowing is not alleged.

*Id*. at 55, 859 P.2d at 165 (emphasis added); *Lopez*, 163 Ariz. at 112, 786 P.2d at 963 ("[T]he jury may consider voluntary intoxication to negate the mental state of 'intentionally' but not the mental state of 'knowingly.'"); *see also Ramos*, 133 Ariz. at 6, 648 P.2d at 121

1   (upholding federal due process challenge to A.R.S. § 13-503).

2          In light of the provisions in A.R.S. §§ 13-503 and 13-1105(A)(1), the holdings of the

3   Arizona Supreme Court in *Schurz*, *Lopez* and *Ramos*, and the fact that the trial court

4   instructed the jury that the proper mental state in support of premeditated first degree murder

5   is that the defendant "intended *or* knew" his conduct would cause the death of another (*see*

6   RT 6/30/82 at 41), voluntary intoxication does not negate a finding of first degree murder.

7   Therefore, Petitioner was not entitled to a second degree murder instruction based on the

8   claim he was intoxicated.

9          Petitioner cites other evidence that he claims supported a lesser-included second

10  degree murder instruction.  Specifically, he asserts that Martin Norton testified that he and

11  Petitioner "stood by while James first shot toward the victim's chest and tried to fire a second

12  shot, but the gun was malfunctioning.  The victim then began grappling with James for the

13  gun.  Only at that point did Petitioner intervene. . . .  Based on that testimony – which was

14  the only evidence of Petitioner's involvement in the murder – a jury could well find that

15  Petitioner did not premeditate his actions."  (Dkt. 65 at 29-30.)

16         The allegation that Petitioner reacted impulsively in participating in Maya's killing

17  once James and the victim began struggling at the murder site is speculative, at best, and

18  contrary to the evidence presented at trial.  In fact, other significant evidence supports the

19  court's decision not to give a second degree murder instruction.  For instance, Norton

20  testified that over a period of several hours, beginning while they were still in Phoenix at

21  James's trailer, Petitioner and James agreed they should kidnap Maya, take him in his car to

22  an abandoned mineshaft in Salome, and kill him there.  (RT 6/28/82 at 26-27.)  Additional

23  testimony from Norton revealed that Petitioner personally held a gun on Maya for the

24  duration of the trip to Salome and threatened to shoot him if he made any noise or called for

25  help when they were pulled over by a patrol officer during that trip.  (*Id.* at 30-31.)  Norton's

26  testimony supports a conclusion that Petitioner participated in the planning and execution of

27  Maya's murder and that this took place over a long period of time (several hours), ample time

28  for Petitioner to reflect on the deed.  *See  State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d

420, 248 (2003) (circumstantial evidence that may prove premeditation includes "threats made by the defendant to the victim, a pattern of escalating violence between the defendant and the victim, or the acquisition of a weapon by the defendant before the killing."); *see also Clabourne*, 64 F.3d at 1380 (a period of reflection of "any length of time" after forming the intent to kill is sufficient to show premeditation.)

In light of the fact the trial court instructed the jury that premeditated murder required either the intent or knowledge that he would cause the death of another (*see* RT 6/30/82 at 41; *see also Schurz*, 176 Ariz. at 55, 859 P.2d at 165; *Lopez*, 163 Ariz. at 112, 786 P.2d at 963), together with the evidence of Petitioner's active participation, over a period of several hours, in the events leading to Maya's execution, the PCR court's denial of relief on this issue was not objectively unreasonable under the principles outlined in *Beck*. *See Hopper*, 456 U.S. at 611 ("due process requires that a lesser-included offense instruction be given *only* when the evidence warrants such an instruction.")

### Claim 20 – Trial Court Failed to Consider and Give Effect to All Relevant Mitigating Evidence

Petitioner contends that the trial court refused to consider the following mitigating evidence at sentencing: (1) his youth; (2) his impulsive conduct, inability to premeditate, and abusive childhood; (3) the state's failure to give him promised psychiatric treatment; (4) his lack of a previous record of violence; (5) the fact that his prior felony record stemmed from his abusive father filing charges against him; and (6) the fact that his conduct was that of a follower and that he did not initiate the crime.  (Dkt. 13 at 39; *see also* Dkt. 65 at 36-39.)

The record does not indicate that the parties filed sentencing memoranda prior to the mitigation hearing.  It is Petitioner's contention that all of the mitigating circumstances at issue were presented to the sentencing court but the court simply failed to consider them.  (*See* Dkt. 65 at 36-39.)  At sentencing, the trial court stated:

As to mitigating circumstances, the Court finds the following:

1) The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was not significantly impaired and certainly not so impaired as to constitute a defense to prosecution.

2) The defendant was not under unusual or substantial duress.

3) The defendant was one of the individuals who actually committed the offense and was not found guilty by reason of being legally accountable for the conduct of another person, the provision of A.R.S. § 13-303, therefore, this mitigation does not exist.

4) The defendant could have seen that his conduct in the course of the commission of the offense for which the defendant was convicted would cause or create a grave risk of causing death to another person, therefore, this mitigating circumstance does not exist.

5) The Court does not find that the defendant's age, to wit, 20 years of age at the time of the offense and 21 at the time of Sentencing could be a mitigating circumstance.

6) The Court does not find any other mitigating circumstances.

(RT 10/25/82 at 7-8.) Upon making these findings, the sentencing court concluded that death was the appropriate sentence, finding "there are no mitigating circumstances significantly substantial [to warrant a lesser sentence]." (*Id.*)

The Arizona Supreme Court upheld the trial court's findings, stating:

The appellant urged several non-statutory mitigating circumstances: that he is a follower and merely followed the lead of James in committing the murder, that he had been promised but was never given psychological care while in custody previously, that he was young (20 years) at the time of the crime, that he has no previous record of violence, and that he would not have a juvenile record were it not for his own father filing charges against him.

In response, we first note that from the beginning the appellant actively participated in the crime, and even pointed the gun at Maya on the way to Salome. Second, there is no evidence that appellant's ability to appreciate the wrongfulness of his acts was substantially impaired. Third, the sentencing court specifically found that the appellant's age was not a mitigating factor. Considering the deliberation involved in the crime, and the duration of the crime, we agree that the appellant's age is not a sufficient factor to call for leniency. [Citation omitted.] Finally, we agree with the trial court that all of appellant's claimed mitigating circumstances, considered as a whole, are not sufficiently substantial to call for leniency.

*Libberton*, 141 Ariz. at 140, 685 P.2d at 1292.

Under clearly established federal law, the sentencing court is required to consider any mitigation offered by Petitioner, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996). However, it is up to the sentencer and the state appellate courts to determine the weight to be given the mitigation evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982); *Ceja*,

- 33 -

97 F.3d at 1251.

The trial court did not categorically exclude the presentation or consideration of any type of mitigation. *See Eddings*, 455 U.S. at 113-14 (holding that court may not refuse to consider mitigating evidence as a matter of law); *Lockett*, 438 U.S. at 608 (holding that statute may not categorically exclude consideration of mitigating evidence). Petitioner has presented nothing to indicate the court did not consider all relevant mitigation (*see* RT 10/25/82 at 7-8); in the absence of such an indication, "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overturned on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). The heart of Petitioner's contention appears to be that the Arizona courts were obligated to find the evidence he presented to be mitigating. The Constitution does not require such a finding. There is a distinction between "a failure to consider relevant evidence and a conclusion that such evidence was not mitigating"; the latter determination does not implicate the Constitution. *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006).

Moreover, the Arizona Supreme Court independently reviewed Petitioner's proffered mitigation and agreed that "appellant's mitigating circumstances, considered as a whole, are not sufficiently substantial to call for leniency." *Libberton*, 141 Ariz. at 140, 685 P.2d at 1292. Even if the trial court had committed constitutional error at sentencing, a proper and independent review of the mitigation and aggravation by the Arizona Supreme Court cured any such defect. *See Clemons v. Mississippi*, 494 U.S. 738, 750, 754 (1990) (holding that appellate courts are able to fully consider mitigating evidence and are constitutionally permitted to affirm a death sentence based on independent re-weighing despite any error at sentencing).

Under these circumstances, Petitioner has not demonstrated the PCR court's denial of relief on these issues was objectively unreasonable in light of the principles outlined in *Lockett* or *Eddings*. This claim must fail.

### Claim 21 – Trial Court Improperly Considered Evidence of Petitioner's Felony Record

Petitioner contends the trial court improperly considered his two prior non-violent felony convictions as an aggravating circumstance in imposing a death sentence, in violation of his Eighth and Fourteenth Amendment rights.  He cites the fact that the trial court admitted testimony about these crimes and, just prior to imposing the death penalty, "noted that '[t]he defendant was on probation at the time he committed the offense.'"  (Dkt. 65 at 39; *see also* Dkt. 13 at 39-40.)

"Non-statutory" aggravation evidence is not recognized in Arizona; the only aggravating circumstances allowed to support a death sentence are enumerated in the governing statute, A.R.S. § 13-703(F), and the sentencing court may only consider evidence in aggravation that tends to establish a statutory factor.  *State v. Gulbrandson*, 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995); *State v. Atwood*, 171 Ariz. 576, 673, 832 P.2d 593, 656 (1992), *overturned on other grounds by State v. Nordstrom*, 200 Ariz. 229, 25 P.3d 717 (2001).  Absent evidence to the contrary, a judge is presumed to focus only on relevant sentencing factors.  *State v. Beaty*, 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988).

The record does not support the conclusion that the sentencing court considered Petitioner's prior felony convictions in imposing a death sentence.  The court did note that petitioner was on probation at the time he committed the crimes against Maya.  (RT 10/25/82 at 5.)  However, Petitioner's probationary status arose as the court considered whether to impose aggravated and consecutive sentences for Petitioner's *non-capital crimes*, not as an aggravating circumstance with respect to imposition of the death penalty.  (*See id.*)  This conclusion is bolstered by the court's citation to A.R.S. § 13-702(b), which deals with aggravating circumstances related to *non-capital* crimes.  In sum, review of the sentencing transcript shows that the state court did not use Petitioner's prior felonies and probation status as an aggravating factor in imposing the death penalty.  This claim will be denied.

**Claim 22 – Trial Court Improperly Considered Sentencing Recommendations from Victim's Family**

Petitioner next contends that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated because "[t]he trial court considered a Presentence Report in sentencing [him] to death" and the report contained recommendations from family members and the probation officer who authored the report that Petitioner be sentenced to death. (Dkt. 65 at 35.)

In the Presentence Report ("PSR"), the author recounted the views of four of Maya's relatives on the terrible impact his murder had upon them and their family. The author further stated that each of the four recommended that Petitioner be given a death sentence. (ROA, Vol. 2, Item 139 at 2-3.) The PSR author recommended that Petitioner be given the "maximum" sentence permitted by law. (*Id.* at 7, 8.)

As an initial matter, when Petitioner was sentenced in 1982, there was no clearly established Supreme Court law governing the admission of victim evidence. Petitioner relies on the cases of *Booth v. Maryland*, 482 U.S. 496, 509 (1987), and *Payne v. Tennessee*, 501 U.S. 808, 825, 827 (1991), both of which were decided after he was sentenced. In the absence of clearly established Supreme Court law, the state court decision denying this claim was not objectively unreasonable. *Musladin*, 127 S. Ct. at 654 (denying habeas relief in absence of clearly established federal law).

Moreover, the sentencing transcript and Special Verdict clearly establish that the court's determination to impose a death sentence was based upon its finding of two statutory aggravating factors together with its finding that any mitigation was not sufficiently substantial to call for leniency. (*See* RT 10/25/82 at 6-8.) Nowhere in imposing sentence does the court indicate that recommendations from the victim's family or third parties played a role in its determination. (*See id.*) This claim will be denied.

**Claims 24 and 36 – Trial Court Failed to Find Aggravating Factors Beyond a Reasonable Doubt**

In Claim 24, Petitioner asserts his federal constitutional rights were violated when the trial court failed to find the existence of aggravating factors beyond a reasonable doubt.

(Dkt. 13 at 40.) Claim 36 is related, asserting that Petitioner's rights were violated when the trial court failed "to make meaningful findings about the facts, reasoning, and legal principles (e.g., the construction of the cruel, heinous, or depraved aggravator it applied) that allegedly support its decision to impose death"; according to Petitioner, this failure "deprived [him] of meaningful appellate review to ensure that his death sentence was not imposed arbitrarily or irrationally." (*Id.* at 44.)

As noted, the trial court found two aggravating factors justifying the death penalty: that the murder was committed for pecuniary gain and that the offense was especially cruel, heinous or depraved. (RT 10/25/82 at 6.) The court did not expressly state that it found the two aggravating factors proved *beyond a reasonable doubt*. However, the Arizona Supreme Court has held that aggravating circumstances must be proved beyond a reasonable doubt. *State v. Jordan*, 126 Ariz. 283, 286, 614 P.2d 825, 828 (1980). This Court will presume the sentencing court applied the correct standard. *Walton*, 497 U.S. at 653 ("Trial judges are presumed to know the law and to apply it in making their decisions."); *Ceja*, 97 F.3d at 1250 (presuming Arizona courts used a reasonable doubt standard without use of the specific language).

Moreover, the Arizona Supreme Court applied the "beyond a reasonable doubt" standard in its independent review on appeal. *See Libberton*, 141 Ariz. at 139-40, 685 P.2d at 1291-92. Thus, even if the sentencing court failed to apply the correct standard, "a state appellate court may itself determine whether the evidence supports the existence of aggravating circumstances" and, if it so finds, uphold the death sentence. *Walton*, 497 U.S. at 654. The Arizona Supreme Court did just that.

As a separate matter, Petitioner contends the trial court failed to provide sufficient written findings in support of the death sentence, which deprived him of meaningful appellate review. Petitioner's citation to *Dobbs v. Zant*, 506 U.S. 357, 358-59 (1993) is unavailing as it holds only that capital sentences should be reviewed on the entirety of the available record; it does not require a trial court to make any specific findings or record for purposes of appellate review. Because the merits of Petitioner's claim are not squarely

governed by clearly established Supreme Court law, he cannot obtain habeas relief. *Musladin*, 127 S. Ct. at 654 (denying habeas relief in absence of clearly established federal law); *see also Lopez v. Schriro*, ___ F.3d ___, No. 06-99000, 2007 WL 1760589 at *7 (9th Cir. June 20, 2007) (holding there is no established Supreme Court law or constitutional requirement that a particular sentencing record be produced by the trial court).

Furthermore, as previously stated, the Arizona Supreme Court conducted an independent review of Petitioner's death sentence, which included an independent determination of the existence of aggravating and mitigating circumstances. *See Libberton*, 141 Ariz. at 139, 685 P.2d at 1291. The court stated, "we independently review the record to determine the existence or absence of aggravating and mitigating circumstances, and to determine whether the death penalty should be imposed." *Id.* This review was not limited to the sentencing "record" created by the trial court, but extended to the entire evidentiary record. In *State v. White*, the court explained:

> This independent review includes a painstaking search of the entire record for error, an examination of the facts that establish the presence or absence of aggravating and mitigating circumstances, and a separate determination of whether the latter circumstances outweigh the former when both are present.

168 Ariz. 500, 521, 815 P.2d 869, 890 (1991), *abrogated on other grounds by State v. Salazar*, 173 Ariz. 399, 844 P.2d 566 (1992). Because the state supreme court's review is not dependent on the trial court's sentencing record, any alleged deficiencies in that record do not inhibit the state appellate court's constitutional review.

Claims 24 and 36 will be denied.

**Claims 9 and 41 – Improper Vouching**

In Claim 9, Petitioner contends that by presenting witness Martin Norton's plea agreement to the jury and examining him about its contents, the prosecution improperly vouched for his credibility. (Dkt. 13 at 36; Dkt. 65 at 31.) Similarly, in Claim 41, Petitioner argues that a questionnaire given to prospective jurors improperly vouched for Norton's credibility. (Dkt. 13 at 46.) Petitioner asserts that this conduct violated his right to due process of law and a fair trial under the Sixth and Fourteenth Amendments. In

1    addition, Petitioner contends the questionnaire "constituted a charge to the jury and a

2    comment on matters of fact by the court in violation . . . of [his] rights to due process and a

3    fair trial under the Sixth and Fourteenth Amendments." (Dkt. 13 at 46; Dkt. 65 at 31.)

4         Vouching

5         Petitioner cites several examples of improper vouching.  In his amended petition and

6    merits brief, he contends that the State "improperly" introduced Norton's plea agreement into

7    evidence in its case in chief and examined Norton on its contents.  (*See* Dkt. 13 at 36; Dkt.

8    65 at 31.)   The plea agreement states, in pertinent part:

9         (1)   Martin David Norton agrees to testify fully and truthfully in any
               proceedings determined to be necessary by the State of Arizona
10              regarding the victim Juan Maya and/or in any criminal
               prosecution of Lawrence Keith Libberton or Steven Craig James
11              . . . .

12   (Dkt. 14, Ex. 17 at 1.)  Petitioner did not object and the request for admission was granted.

13   (*See* RT 6/28/82 at 54.)

14        Petitioner also contends that the questionnaire given to prospective jurors vouched for

15   Norton's credibility because it too referred to the fact that Norton was testifying pursuant to

16   a plea agreement requiring truthful testimony.  (Dkt. 13 at 46; Dkt. 65 at 31.)   The

17   questionnaire states, in pertinent part:

18        13. The evidence will further show that Martin Norton has already admitted
           his guilt in juvenile court and has been sentenced as a juvenile.  In return for
19         the State's agreement that he should be sentenced as a juvenile with a
           maximum incarceration time of up to the age of 18 years, Martin Norton has
20         agreed to testify truthfully in all proceedings necessary against Lawrence K.
           Libberton and Stephen C. James.  Do you believe that such a plea agreement
21         is unfair to either Lawrence K. Libberton or Stephen C. James?

22                   Yes ___ No ___

23   (Dkt. 14, Ex. 12 at 4.)

24        Petitioner next contends that the prosecutor engaged in improper vouching when she

25   exhorted jurors at opening to "[s]it and listen to Martin Norton testify truthfully." (*See* Dkt.

26   83 at 55; RT 6/23/82 at 13.)  He also asserts that the court engaged in improper vouching by

27   "telling jurors from the bench that 'Martin Norton has agreed to testify truthfully in all

28   proceedings necessary against [Petitioner].'" (Dkt. 65 at 31; RT 6/21/82 at 6.)

1    Prosecutorial misconduct occurs when a prosecutor vouches for the credibility of a

2  witness.  *United States v. Young*, 470 U.S. 1, 18-19 (1985); *Lawn v. United States*, 355 U.S.

3  339, 359-60 n.15 (1958); *United States v. Berger*, 295 U.S. 78, 86-88 (1935).  "Vouching

4  consists of placing the prestige of the government behind a witness through personal

5  assurances of the witness's veracity, or suggesting that information not presented to the jury

6  supports the witness's testimony."  *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th

7  Cir. 1993) (citing *Unites States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991); *United States*

8  *v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)).  In *Necoechea*, the Ninth Circuit noted:

9            Vouching is especially problematic in cases where the credibility of witnesses
             is crucial, and in several cases applying the more lenient harmless error
10           standard of review, [courts] have held that such prosecutorial vouching
             requires reversal. [Citation omitted.] At the same time, we have recognized
11           that prosecutors must have reasonable latitude to fashion closing arguments,
             and thus can argue reasonable inferences based on the evidence, including that
12           one of the two sides is lying. [Citations omitted.]

13  986 P.2d at 1276.

14    To warrant habeas relief, Petitioner must show that any vouching "so infected the trial

15  with unfairness as to make the resulting conviction a denial of due process."  *Darden v.*

16  *Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637

17  (1974)); *see also Davis v. Woodford*, 384 F.3d 628, 643-44 (9th Cir. 2004) (applying *Darden*

18  standard to claims involving prosecutorial misconduct, in particular, prosecutorial vouching).

19    The jury questionnaire's reference to Norton's plea agreement's "truthful testimony"

20  clause, the admission of the plea agreement into evidence during the State's direct

21  examination of Norton, and the prosecutor's exhortation to the jury to listen to Norton testify

22  "truthfully," did inform and remind the jury that Norton signed a plea agreement requiring

23  that he testify truthfully.  Such references can constitute improper vouching.  *See United*

24  *States v. Lew*, 875 F.2d 219, 223 (9th Cir. 1989) (citing *United States v. Wallace*, 848 F.2d

25  1464, 1474 (9th Cir. 1988) for the proposition that "it was improper to allow the prosecution

26  to elicit testimony on direct examination regarding the truthfulness requirement of a plea

27  agreement.")  However, "a reference to the 'truthful testimony' provisions of a witness's

28  agreement with the government does not constitute vouching if it is made in response to an

- 40 -

1  attack on the witness's credibility because of his plea bargain." *United States v. Monroe*, 943

2  F.2d 1007, 1013 (9th Cir. 1991); *see also United States v. Shaw*, 829 F.2d 714, 716 (9th Cir.

3  1987).

4          In this case, the questionnaire, the admission of the plea agreement into evidence, the

5  prosecutor's examination of Norton about its contents, and her exhortation to jurors during

6  opening to "[s]it and listen to Martin Norton testify truthfully," were presented to jurors

7  before any attack by the defense on Norton's credibility; thus, they were not offered in direct

8  rebuttal to defense attacks on his credibility and do not meet the vouching exception set forth

9  in *Monroe* and *Shaw*.  Nevertheless, the Court believes that these references were harmless

10  and, thus, insufficient to warrant habeas relief. *See Brecht v. Abrahamson*, 507 U.S. 619,

11  622-23 (1993) (holding that trial error does not warrant habeas relief unless it "had

12  substantial and injurious effect or influence in determining the jury's verdict.") (quoting

13  *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

14          The Ninth Circuit's decision in *Shaw* is instructive.  In that case, as in this case, the

15  witness's plea agreement and the reference to truthful testimony were referenced *prior* to any

16  attack on the witness's credibility.  The government argued that if such references are

17  permissible to rebut an attack on a witness's credibility, they should not be considered

18  vouching simply because the government anticipates a defense attack on the witness's

19  credibility.  *Shaw*, 829 F.2d at 717.  Addressing this argument, the court stated:

20          There is some logic to the government's argument, but we cannot accept it in
          its entirety.  As we recognized in *[United States v.] Roberts*[, 618 F.2d 530
21          (9th Cir. 1980)], every plea agreement that contains a requirement of truthful
          testimony contains an implication, however muted, that the government has
22          some means of determining whether the witness has carried out his side of the
          bargain. [Citation omitted.] . . . .  When the prosecution refers, as it did here,
23          to the requirement of truthfulness before the issue of bias is drawn, it runs the
          risk that its reference will be interpreted as an attempt to establish truthfulness
24          and suggest verifiability.

25          *We agree, however, with the government that what was said is more important
          than when it was said, at least in a case such as this one where an attack on*
26          *the witness' credibility was almost certain to be forthcoming*. . . .

27          In light of all the circumstances of this case, however, we do not regard the
          statement (or the less suggestive testimony of the witness regarding the plea
28          bargain) as cause for reversal. . . .  We consequently conclude that it is more

probable than not that the vouching did not materially affect the verdict; the error was harmless.

*Shaw*, 829 F.2d at 717-18 (emphasis added).

In light of *Shaw* and the factors outlined in *Necoechea*, any reference to Norton's plea and its "truthful testimony" requirement was harmless and did not so infect the trial with unfairness as to make his subsequent conviction a denial of due process. For instance, the jury questionnaire was designed to determine if jurors would fairly consider Norton's testimony, even though he was young, had pleaded guilty to the crimes, and had received a favorable plea deal. In addition, nothing in the questionnaire or plea agreement, or in the prosecutor's exhortation to jurors to "listen to Martin Norton testify truthfully," implied that she or the trial court were able to discern or had any way of discerning if Norton would in fact testify truthful. In fact, the court specifically instructed the jury that "what the attorneys say to you during Opening Statements is not evidence and is not to be considered by you as evidence." (RT 6/23/82 at 5; *see also* 6/30/82 at 39.) The court also instructed jurors that they "must decide the accuracy of each witness' testimony" taking account of a witness's "ability and opportunity to observe, his memory, manner while testifying, any motive or prejudice he might have, and any inconsistent statements he might have made." (RT 6/30/82 at 39.) Also militating against a finding of unfair vouching is the fact that the court instructed the jury that a witness's felony conviction was relevant in considering his credibility. (*See id.* at 40.)

Finally, as in *Shaw*, although the questionnaire and Norton's plea agreement brought Norton's requirement for truthful testimony to the attention of prospective jurors prior to any attack on Norton's credibility by the defense, it was a virtual certainty that such an attack would be forthcoming. Norton was the only eyewitness to Maya's murder offered by the State, he admitted his own participation in Maya's murder, and had what could be described as a troubled adolescence. In addition, there were multiple inconsistencies between his initial police statements and his December 29, 1981 statement, as well as his trial testimony. Defense counsel's lengthy cross-examination focused almost exclusively on Norton's

1    credibility, highlighting his motive to testify against Petitioner in return for favorable

2    treatment as a juvenile.  (*See* RT 6/29/82 at 178-80; *see also* RT 6/30/82 at 30.)

3         In sum, the references to Norton's plea agreement in the questionnaire, the admission

4    of the plea agreement itself into evidence by the State on direct examination, and the

5    prosecutor's exhortation to jurors to listen to him testify truthfully, even if amounting to

6    vouching, did not "so infect[] the trial with unfairness" as to make his conviction a denial of

7    due process of law.  *See Darden*, 477 U.S. at 181.

8         As a final matter, Petitioner's claim that the trial court "endorsed" Norton's veracity

9    when it told prospective jurors he "agreed to testify truthfully in all proceedings necessary

10   against [Petitioner]" is a mischaracterization.  Review of the record shows that the court was

11   merely reading question no. 13 of the jury questionnaire to a potential juror who had failed

12   to answer it.  (*See* RT 6/21/82 at 6-7.)  The Court does not believe this may be fairly

13   characterized as the trial court's vouching for Norton's truthfulness.  Moreover, if use of the

14   questionnaire's references to Norton's plea and its "truthful testimony" requirement were

15   proper, the trial judge's reading of this question to a prospective juror who forgot to fill in

16   an answer is not improper.

17        The PCR court's denial of relief on these claims was not objectively unreasonable in

18   light of pertinent U.S. Supreme Court precedent.

19        <u>Jury Questionnaire and Commentary on the Evidence</u>

20        Petitioner also contends that the jury questionnaire amounted to "a charge to the jury

21   and a comment on the facts by the court" in violation of his right to due process of law and

22   a fair trial guaranteed by the Sixth and Fourteenth Amendments.[9]  (Dkt. 13 at 46; Dkt. 65 at

23   30-31.)  In particular, he objects to portions of the questionnaire summarizing various

24   background facts including Petitioner's arrest at the bank while attempting to use Juan

25

_____

26        [9]    Petitioner notes that the questionnaire states that prospective jurors should
27   answer all questions "as if they were being asked by the Judge in open court."  (Dkt. 14, Ex.
     12 at 1.)  Thus, he appears to reason that any comment on the facts in the questionnaire is
28   tantamount to a comment on the facts by the court.  (*See* Dkt. 65 at 30-31.)

- 43 -

1    Maya's identification to cash a check; his possession of personal items belonging to Maya;

2    and the reference to the fact that Norton made statements to police incriminating Petitioner

3    and Steven James.  (Dkt. 65 at 30-31; *see also* Dkt. 14, Ex. 12 at 1-2.)  Petitioner also cites

4    a passage stating that the evidence would show Norton was involved in the crimes at issue.

5    (Dkt. 65 at 31; *see also* Dkt. 14, Ex. 12 at 4 (Question No. 12).)

6           Long ago, in *Quercia v. United States*, 289 U.S. 466, 470 (1933), the Supreme Court

7    noted that the privilege of a trial judge to comment on the facts has "inherent limitations."

8    The Court stated:

9            In commenting upon testimony he may not assume the role of a witness.  He
             may analyze and dissect the evidence, but he may not either distort it or add
10           to it.  His privilege of comment in order to give appropriate assistance to the
             jury is too important to be left without safeguards against abuses.   The
11           influence of the trial judge on the jury "is necessarily and properly of great
             weight" and "his lightest word or intimation is received with deference, and
12           may prove controlling."  This court has accordingly emphasized the duty of the
             trial judge to use great care that an expression of opinion "should be so given
13           as not to mislead, and especially that it should not be one-sided"; that
             "deductions and theories not warranted by the evidence should be studiously
14           avoided."

15   *Id.* at 470; *see Powell v. Galaza*, 328 F.3d 558, 564 (9th Cir. 2003) (citing *Quercia* as

16   controlling precedent for analyzing the proper limits on a trial judge's comments to the

17   jury).[10]

18          Even accepting Petitioner's assertion that the questionnaire's account of the

19   background facts equated to a characterization of those facts by the trial court, Petitioner

20   cannot establish a due process violation.  Petitioner has not disputed the veracity of any of

21   the facts he claims were improperly recounted in the questionnaire.  Testimony at trial by

22   Norton and others established these facts.  Petitioner has not alleged, let alone explained,

23   how any of the facts recounted in the questionnaire "distort or add" to the evidence presented

24   at trial.  *See Quercia*, 289 U.S. at 470.  Thus, Petitioner cannot establish that the summary

25   of the background facts in the questionnaire violates the "limitations" placed on a trial

26

27          [10]      Petitioner relies on the case of *United States v. Bland*, 697 F.2d 262, 263-66
     (8th Cir. 1983); however, *Bland* is not controlling and is distinguishable because it involved
28   a trial judge engaging in extensive questioning of a witness on behalf of the prosecution.

judge's comment on the facts outlined in *Quercia*, let alone establish that the recounting of these facts so infected the trial with unfairness that it rendered Petitioner's conviction a denial of due process.  *See Darden*, 477 U.S. at 181.  Therefore, the PCR court's denial of relief was not objectively unreasonable in light of applicable Supreme Court precedent and this claim will be denied.

## B.  CLAIMS OMITTED FROM MERITS BRIEF  (CLAIMS 5, 8, 10, 12-15, 17, 23, 25-26, 31-36,  38 AND 40)

In a prior order addressing "procedural bar and other issues raised by Respondents' answer," the Court explicitly directed Petitioner to file a Merits Brief "limited to one hundred (100) pages, not including attachments, if any, addressing the merits of Claims 1-26, 31-36 and 38-41."  (Dkt. 45 at 18.)  The Court also permitted a Reply to Petitioner's response "limited to fifty (50) pages."  (*Id.*)  Instead of following these instructions, Petitioner filed a forty-one-page Merits Brief, which failed to discuss any aspect of Claims 5, 8, 10, 12-15, 17, 23, 25-26, 31-36, 38, and 40.  Instead, Petitioner "reserved" the right to address these claims in a Reply Brief.  (Dkt. 65 at 2.)   Respondents contend that Petitioner's failure to discuss these claims in his Merits Brief constitutes a failure to comply with a previous order of the Court and, therefore, the Court should consider the claims as having been waived.  (Dkt. 70 at 69-70.)  Petitioner subsequently filed a 100-page "Reply Brief," in which he contested Respondents' contention these claims were waived and proceeded to brief most of these claims (with the exception of Claims 5, 8, and 23).

In following this procedure, Petitioner has utterly failed to comply with the clear directive of the Court and offered no explanation for his actions.  His failure to brief all of his claims as directed limited Respondents' ability to address these claims.  Because the claims were raised in the amended petition, the Court believes the sanction of waiver is too draconian.  However, in light of the limited briefing provided, many of the claims must be addressed in an abbreviated fashion.

**Claim 5 – Police Lacked Probable Cause to Stop Petitioner and the Subsequent Search and Seizure of Evidence Was Unreasonable**

Petitioner alleges there was no probable cause for the search of his person and the car at the time of his arrest, which violated his Fourth Amendment right to be free from unreasonable searches. Petitioner contends the seizure of evidence found as a result of the searches should have been suppressed. (Dkt. 13 at 35.)

In *Stone v. Powell*, 428 U.S. 465, 494 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial." Pursuant to *Stone*, a prerequisite for consideration of Petitioner's Fourth Amendment claim is the denial of the chance to fully and fairly litigate this claim in state court. Other than a self-serving and conclusory allegation in the Amended Petition that he did not have such an opportunity, Petitioner has presented nothing to support this proposition. This claim will be denied.

**Claim 8 – Right to the Same Judge Throughout State Court Proceedings**

Petitioner contends that his right to due process of law and a fair trial under the Fifth and Sixth Amendments was violated when a new judge was substituted during his state court proceedings. Petitioner does not explain how judicial substitution compromised his right to a fair trial. Review of the record indicates that the change of judge occurred on June 22, 1982, the day prior to commencement of trial. The new judge presided over the entire trial and also the sentencing. (*See* ROA, Vol. 1, Item 105 at 2.) Petitioner has cited no Supreme Court precedent holding that substitution of a new judge during state criminal proceedings is a per se violation of his federal due process rights. As a result, the denial of this claim by the PCR court was not a violation of clearly established federal law.[11] *See Musladin*, 127 S. Ct. at 654 (denying habeas relief in absence of clearly established federal law). This claim will be denied.

---

[11]     Petitioner cites, without explanation of its applicability to his case, *Ross v. Reda*, 510 F.2d 1172 (6th Cir. 1975). (*See* Dkt. 13 at 36.)

1

**Claim 10 – Trial Court Failed to Give a Cautionary Instruction About the Contingent Nature of Norton's Plea Agreement and the Unreliability of Accomplice Testimony**

2

3       Petitioner contends that the trial court's failure, *sua sponte*, to instruct the jury "about

4   the nature of Norton's contingent plea agreement and the risk that it created" violated his

5   right to due process and a fair trial under the Sixth and Fourteenth Amendments.  (Dkt. 13

6   at 36; Dkt. 83 at 56.)  Petitioner argues that "[a]ccomplice testimony, like Martin Norton's,

7   is 'inevitably suspect' and 'unreliable.'" (Dkt. 83 at 56.)  He contends that a cautionary

8   instruction to this effect is necessary "where, as here, evidence other than the accomplice's

9   testimony is weak." (*Id.*)  While conceding that defense counsel did not request a cautionary

10   instruction, Petitioner asserts that the state court should have done so *sua sponte*, because

11   "[t]he State's case depended upon [the witness's] credibility." (*Id.* at 57.)

12       In Arizona, special instructions regarding the unreliability of accomplice testimony

13   are prohibited as improper comment on the evidence.  *State v. Bussdieker*, 127 Ariz. 339,

14   342, 621 P.2d 26, 29 (1980) ("[I]t is not the law in Arizona that the jury should be instructed

15   to regard (an accomplice's) testimony with distrust. . . . Our most recent cases have made it

16   clear that a cautionary instruction of this type is a comment on the evidence . . .")  In light

17   of *Bussdieker*, Arizona law prohibited the trial court from giving "cautionary" instructions

18   about the unreliability of a witness, even an accomplice.  Unless the holding in *Bussdieker*

19   is contrary to Supreme Court precedent, Petitioner's claim is without merit.

20       Petitioner cites several circuit court of appeals cases holding that failure to give an

21   accomplice instruction is reversible error if requested by the defense and if "that testimony

22   is important." *See, e.g.*, *United States v. Bernard*, 625 F.2d 854, 857 (9th Cir. 1980).

23   However, none of these cases support the proposition that a state court's failure to give such

24   an cautionary instruction, *sua sponte*, violates federal due process.  More importantly,

25   Petitioner does not cite any clearly established Supreme Court law governing this claim;

26   therefore, he cannot obtain habeas relief.  *Musladin*, 127 S. Ct. at 654 (denying habeas relief

27   in absence of clearly established federal law).

28

- 47 -

1

**Claims 12-15**

2

Aggravated Robbery (Claim 12)

3

Petitioner contends that the trial court's failure to instruct the jury "that a specific

4 intent to *permanently* deprive another of property is an element of robbery violated [his]

5 rights to due process and a fair trial under the Sixth, Eighth and Fourteenth Amendments."

6 (Dkt. 83 at 35 (emphasis added).)  He argues that the instruction given "falls far short of the

7 required specific intent instruction" because it only defined the term "with intent" to mean

8 "a person's objective is to cause the result."  (*Id.* at 35-36.)

9

A.R.S. § 13-1902(A) defines robbery as follows:

10

11

A person commits robbery if in the course of taking any property of another
from his person or immediate presence and against his will, such person
threatens or uses force against any person with intent either to coerce surrender
of property or to prevent resistence to such person taking or retaining property.

12

13 In addition, A.R.S. § 13-1903(A) provides:

14

A person commits aggravated robbery if in the course of committing robbery
as defined in § 13-1902, such person is aided by one or more accomplices
actually present.

15

16

The trial court instructed the jury that the elements of aggravated robbery required a

17 showing that "1) The defendant took another's property; and 2) The taking was against the

18 other person's will; and 3) The defendant threatened or used force against any person with

19 the intent to force surrender of the property or to prevent resistance to the taking or keeping

20 the property; and 4) The defendant was aided by an accomplice."  (RT 6/30/82 at 41.)  The

21 court further instructed the jury that "the term 'with the intent' or 'intended' means that a

22 person's objective is to cause that result or to engage in that conduct."  (*Id.* at 43.)

23

When a particular jury instruction is challenged, the question is whether the erroneous

24 instruction "so infected the entire trial that the resulting conviction violates due process."

25 *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  The Court must consider the jury instruction

26 at issue in the context of the whole charge given the jury.  *See id.* at 146-47; *Francis v.*

27 *Franklin*, 471 U.S. 307, 315 (1985).  This Court must assess "'whether there is a reasonable

28 likelihood that the jury applied the challenged instruction in a way' that violates the

1   Constitution." *Estelle*, 502 U.S. at 72. Due Process requires that the state prove every

2   element of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970);

3   *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979).

4          Petitioner's allegation is that the aggravated robbery instruction relieved the

5   prosecution of the burden of proving specific intent beyond a reasonable doubt. Upon

6   review, the Court believes Petitioner has not established that the trial court's instructions on

7   robbery were in error. The instructions given tracked the statutory definitions for robbery

8   and aggravated robbery provided in A.R.S. §§ 13-1902 and 13-1903. Moreover, because the

9   specific intent to *permanently* deprive Petitioner of his property was not at issue in this case,

10  the court was not required to instruct the jury that Petitioner had to manifest such a specific

11  intent. *See State v. Gomez*, 102 Ariz. 432, 434, 432 P.2d 444, 446 (1967) (holding that

12  failure to give specific intent instruction on need to *permanently* deprive a person of his

13  property is not required unless such an intent is at issue, as when the defendant asserts he did

14  not intend to deprive the owner of his property permanently or when he alleges "he took the

15  property with the uncoerced consent of the victim.") As a result, Petitioner cannot show that

16  the instruction given "so infected the entire trial that the resulting conviction violates due

17  process." *See Estelle*, 502 U.S. at 72; *Cupp*, 414 U.S. at 147. Thus, the PCR court's denial

18  of relief was not objectively unreasonable under controlling Supreme Court law and this

19  claim will be denied.

20          Kidnapping (Claim 13)

21          Petitioner next contends that kidnapping was not a proper predicate offense for felony

22  murder "because '[t]he felony murder doctrine does not apply where the felony is an offense

23  included in the charge of homicide.'" (Dkt. 83 at 34 (citing *State v. Essman*, 98 Ariz. 228,

24  235, 403 P.2d 540, 545 (1965).) He argues that the trial court permitted the jury to find him

25  guilty of felony murder "on the basis of an offense included in the charge of murder:

26  restraining a person's movements with the intent to inflict death." (Dkt. 83 at 34.) In other

27  words, according to Petitioner, "[t]he acts of kidnapping, restraint with the intent to inflict

28  death, merge into the resultant homicide and cannot support a separate offense of felony

1   murder." (*Id.* at 35.)

2       The court gave the following instruction regarding the crime of kidnapping:

3           The crime of Kidnapping requires proof that *the defendant knowingly*
    *restrained another person with the intent to inflict death or physical injury on*
4   *the victim.*  Restrain means to restrict a person's movements without consent
    or without legal authority in any manner which interferes substantially with
5   such person's liberty, by moving such person from one place to another or by
    confining such person.  Restraint is without consent if it is accomplished by
6   physical force or intimidation.  If you determine beyond a reasonable doubt
    that the crime of Kidnapping occurred, you should then determine if the
7   offense is a dangerous offense or a non-dangerous offense.

8   (RT 6/30/82 at 42 (emphasis added).)

9       Upon review, the Court does not believe that the trial court's instruction was

10  erroneous.  In *State v. Lewis*, 169 Ariz. 4, 816 P.2d 263 (Ct. App. 1991), the Arizona Court

11  of Appeals explicitly held that kidnapping is a proper predicate offense for felony murder

12  under Arizona law.  *See also* A.R.S. § 13-1105(A)(2) (listing kidnapping as a predicate

13  felony for first degree felony murder).  In *Lewis*, as in this case, the trial court instructed,

14  *inter alia*, that to support a kidnapping charge, restraint of the victim's movements had to be

15  "with the intent to inflict death or physical injury on the person." 169 Ariz. at 6, 816 P.2d

16  at 265.  In rejecting Lewis's argument (now urged here), the court stated, "we can conceive

17  of many situations in which a homicide is unaccompanied by even a slight restraint." *Id.*; *see*

18  *also State v. Villafuerte*, 142 Ariz. 323, 327, 690 P.2d 42, 46 (1984) ("With substantial

19  evidence on the kidnapping charge, a finding of guilt on the felony murder charge could

20  directly follow.")  Because the kidnapping offense requires restraint, which is not required

21  for the murder, the underlying felony does not merge into the homicide.  *Cf. Blockburger v.*

22  *United States*, 284 U.S. 299, 304 (1932) (for purposes of punishment, the test is whether each

23  offense "requires proof of a fact which the other does not.")

24      Under Arizona law, kidnapping is a proper predicate offense for felony murder that

25  does not merge into the homicide.  Petitioner has not demonstrated that the PCR court's

26  denial of this claim was objectively unreasonable under clearly established Supreme Court

27  law.  Therefore, the claim will be denied.

1        Felony Murder (Claim 14)

2        Petitioner contends that because his conviction for aggravated robbery was flawed,

3    and because the crime of kidnapping was not a proper predicate offense for felony murder,

4    he could not constitutionally have been convicted of felony murder.  (Dkt. 13 at 37-38; Dkt.

5    83 at 59.)  Because the Court concludes that the robbery instruction was not in error and the

6    trial court's determination that kidnapping was a proper predicate offense to felony murder

7    was also not error, this claim is without merit.

8        Theft (Claim 15)

9        Petitioner next challenges his theft conviction.  He contends that this conviction

10   "violated his rights under the Sixth and Fourteenth Amendments because there was no

11   evidence of the required element that the alleged stolen property's value exceed $100."  (Dkt.

12   13 at 38.)

13       Due process requires that the state prove every element of a crime beyond a

14   reasonable doubt.  *In re Winship*, 397 U.S. at 364; *Sandstrom*, 442 U.S. at 520-21.  Here, the

15   trial court instructed the jury on the $100 monetary requirement.  (RT 6/30/82 at 42-43.)

16   Although no evidence of the precise value of any of the property found in Petitioner's

17   possession was presented at trial, "[s]uch testimony is not always necessary if value may be

18   inferred from other evidence and the item is not something so unique as to require expert

19   testimony as to its value."  *State v. Blankenship*, 127 Ariz. 507, 511-12, 622 P.2d 66, 70-71

20   (Ct. App. 1980).

21       Evidence was presented at trial establishing Petitioner possessed the victim's property,

22   including checks, clothes, and a car (for which title was signed over to Petitioner).  Although

23   no dollar value was placed on the property, Daniel McIntosh testified that Petitioner told him

24   he bought the car for $500.  McIntosh testified that he thought the car was too nice to be

25   worth only $500.  (RT 6/28/82 at 8, 38.)  Testimony was also presented that the car was a

26   seven-year old Thunderbird, with a nice interior, a stereo, and power windows.  Based on this

27   evidence, the jury could reasonably have inferred the value of the car alone surpassed $100.

28   For these reasons, Petitioner's due process claim is without merit.

**Claim 17 – Trial Court Should Have Granted a New Trial Based on Expert Evidence that Petitioner Could Not Have Premeditated the Crimes**

Petitioner contends that the trial court received evidence prior to sentencing, via the reports of George Dee, Ph.D. and Paul Bindelglas, M.D., that raised doubts as to whether he could have premeditated the crime. He contends that the court's failure to grant a new trial, *sua sponte*, based on this evidence violated his right to due process and a fair trial under the Sixth and Fourteenth Amendments. (Dkt. 13 at 38; *see also* Dkt. 83 at 68-71.)

Both Dr. Dee and Dr. Bindelglas filed reports on Petitioner's mental state just prior to the mitigation hearing in October 1982. Dr. Dee indicated that Petitioner had defective judgmental function, impulsivity and flattening affect, and immaturity and poor social adjustment. (Dkt. 70, Ex. E at 3.) He further opined, "It is not likely that [Petitioner] has planned any of his misadventures but is more apt to have responded impulsively and got carried away with what's happening at the time." (*Id.*)

In his report, Dr. Bindelglas opined that Petitioner's "judgemental [sic] functioning is markedly impaired and he has impulsive tendencies. He also has depressive paranoid features." He stated he did not know if Petitioner's impulsiveness "is a characterological defect or is related to any organic deficit due to two [concussions]," but noted that a CAT scan was negative. (*See* Dkt. 70, Ex. D at 3.) He did not believe Petitioner acted with premeditation because "[h]e is much too impulsive for that." (*Id.*)

Petitioner cites no Supreme Court precedent to support the specifics of this claim. Instead he relies on *Beck*, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and *Gardner v. Florida*, 430 U.S. 349 (1977), for general bromides about due process requiring a full and fair trial, which he asserts is denied if "evidence central to any reliable decision on whether Petitioner premeditated the murder was not heard by the jury." (Dkt. 83 at 70.) None of the cases cited by Petitioner address anything like the claim he now raises, nor can anything in those cases be reasonably construed to support his claim that the sentencing court violated due process when it failed, *sua sponte*, to order a new trial based on the findings of Drs. Dee and Bindelglas.

1    In addition, although Arizona permits expert testimony to establish personality traits

2    such as the trait of acting impulsively or without reflection, Arizona does not permit expert

3    testimony "specifically as to whether a defendant was acting reflectively *at the time of the*

4    *killing*." *State v. Rivera*, 152 Ariz. 507, 514, 733 P.2d 1090, 1097 (1987) (quoting *State v.*

5    *Christensen*, 129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981); *see also State v. Ortiz*, 158

6    Ariz. 528, 533, 764 P.2d 13, 18 (1988); *State v. Arnett*, 158 Ariz. 15, 22, 760 P.2d 1064,

7    1071 (1988) (trial court properly excluded expert testimony where "proposed testimony did

8    not show a character trait of impulsivity, but instead was testimony of defendant's probable

9    state of mind at the time the offense occurred.")  Thus, Drs. Dee and Bindelglas could only

10   have testified at trial that Petitioner had general tendencies or character traits causing him to

11   act impulsively.  They could not have testified Petitioner was incapable of acting reflectively

12   at the time of the crime.

13   When weighed against the evidence of premeditation presented at trial through the

14   testimony of accomplice Martin Norton, the Court believes any testimony that Petitioner had

15   a personality trait that caused him to act impulsively would not likely have resulted in his

16   acquittal on the first degree murder charge.   This view is reinforced by the fact that the trial

17   court also instructed the jury on first degree felony murder, for which premeditation is not

18   an element. *See Tucker*, 205 Ariz. at 167, 68 P.3d at 120.  For all these reasons, Petitioner's

19   conclusory assertion that the sentencing court violated his right to due process of law when

20   it failed, *sua sponte*, to order a new trial based on the reports of Drs. Dee and Bindelglas, is

21   without merit.

22       **Claim 23 – Trial Court Improperly Considered Petitioner's Refusal to**
         **Admit Guilt as an Aggravating Factor**
23

24   Petitioner next asserts that the sentencing court improperly treated his refusal to admit

     guilt (outlined in the Presentence Report) as an aggravating factor.  (Dkt. 13 at 40.)  Arizona
25

     law requires that "the trial court may give aggravating weight only to the evidence which
26
     tends to establish the aggravating circumstances specifically enumerated in A.R.S. § 13-
27
     703(F)." *See State v. Atwood*, 171 Ariz. 576, 673, 832 P.2d 593, 656 (1993), *overruled on*
28

*other ground by State v. Nordstrum*, 200 Ariz. 229, 25 P.3d 717 (2001).  Absent proof to the contrary, the trial judge is presumed to focus on the relevant sentencing factors and set aside "the irrelevant, the inflammatory, and the emotional factors." *Id.* at 674, 832 P.2d at 658. In light of Petitioner's failure to provide specifics in his Merits or Reply Brief and the fact that nothing in the sentencing transcripts indicates the court considered Petitioner's failure to admit guilt as an aggravating factor in imposing a death sentence, this claim is without merit and will be denied.

### Claim 25 – Sentencing Court Improperly Found the "Heinous, Cruel and Depraved" Aggravating Circumstance

Petitioner next asserts the Arizona Supreme Court erroneously concluded that the "heinous, cruel and depraved" aggravating circumstance was established beyond a reasonable doubt.  In *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990)*,* the Supreme Court held that the appropriate standard of federal habeas review of a state court's application of an aggravating circumstance is the "rational factfinder" standard; i.e., "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the aggravating factor to exist.  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Based on the factual findings made by the Arizona Supreme Court, *see Libberton*, 141 Ariz. at 139-40, 685 P.2d at 1291-92, a rational finder of factor could have found the existence of the especially heinous, cruel or depraved aggravating factor.  This claim will be denied.

### Claim 26 – Sentencing Court's Aggravation Finding that Petitioner Committed the Murder for Pecuniary Gain Repeats an Element of the Underlying Crime of Felony Murder

Petitioner alleges it was improper for the trial court to find the pecuniary gain aggravating factor because it "repeats an element of the underlying crime of felony murder." (Dkt. 13 at 41.)  To support this assertion, Petitioner merely cites *Lowenfeld v. Phelps*, 484 U.S. 231 (1988).  The Court has reviewed *Lowenfeld* and believes nothing in it prohibits state courts from using the pecuniary gain aggravating factor to support a death sentence based on a felony murder conviction where, as in this case, one of the underlying crimes is

1    armed robbery.  *Id.* at 241-46.

2        Petitioner also contends that this aggravating factor was not proved beyond a

3    reasonable doubt.  (Dkt.  13 at 41.)  The Court concludes that a rational fact finder could

4    have found this factor to exist.  *See Lewis*, 497 U.S. at 781.  This claim will be denied.

5        **Claim 31 – Arizona Courts Applied an Unconstitutional Standard in Finding**
         **Petitioner Death Eligible**

6        Petitioner alleges the trial court made no finding that Petitioner was death eligible

7    under *Enmund v. Florida*, 458 U.S. 782 (1982).  (Dkt. 83 at 71.)  Further, he contends that

8    his death sentence is invalid because the Arizona Supreme Court's *Enmund* finding was not

9    supported by the record.  (Dkt. 13 at 43.)

10       In *Enmund*, the Supreme Court held that the Eighth Amendment prohibits imposition

11   of  the death penalty "in the absence of proof [a defendant] killed or attempted to kill, and

12   regardless of whether [he] intended or contemplated that life would be taken."  458 U.S. at

13   801.  On appeal, the Arizona Supreme Court noted that the trial court failed to make an

14   *Enmund* finding in imposing the death sentence.  *See Libberton*, 141 Ariz. 136, 685 P.2d at

15   1288.  The court then reviewed the record and concluded that the evidence established

16   beyond a reasonable doubt that Petitioner intended to kill Maya.  *Id.* at 136-37, 685 P.2d at

17   1288-89.

18       The Supreme Court holds that an *Enmund* finding is not required to be made by the

19   trial court; rather, it is sufficient if the finding is made at any point in the state court process,

20   including on appeal.  *Cabana v. Bullock*, 474 U.S. 376, 386-87 (1986), *abrogated on other*

21   *grounds by Pope v. Illinois*, 481 U.S. 497, 503 n.7 (1987).  On habeas review, a state court's

22   findings regarding *Enmund* are factual determinations which are presumed correct and which

23   Petitioner "bears the heavy burden of overcoming."  *Id.* at 377-78.  Petitioner must rebut this

24   presumption of correctness with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1)

25   (petitioner bears the burden of overcoming by "clear and convincing evidence" the

26   presumption of correctness applicable to a state court's factual determinations); *Revilla v.*

27   *Gibson*, 283 F.3d 1203, 1211 (10th Cir. 2002) (same).

28

1    Petitioner fails to rebut the Arizona Supreme Court's *Enmund* finding with clear and

2    convincing evidence.  Therefore, the PCR court's denial of post-conviction relief on this

3    issue was not objectively unreasonable in light of *Enmund*.  Further, there is sufficient

4    evidence from which a rational fact-finder could find that Petitioner intended to kill Maya.

5    *See Jackson*, 443 U.S. at 319 (evidence is sufficient if looked at "in the light most favorable

6    to the prosecution, *any* rational trier of fact" could have made the finding beyond a

7    reasonable doubt).  As recounted by the Arizona Supreme Court, evidence showed Petitioner

8    agreed at the trailer with James that Maya had to be killed, agreed to hide Maya's body in

9    a mine shaft, pointed a gun at Maya on the trip to Salome and threatened to shoot Maya if

10   he made any noise when they were stopped by a patrolman, beat Maya's head with rocks at

11   the murder site, and attempted to shoot Maya in the head at close range while Maya lay on

12   the ground.  *Libberton*, 141 Ariz. at 136-37, 685 P.2d at 1288-89; *see also* RT 6/28/82 at 26,

13   27, 28-31, 38-42.  Petitioner's claim will be denied.

14               **Claims 32, 33 and 35 – Constitutionality of the Death Penalty**

15   In Claim 32, Petitioner   asserts that the Arizona death penalty is imposed

16   discriminatorily against poor, young, and male defendants.  (Dkt. 13 at 43.)  Petitioner "has

17   the burden of proving 'the existence of purposeful discrimination.'"  *McCleskey v. Kemp*,

18   481 U.S. 279, 292 (1987).  Absent a showing that the sentencing court "acted with

19   discriminatory purpose," Petitioner cannot prevail on this claim.  *See id.*  Because Petitioner

20   has provided no evidence to support an allegation of purposeful discrimination against him

21   based on his poverty, youth, or gender, this claim will be denied.

22   In Claim 33, Petitioner asserts that "arbitrary application of the death penalty in [his]

23   case amounts to cruel and unusual punishment."  (Dkt. 13 at 43.)  Petitioner provides no

24   factual or legal support for this cursory assertion, which is insufficient to establish

25   entitlement to habeas relief.

26   In Claim 35, Petitioner contends the "death sentence as actually imposed in the State

27   of Arizona . . . and in this case, serves no purpose of deterrence or retribution and constitutes

28   purposeless infliction of pain and suffering unjustified by any valid state interest in violation

of the Eighth and Fourteenth Amendments." (Dkt. 13 at 44.)   Petitioner cites no authority to support this claim.  His political or philosophical argument against the existence of the death penalty is not a sufficient basis for habeas relief.

**Claims 34 and 38 – Cumulative Error at Trial, Sentencing and Appeal**

Petitioner contends that the "numerous failings of trial counsel, the errors made by the court and the instances of prosecutorial misconduct . . . . taken together . . . deprived [him] of his right to a fair trial and a fair sentencing." (Dkt. 13 at 44, 45; Dkt. 83 at 92-93.)

For the reasons stated in addressing each of Petitioner's properly exhausted claims, the Court believes that none warrant habeas relief.  Attempting to argue a "cumulative" effect will not surmount these findings.  For the reasons previously stated in the Court's analysis, Petitioner's claims fail either as a matter of law and/or because he cannot establish that any alleged error would likely have resulted in a different outcome at the guilt or sentencing stage of trial.

**Claim 40 – Death Qualification of the Jury**

Petitioner asserts that the "death qualification" in the questionnaire "served no legitimate purpose" and "biased and prejudiced the jury," thereby denying him an impartial jury in violation of his Sixth and Fourteenth Amendment rights.[12]  (Dkt. 13 at 45-46.)

Petitioner cites no authority to support his contention that "death qualifying" prospective jurors violates his constitutional rights.  Conversely, in *Lockart v. McCree*, 476 U.S. 162, 173 (1986), the Supreme Court held that "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases."  The PCR court's denial of relief on this claim was not objectively unreasonable under clearly established Supreme Court precedent.

---

[12]   The questionnaire explained that if Petitioner was found guilty of first degree murder the court would be required to impose a sentence of life imprisonment or the death penalty.  The questionnaire then asked about the potential jurors' attitudes toward the death penalty – e.g., "Because of conscientious or religious scruples or feelings you may have against the death penalty, would you find it impossible to return a verdict of guilty to first degree murder?" (Dkt. 14, Ex. 12 at 3.)

*C.  INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS*

Claims 18, 19 and 39 of the amended petition allege ineffective assistance of counsel ("IAC") at trial, at sentencing, and on appeal, respectively.  Because Petitioner seeks to support his IAC claims with documents that are not part of the state court record, the Court first considers Petitioner's requests to expand the record.  Petitioner's requests for an evidentiary hearing will be considered within the discussion of the merits of the particular claims.

**Standards for an Evidentiary Hearing and Expansion of the Record**

<u>Evidentiary Hearing</u>

Historically, the district court has considerable discretion to hold an evidentiary hearing to resolve disputed issues of material fact.  *See Townsend v. Sain*, 372 U.S. 293, 312, 318 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254 (e)(2); *Baja v. Ducharme*, 187 F.3d 1075, 1077-78 (9th Cir. 1999); Rule 8, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the district court judge shall determine if an evidentiary hearing is required).  That discretion is significantly circumscribed by § 2254(e)(2) of the AEDPA.  *See Baja*, 187 F.3d at 1077-78.

Section 2254 provides that:

*If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --*

(A) the claim relies on --

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).  The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's

1   factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner

2   or prisoner's counsel." *Williams*, 529 U.S. at 432.  A hearing is not barred, however, when

3   a petitioner diligently attempts to develop the factual basis of a claim in state court and is

4   "thwarted, by example, by the conduct of another or by happenstance was denied the

5   opportunity to do so." *Id.*; *see Baja*, 187 F.3d at 1078-79 (allowing hearing when state court

6   denied opportunity to develop the factual basis of claim).

7         When the factual basis for a particular claim has not been fully developed in state

8   court, the district court must first determine whether the petitioner was diligent in attempting

9   to develop the factual record.  *See Baja*, 187 F.3d at 1078 (quoting *Cardwell v. Greene*, 152

10  F.3d 331, 337 (4th Cir. 1998)).  The diligence assessment is an objective one, requiring a

11  determination of whether a petitioner "made a reasonable attempt, in light of the information

12  available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at

13  435.  For example, when there is information in the record that would alert a reasonable

14  attorney to the existence and importance of certain evidence, the attorney fails to develop the

15  factual record if he does not make reasonable efforts to sufficiently investigate and present

16  evidence to the state court. *See id.* at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th

17  Cir. 2002) (lack of diligence because petitioner knew of and raised the claims in state court,

18  but failed to investigate all the factual grounds for such claims).

19        Absent unusual circumstances, diligence requires that a petitioner "at a minimum,

20  seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*,

21  529 U.S. at 437; *see Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir.) (finding no diligence

22  because petitioner neither requested an evidentiary hearing in the trial court nor filed a state

23  habeas petition), *amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001).  The mere

24  request for an evidentiary hearing, however, may not be sufficient to establish diligence if

25  a reasonable person would have taken additional steps. *See Dowthitt v. Johnson*, 230 F.3d

26  733, 758 (5th Cir. 2000) (failed to present affidavits of family members that were easily

27  obtained without court order and with minimal expense); *see also McNair v. Campbell*, 416

28  F.3d 1291, 1299-1300 (11th Cir. 2005) (no development of evidence available though

petitioner, family members, and medical literature, and no appeal of denial of funds and hearing); *Cannon v. Mullin*, 383 F.3d 1152, 1177 (10th Cir. 2004) (lack of diligence if petitioner does not proffer "evidence that would be readily available if the claim were true."); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003) (no effort to develop the record or assert any facts to support claim).

In sum, if the Court determines that a petitioner has not been diligent in establishing a factual basis for his claims in state court, then the Court may not conduct a hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions. If, however, the petitioner has not failed to develop the factual basis of a claim in state court, the Court will the proceed to consider whether a hearing is appropriate or required under the criteria set forth by the Supreme Court in *Townsend*. 372 U.S. 293; *see Baja*, 187 F.3d at 1078 (quoting *Cardwell*, 152 F.3d at 337); *Horton v. Mayle*, 408 F.3d 570, 582 n. 6 (9th Cir. 2005).

Pursuant to *Townsend*, a federal district court must hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding. *Townsend*, 372 U.S. at 312-13; *Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations). In addition, the Court established six circumstances under which there is presumptively, no "full and fair hearing" at the state level:

(1) the merits of the factual dispute were not resolved in the state hearing;

(2) the state factual determination is not fairly supported by the record as a whole;

(3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;

(4) there is a substantial allegation of newly discovered evidence;

(5) the material facts were not adequate developed at the state-court hearing;

or

(6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

*Townsend*, 372 U.S. at 313.  In any other case in which diligence has been established, the district court judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim."  *Id.* at 318 (noting that if a "habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the judge] may, and ordinarily should, accept the facts as found in the hearing.").

Expansion of the Record

Rule 7 of the Rules Governing Section 2254 Cases authorizes a federal habeas court to expand the record to include additional material relevant to the petition.  Rule 7 provides: "The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath, to written interrogatories propounded by the judge.  Affidavits may also be submitted and considered as part of the record."  Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  The purpose of Rule 7 "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing."  Advisory Committee Notes, Rule 7, 28 U.S.C. foll. § 2254; *see also Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977).  Any time expansion of the record is sought, the Court must assess whether the material submitted are relevant to resolution of the petition.

Section 2254(e)(2), as amended by the AEDPA, limits a petitioner's ability to present new evidence through a Rule 7 motion to expand the record to the same extent it limits the availability of any evidentiary hearing.  *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (applying § 2254(e)(2) to expansion of the record when intent is to bolster the merits of a claim with new evidence) (citing *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam).  Thus, when a petitioner seeks to introduce new affidavits and other documents never presented in state court, for the purpose of establishing the factual predicate of a claim, he must either demonstrate diligence in developing the factual basis in state court

1    or satisfy the requirements of § 2254(e)(2)(A) & (B).  However, when a petitioner seeks to

2    expand the record for other reasons, such as to cure omissions in the state court record, *see*

3    *Dobbs v. Zant*, 506 U.S. 357, 359 (1993) (per curiam), establish cause and prejudice, or

4    demonstrate diligence, the strictures of § 2254(e)(2) do not apply.  *See Boyko v. Parke*, 259

5    F.3d 781, 790 (7th Cir. 2001).

6                    **Expansion of the Record Analysis**

7            Petitioner has presented several depositions and one affidavit which were not

8    presented in his state PCR proceedings.  In particular, he relies on the 1992 depositions of

9    George Dee (psychologist), George S. Lim (Petitioner's trial attorney) and Henry Dean (an

10   officer who guarded Petitioner during the time Petitioner was on work furlough just prior to

11   the crime), and a 1993 affidavit of prosecution trial witness Daniel McIntosh. (Dkt. 14, App.,

12   Exs. 4, 11, 23.)  Petitioner contends that his failure to present these materials in state court

13   was not due to a lack of diligence on his part but, rather, the PCR court's denial of an

14   evidentiary hearing and funds to conduct discovery.  (Dkt. 83 at 15-16.)  As an additional

15   matter, Respondents contend a 1991 affidavit from Martin Norton, attached in support of

16   Petitioner's 1994 PCR petition (*id.*, Ex. 7), is not properly part of the habeas record and

17   should not be considered by this Court.

18           Dee Deposition

19           Petitioner seeks to expand the record to include a November 9, 1992 deposition of Dr.

20   Dee.  Dr. Dee examined Petitioner just prior to the mitigation hearing on October 20, 1982.

21   In his report of that examination, Dr. Dee presented the following diagnoses and opinions

22   concerning Petitioner's mental state:

23           1.      Defective judgmental functioning.

24           2.      Impulsivity and flattening of affect.

25           3.      Poor reality contact.

26           4.      Chronic depression, likely originating at about age 8 or 9.

27           5.      Immaturity and poor social adjustment.

28           6.      It is not likely that he has planned any of his misadventures but is more

apt to have responded impulsively and got carried away with what's happening at the time.

7.    He places distance not really relating to the trouble he is in what has happened, and doesn't learn from experience.

8.    There are problems concerning sexual identity, as there is only a superficial role identity.

9.    Conflict over sexual identity confusion needs to be denied and avoided to maintain feelings of adequacy.

10.    There are severe emotional problems and have been for years.

11.    Without intensive treatment he would be like a time bomb waiting to go off.

12.    There are unresolved issues concerning father.

(Dkt. 70, Ex. E at 3.)

In support of his third PCR petition, filed in 1987, Petitioner included an affidavit from Dr. Dee. The affidavit reiterates many of the findings in the 1982 report concerning Petitioner's mental state, including Dr. Dee's belief that Petitioner has a "general tendency" to react impulsively and reflexively and his opinion that because of this characteristic, Petitioner's participation in Maya's killing was likely not premeditated. Dr. Dee also states his belief that Petitioner's "youth and consequent immaturity . . . was a factor in this killing," and that Petitioner was just "go[ing] along" in Maya's murder. (Dkt. 26, Attach., Ex. 2 at 2.)

Petitioner now presents the November 9, 1992 Dee deposition to support his claims that counsel was ineffective at both the guilt and sentencing stages. As noted, the record already contains Dr. Dee's 1982 report and 1987 affidavit. The 1992 deposition again touches on Dr. Dee's findings concerning Petitioner's mental state – in particular, his opinion that Petitioner has a tendency to act impulsively or reflexively rather than to premeditate.

Depositions involve expense, and the denial of funds to conduct discovery in state court was not Petitioner's fault because the PCR court summarily denied relief on this and other claims without acting on Petitioner's request for funds to pursue discovery. (*See* Dkt. 26, Attach. at 65; ROA-PCR, Vol. 1 of 1, ME 2/10/88 at 1). In light of this denial,

1   Petitioner's diligence in presenting Dee's affidavit in his 1987 PCR petition, and the fact that

2   the deposition contains similar opinions to those presented in state court, the Court finds that

3   Petitioner was diligent with respect to Dr. Dee's deposition.  Therefore, Petitioner's request

4   to include this deposition in the record will be granted and the deposition will be considered

5   to the extent it is relevant to Petitioner's IAC claims.

6       Lim Deposition

7       In contrast, the Court believes Petitioner was not diligent in obtaining trial attorney

8   George Lim's deposition.  Although the Court permitted Petitioner to depose Lim while

9   Petitioner's previous habeas petition was pending in this Court, Respondents registered an

10  objection to its admissibility in light of the fact that Petitioner made no effort to introduce

11  this evidence in support of the IAC claims presented in his 1987 PCR petition.  (*See*

12  *Libberton I*, Dkt. 148 at 5 n.2.)  They renew that objection now.  (Dkt. 70 at 10.)

13      Petitioner asserts that he was denied funds to conduct discovery in support of his

14  1987 PCR petition and was not able to depose Lim until the district court allowed him funds.

15  (Dkt. 83 at 17.)  Upon review, the Court believes this excuse does not support Petitioner's

16  claim of due diligence in obtaining evidence from Lim.  Petitioner presented numerous

17  affidavits in support of his 1987 PCR claims, yet the record is devoid of any attempt by

18  Petitioner to obtain evidence from his own trial attorney.  Petitioner did not file an affidavit

19  from Lim and he has not indicated that obtaining an affidavit would have been cost-

20  prohibitive.  Petitioner was able to obtain affidavits from several other individuals without

21  a grant of funds to conduct discovery.  Lim was obviously well known to Petitioner.  His

22  claim of a lack of funds is unpersuasive and insufficient to establish due diligence.  The

23  record is devoid of any evidence Petitioner made an effort to contact Lim to obtain

24  information from him until he deposed him in 1992, more than a decade after trial.  For this

25  reason, Petitioner's request to expand the record to include Lim's deposition will be denied.

26      Dean Deposition

27      Petitioner also seeks to expand the record to include the 1992 deposition of  Henry

28  Dean.  Dean was a detention officer at the County Jail while Petitioner was in custody during

1   the period leading up to Maya's murder.  Petitioner presents Dean's deposition to support his

2   claim that counsel was ineffective at sentencing in regard to presenting mitigation evidence

3   relating to his history of substance abuse.  Specifically, he contends the deposition shows that

4   Dean could have provided evidence that Petitioner "was subject to personality changes that

5   fellow inmates attributed to [his] drug use."  (Dkt. 65 at 17; *see also* Dkt. 14, App., Ex. 23.)

6        Petitioner attempted to obtain information from Dean in support of his 1987 PCR

7   petition.  In particular, Petitioner filed an affidavit from Carole Larsen-Harper, a paralegal

8   from Petitioner's counsel's law firm, who interviewed Dean on March 10, 1987.  The

9   affidavit was filed in support of Petitioner's 1987 PCR petition.  (*See* Dkt. 26, Attach., Ex.

10  12.)  Petitioner provides no explanation as to why Larsen-Harper was able to locate and

11  interview Dean at that time, but not present an affidavit from him.  Nevertheless, in light of

12  the efforts made at that time to obtain evidence from Dean, and the fact that the PCR court

13  denied Petitioner funds to conduct discovery, the Court concludes Petitioner was diligent in

14  obtaining evidence from Dean.  Petitioner's request to include Dean's 1992 deposition in the

15  record will be granted and the deposition will be considered to the extent it is relevant to

16  Petitioner's IAC claims.

17        McIntosh Affidavit

18        Petitioner seeks to expand the record to include a 1993 affidavit from Daniel

19  McIntosh.  McIntosh's affidavit recounts that he and Petitioner were long-time drug users,

20  that they both sold drugs to support their habits, and that they "took drugs and drank nightly

21  for the five or six days prior to and through November 16, 1981."  (Dkt. 14, App., Ex. 6 at

22  1.)  Petitioner also contends that the affidavit supports "defense arguments that co-defendant

23  James had a violent, dominant, and explosive personality and was the 'leader' primarily

24  responsible for the victim's death."  (Dkt. 83 at 26.)

25        Again, Petitioner argues that he was unable to present McIntosh's affidavit prior to

26  this Court granting him discovery in 1992.  (*See Libberton I* , Dkt. 124.)  Again, the Court

27  disagrees.  Since his direct appeal, Petitioner has been arguing that he merely followed

28  accomplice Steven James's direction in murdering Maya.  *See Libberton*, 141 Ariz. at 140,

1  685 P.2d at 1292.  Petitioner raised a similar argument in his 1987 PCR petition, asserting,

2  *inter alia*, that counsel was ineffective at both the guilt and sentencing stages for not

3  investigating this theory.  (Dkt. 26, Attach. at 12-14, 18-19.)

4          The Court notes that Petitioner was able to attach affidavits to his 1987 PCR petition

5  from two other persons, Diane Hodge and Daniel Severance, to support this claim.  (Dkt. 26,

6  Attach., Exs. 6, 7.)  Nothing in the record indicates Petitioner attempted to obtain an affidavit

7  from McIntosh in support of his 1987 PCR petition, yet McIntosh was well-known to

8  Petitioner.  They went to school together and Petitioner had known him for years.  (RT

9  6/28/82 at 25.)  Petitioner provides no explanation for failing to obtain McIntosh's affidavit

10 in support of his 1987 PCR petition, nor has he alleged that, unlike the other affidavits he did

11 obtain at that time, interviewing McIntosh and obtaining his affidavit would have been cost

12 prohibitive.  *See Dowthitt*, 230 F.3d at 758 (holding that lack of funding to obtain evidence

13 from family members does not establish due diligence where no evidence is presented that

14 obtaining the affidavits would have been cost prohibitive).  The Court believes Petitioner was

15 not diligent in developing the record with respect to McIntosh's 1993 affidavit and expansion

16 of the record to include this affidavit will be denied.

17          Norton Affidavit

18          Petitioner attached Martin Norton's 1991 affidavit to his fourth PCR petition filed in

19 1994, twelve years after he was convicted.  Petitioner presented the affidavit at that time to

20 support his claim that permitting Norton to testify pursuant to a plea agreement containing

21 a "consistency clause" is inherently unreliable and violative of due process.  Because the

22 PCR court considered the affidavit with respect to the claims raised in the 1994 petition, the

23 affidavit is properly part of the record with respect to those claims.

24          Petitioner seeks to use the affidavit to support his IAC claims.  (*See* Dkt. 83 at 21.)

25 However, because Petitioner never presented this affidavit in state court to support any

26 claims of IAC at trial and/or sentencing, consideration of the affidavit as to those claims is

27 not appropriate unless expansion of the record is granted.  As previously noted, Petitioner has

28 alleged as far back as his direct appeal that accomplice James was more culpable, that James

was extremely violent and the main impetus in the murder of Maya, and that James effectively overbore Petitioner's will and forced him to go along in the crimes. *See Libberton*, 141 Ariz. at 140, 685 P.2d at 1292. Petitioner reiterated this theory in his 1987 PCR petition, alleging counsel was ineffective because he failed to discover readily available evidence to support this claim. (*See* Dkt. 26, Attach. at 11, 12-14.)  Again, Petitioner presented affidavits from others, including Diane Hodge and Daniel Severance, to support claims raised in that petition despite the state court's failure to grant funds to conduct discovery. (*See* Dkt. 26, Attach., Exs. 6, 7.)  Yet the record is devoid of even a claim by Petitioner that he attempted to speak to Norton and obtain an affidavit from him prior to 1991. Petitioner presents no evidence that interviewing Norton and obtaining his affidavit in 1987 would have been cost-prohibitive.  Cost did not prevent him from obtaining other affidavits to support the claims raised in his 1987 petition, nor did it prevent him from eventually obtaining Norton's affidavit.  Thus, his claim of a denial of funds is not sufficient to excuse his failure to present evidence from Norton in support of the claims raised in his 1987 petition.  *See Dowthitt*, 230 F.3d at 758.  As a result, Norton's affidavit may not properly be considered in support of any claims other than those raised in the 1994 PCR petition (Claims 1, 2 and 3 of the amended petition).[13]

### Clearly Established Law Regarding IAC

To prevail on a claim of IAC, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  To prove deficient performance, a defendant must also overcome "the presumption that, under the circumstances, the

---

[13]    The Court did not discuss Norton's affidavit as to Claims 1-3 because it determined that taking Petitioner's factual allegations as true he was not entitled to relief.

1   challenged action might be considered sound trial strategy." *Id.*  To demonstrate prejudice,

2   a petitioner "must show that there is a reasonable probability that, but for counsel's

3   unprofessional errors, the result of the proceeding would have been different.  A reasonable

4   probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

5   Trial counsel has "a duty to make reasonable investigations or to make a reasonable

6   decision that makes particular investigations unnecessary," and "a particular decision not to

7   investigate must be directly assessed for reasonableness in all the circumstances, applying

8   a heavy measure of deference to counsel's judgments."  *Hayes v. Woodford*, 301 F.3d 1054,

9   1066 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691).  To determine whether the

10  investigation was reasonable, the court "must conduct an objective review of [counsel's]

11  performance, measured for reasonableness under prevailing professional norms, which

12  includes a context-dependent consideration of the challenged conduct as seen from counsel's

13  perspective at the time."  *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation

14  marks omitted).  As the Supreme Court recently reiterated, "In judging the defense's

15  investigation, as in applying *Strickland* generally, hindsight is discounted by pegging

16  adequacy to 'counsel's perspective at the time' investigative decisions are made and by

17  giving a 'heavy measure of deference to counsel's judgments.'"  *Rompilla v. Beard*, 545 U.S.

18  374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689, 691).

19  The right to effective assistance of counsel applies not just to the guilt phase, but

20  "with equal force at the penalty phase of a bifurcated capital trial."  *Silva v. Woodford*, 279

21  F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir.

22  1995)).  With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen

23  a defendant challenges a death sentence . . . the question is whether there is a reasonable

24  probability that, absent the errors, the sentencer . . . would have concluded that the balance

25  of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S.

26  at 695.  In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the

27  evidence in aggravation against the totality of available mitigating evidence."  *Wiggins*, 539

28  U.S. at 534.  The "totality of the available evidence" includes "both that adduced at trial, and

1  the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams*, 529 U.S. at

2  397-98)).

3        A court need not address both components of the *Strickland* inquiry, or follow any

4  particular order.  If it is easier to dispose of an ineffectiveness claim on the ground of lack

5  of sufficient prejudice, without evaluating counsel's performance, that should be done.

6  *Strickland*, 466 U.S. at 697.

7                    **Standard of Review**

8        Petitioner presented all of his claims of IAC – guilt phase, sentencing, and appellate

9  – in his 1987 PCR petition.  The trial court summarily rejected these and other claims, stating

10  Petitioner "has failed to raise any colorable claim whatsoever," and "no material issue of fact

11  or law exists which would entitle [Petitioner] to relief." (ROA-PCR, Vol. 1 of 1, ME 2/10/88

12  at 1.) The court also stated its belief that Petitioner "received nothing but effective assistance

13  [of counsel]" and that "nothing [he] has raised . . . would have affected the outcome of the

14  trial or sentencing."  (*Id.*)  The Arizona Supreme Court denied review without comment.

15        Petitioner contends that because the state court gave no reasoned explanation for

16  denial of these claims, this Court should independently review the record and assess the

17  claims de novo.  Petitioner also argues that, to the extent the PCR court explained its ruling,

18  it applied a prejudice standard contrary to the standard outlined in *Strickland*; this argument

19  is premised on the court's statement that "nothing [Petitioner] raised . . . would have affected

20  the outcome of the trial" (ROA-PCR, Vol. 1 of 1, ME 2/10/88 at 1), whereas *Strickland*

21  provides that to establish prejudice arising from IAC, a habeas applicant must show "a

22  reasonable probability that, but for counsel's unprofessional errors, the outcome of the

23  proceeding would have been different," 466 U.S. at 694.

24        The Court notes that Petitioner has asserted somewhat contradictory arguments, that

25  the state PCR court adopted an improper prejudice standard and that the court provided no

26  rationale for its determination.  Regardless, as discussed at the beginning of the Merits

27  Analysis Section, the Court agrees with Petitioner's argument that the PCR court's one-page

28  summary dismissal of the 1987 PCR petition was not a "reasoned decision."  When a state

1  court does not provide a reasoned decision, this Court independently reviews the record and

2  assesses whether the state court's denial of Petitioner's IAC claims was objectively

3  unreasonable under *Strickland.  See Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.

4  **Claim 18 – Guilt Phase IAC**

5  Petitioner raises the following specific allegations of IAC during the guilt phase of his

6  trial:   (a) failure to interview witnesses; (b) failure to develop and present a defense;

7  (c) stipulating to admitting Petitioner's prior convictions and failing to object to improper

8  references to them; (d) failure to object to or adequately impeach Martin Norton's trial

9  testimony; (e) failure to object to the jury questionnaire; (f) failure to object to prosecutor's

10  closing commenting on Petitioner's silence; (g) failure to request an instruction on the

11  voluntariness of statements to police; and (h) failure to request an instruction on the effect

12  of voluntary intoxication.  (Dkt. 65 at 5-13.)

13  a. Failure to Interview Witnesses

14  Petitioner first contends trial counsel, George Lim, was ineffective because he failed

15  to interview any prosecution witnesses and did "essentially no pre-trial investigation." (Dkt.

16  65 at 5.)  Specifically, Petitioner contends that counsel:

> failed to investigate, among other things, Petitioner's state of mind at the time
> of the offense; his adolescent history of substance abuse; his physical, mental
> and emotional illnesses (even though Lim believed that investigation of
> Libberton's emotional state was necessary); his abused childhood and his
> inability to have premeditated this crime.  A proper investigation would have
> revealed that Petitioner was under significant mental and emotional stress at
> the time of the crime; that Petitioner . . . was under the influence of drugs and
> alcohol; and that he had a history of physical, mental and emotional illness.

(*Id.*)

Below, the Court reviews the evidence, to the extent properly before this Court, that

Petitioner asserts establishes the prejudice prong of the *Strickland* standard.

*Daniel McIntosh*

Daniel McIntosh was a friend of Petitioner who testified at trial.  Petitioner contends

that if counsel had conducted a pre-trial interview of McIntosh, "[counsel] could have

developed evidence about [accomplice] James' greater culpability in this case and the impact

1   of drugs and alcohol." (*Id.*)

2          Counsel participated in a pretrial deposition of McIntosh on December 28, 1981, at

3   which McIntosh was examined on the issues of both James's and Petitioner's culpability and

4   their use of alcohol and drugs.  McIntosh stated, and repeated at trial, that he left James's

5   trailer before Juan Maya arrived and had no direct knowledge of what transpired.  (RT

6   12/28/81, McIntosh Depo. at 12, 40; RT 6/28/82 at 6-7, 35-36.)  Martin Norton also testified

7   that McIntosh was not present when the crimes were committed.  (RT 6/28/82 at 68.)  Thus,

8   any information regarding culpability would not have been significantly persuasive.

9          On the question of Petitioner's use of drugs and alcohol, McIntosh indicated in his

10  pretrial deposition that he was at James's trailer early on the night of the murder and that he,

11  Petitioner, and James each drank eight or nine beers and between them smoked one

12  marijuana cigarette.  (RT 12/28/81, McIntosh Depo. at 8-9, 11.)  McIntosh reiterated this

13  during questioning by defense counsel.  (*See id.* at 38-39, 40.)  On cross-examination at trial,

14  McIntosh essentially reiterated these facts.  (*See* RT 6/28/82 at 26-33, 46-48.)  In fact, he

15  testified at trial that their use of marijuana may have been more than he stated in the

16  deposition, perhaps as much as "half a bag." (*Id.* at 47.)  In light of the information presented

17  in McIntosh's pretrial deposition, defense counsel was able to elicit on cross-examination

18  that Petitioner was drinking throughout the day on November 16, 1981, and may have

19  smoked as much as "half a bag" of marijuana with James and McIntosh.

20         Counsel could reasonably have believed an additional interview was not necessary

21  after he questioned McIntosh during the deposition. *See Eggleston v. United States*, 798 F.2d

22  374, 376 (9th Cir. 1986) (counsel's failure to interview a witness is not ineffective "when the

23  person's account is otherwise fairly known to defense counsel").  Further, Petitioner has not

24  shown that if counsel had conducted another interview it would have provided additional

25  persuasive evidence at trial regarding Petitioner's culpability or his use of alcohol and drugs

26  around the time of the crime.  Therefore, the Court finds there is not a reasonable probability

27  that a pretrial interview would have changed the verdict.

28

1     *Martin Norton*

2        Petitioner also argues that if trial counsel had interviewed Martin Norton before trial,

3 "he would have been prepared not only to impeach him, but also to make him a favorable

4 witness about Petitioner's comparatively limited role in the alleged crimes." (Dkt. 65 at 6.)

5 The Court disagrees and finds these assertions purely speculative.

6        Norton made several statements to police and prosecutors prior to trial. Although the

7 particulars of these statements differ in many respects (primarily relating to Norton's own

8 involvement in the crimes), each statement implicates Petitioner as an active participant in

9 the crimes against Maya.[14] (*See* Dkt. 14, Exs. 13, 14; Dkt. 70, Ex. A.)

10        At trial, defense counsel extensively cross-examined Norton on the inconsistencies

11 in his several statements. (RT 6/28/82 at 55-89; RT 6/29/82 at 90-181.) Counsel cross-

12 examined Norton on the fruits of a plea deal that would allow him to be tried as a juvenile,

13 with a maximum sentence of three years, in return for testimony implicating Petitioner.

14

15        [14]    For instance, on November 18, 1981, Norton was interviewed by authorities

16 for the first time. At this point Maya's body had not been recovered. Detective R.E. Davis recounts in his report that Norton admitted being in contact with the victim and going with

17 him to James's trailer. Norton told Davis he saw both James and Petitioner brutally assault

18 Maya then take him to Maya's car and leave. Norton told Davis he did not go with them and did not know what happened to Maya. (Dkt. 14, Ex. 13 at 1-2.) Detective Davis interviewed

19 Norton again the next day after recovering Maya's body. He recounts that Norton again

20 admitted being with Maya on November 16, 1981, but again denied knowing what happened to him. (Dkt. 70, Ex. A at 3-4.)

21        On November 26, 1981, Norton was interviewed by police a third time. After being

22 advised of his *Miranda* rights, Norton told Detective Jack Hackworth that after he was picked up by Maya, they went to James's trailer. Norton told Detective Hackworth, as in his

23 earlier statements, that Petitioner participated in beating Maya at James's trailer. Norton also

24 recounted that he, James, and Petitioner discussed killing Maya. They planned to take him to an abandoned mine shaft on James's parents' property near Salome to kill him. Norton

25 recounted that on the way up to the murder site, Petitioner held a gun on Maya. When they

26 arrived at the site, Norton recounted that Petitioner participated in bludgeoning Maya to death with rocks and attempted to shoot him in the head, after which Petitioner and James

27 dragged Maya's body over to the mineshaft and threw him in. (*See* Dkt. 14, Ex. 14 at 1-4.)

       Norton repeated these essential facts in his December 29, 1981 interview and at trial.

28 (*See* Dkt. 14, Ex. 15 at 12, 15-18; *see also* RT 6/28/82 at 21, 26, 30-31, 38-42.)

Defense counsel also established that Norton was selling drugs for Steven James, and that he engaged in a dine and dash at a local restaurant the night of the murder. Moreover, on multiple instances defense counsel used Norton's pre-trial statements to police, in particular his December 29, 1981 statement (referenced by the "consistency clause" in his plea agreement), to highlight discrepancies in Norton's trial testimony. (*See* RT 6/28/82 at 78; RT 6/29/82 at 94-95, 97-100, 121-24, 126-27, 129-30,144-45,178-80.) At closing, defense counsel characterized Norton as a "street-wise punk," whose testimony about the murder was uncorroborated. He emphasized that the State presented no physical evidence placing Petitioner at James's trailer that night or at the scene of the murder in Salome. ( *See* RT 6/30/82 at 23-28.)

The Court has reviewed defense counsel's cross-examination of Norton and his closing arguments and believes that counsel's conduct belies any claim of ineffectiveness. Petitioner's contention that if counsel had interviewed Norton pre-trial he could have more effectively cross-examined him is vague and speculative.[15] He has not shown what more could have been ascertained through a pretrial interview. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (finding insufficient conclusory allegations that did not identify what counsel would have done if performing effectively). As a result, Petitioner has not demonstrated that if counsel had interviewed Norton pretrial, there is a reasonable probability it would have changed the outcome of the trial.

### Diane Rhea Hodge and Daniel Severance

Petitioner contends that counsel failed to interview accomplice Steven James's girlfriend, Diane Rhea Hodge, and James's roommate, Daniel Severance. He contends that Hodge, in particular, could have testified James was a heavy substance abuser, that he was in a "horrible state of mind" at the time of Maya's killing, and that these facts, and James's imposing physical stature, could have demonstrated that "any involvement by Petitioner in

---

[15]     Petitioner attempts to bolster this claim with a 1991 affidavit of Norton; however, as discussed above, the Court determined that expansion of the record as to this affidavit was precluded by 28 U.S.C. § 2254(e)(2).

1   the killing was much less than that of either James or [accomplice] Norton." (Dkt. 65 at 7-8.)

2          In their affidavits, Hodge and Severance focus on accomplice James's state of mind

3   at the time of Maya's killing – in particular, James's abuse of alcohol and drugs and the

4   belligerent state of mind this produced.  Neither Hodge nor Severance witnessed the crimes

5   against Maya, but Severance speculated that James's aggressive demeanor may have

6   "influenced" Petitioner to follow along in the crimes.  (*See* Dkt. 14, Exs. 9, 10.)

7          On the question of Petitioner's guilt, the Hodge and Severance affidavits are of limited

8   relevance.  *See* A.R.S. § 13-412(C) (providing that duress is not a defense to homicide).

9   Neither Hodge nor Severance were eyewitnesses to the crimes.  Even if James was the prime

10  motivator behind Maya's murder and "influenced" Petitioner's participation, such evidence

11  is not a defense to the charges.  Therefore, Petitioner cannot show that if counsel had

12  interviewed these individuals he would have obtained any information that was reasonably

13  probable to produce an acquittal on the first degree murder charge.

14          *Drs. Dee and Bindelglas*

15          Petitioner contends that counsel was ineffective for not interviewing Drs. Dee and

16  Bindelglas prior to trial.  Both doctors opined in pre-sentence reports and in subsequent

17  affidavits (as well as in the 1992 deposition of Dr. Dee), that Petitioner suffered from mental

18  traits which caused him to act impulsively and without reflection and that, as a result, it is

19  unlikely he premeditated Maya's murder.  (Dkt. 65 at 8; Dkt. 70, Exs. D, E; Dkt. 14, App.,

20  Exs. 4, 5; Dkt. 26, Attach., Exs. 2, 3.)

21          As noted in addressing Claim 17, Arizona law allows expert testimony at trial to

22  establish personality traits such as a tendency to act impulsively or without reflection.

23  However, Arizona does not permit expert testimony "specifically as to whether a defendant

24  was acting reflectively *at the time of the killing.*"  *Rivera*, 152 Ariz. at 514, 733 P.2d at 1097;

25  *see also Ortiz*, 158 Ariz. at 533, 764 P.2d at 18; *Arnett*, 158 Ariz. at 22, 760 P.2d at 1071.

26  Thus, even if counsel had interviewed Drs. Dee and Bindelglas prior to trial and presented

27  them as witnesses, they could not have testified that Petitioner did not act with premeditation

28  in the killing of Maya.  If called to testify, the Court believes their opinions concerning

1    Petitioner's general tendency to act impulsively and without reflection would have had

2    limited impact when considered against the evidence of premeditation presented at trial, in

3    particular Norton's eyewitness testimony of Petitioner's active participation in the assault,

4    robbery, and murder of Maya over a period of several hours (*see* RT 6/28/82 at 25-41).

5            Further, Petitioner cannot establish ineffective assistance based on counsel's failure

6    to investigate Petitioner's alleged "mental and emotional illness." (*See* Dkt. 65 at 5.)  Prior

7    to trial Petitioner was examined by two mental health experts, Maier Tuchler, M.D., and

8    Merton Berger, M.D.  Both doctors concluded Petitioner had no major mental illness and was

9    competent to stand trial.  (*See* Dkt. 70, Exs. B, C.)  Neither Dr. Dee nor Dr. Bindelglas

10   alleged that Petitioner was insane or incompetent.   Because Petitioner's sanity and

11   competence were not challenged, and because Arizona does not allow expert testimony

12   regarding a defendant's mental disorder short of insanity as an affirmative defense or to

13   negate a mens rea element of the crime, such testimony could not have provided a viable

14   defense to the charge of first degree murder.  *See State v. Mott*, 187 Ariz. 536, 541, 931 P.2d

15   1046, 1051 (1997); *see also Clark v. Arizona*, ___ U.S. ___, 126 S. Ct. 2709 (2006) (holding

16   that *Mott* rule does not violate due process); A.R.S. § 13-412(C) (providing that mental and

17   emotional duress is not a defense to murder or any crime involving infliction of "serious

18   physical injury.")  For these reasons, Petitioner cannot establish a reasonable probability that

19   if counsel had interviewed Drs. Dee and Bindelglas prior to trial and done more investigation

20   into his general mental health history, there is a reasonable probability that he would not have

21   been convicted.

22           Finally, Petitioner asserts counsel was ineffective for failing to investigate his state

23   of mind at the time of the offense; his adolescent history of substance abuse; his physical,

24   mental, and emotional illnesses; and his abused childhood.  (Dkt. 65 at 5.)  Petitioner fails

25   to explain what evidence on these issues could have been discovered by further investigation.

26   *See James*, 24 F.3d at 26 (finding insufficient conclusory allegations that did not identify

27   what counsel would have done if performing effectively).  More importantly, Petitioner fails

28   to explain how any of this information would have provided a defense to the crimes.  As a

1   result, Petitioner cannot show a reasonable probability that investigation of any of these

2   avenues would have resulted in a different outcome at trial.

3        In sum, with respect to counsel's alleged failure to conduct further pretrial

4   investigation or call additional witnesses at trial, Petitioner has not shown that the PCR

5   court's denial of relief  was objectively unreasonable under *Strickland*.

6        b. Failure to Develop and Present a Defense

7        Petitioner contends that trial counsel rendered ineffective assistance in failing to

8   present a defense at trial.  Specifically, Petitioner asserts counsel failed to give an opening

9   statement, raised few objections, conducted ineffectual and sometimes harmful cross-

10  examinations, and failed to cross-examine state witnesses, particularly Detective Jack

11  Hackworth, who interviewed Martin Norton on November 26, 1981, before Petitioner gave

12  his recorded statement on December 29.  (Dkt. 65 at 9-10.)

13        *i. Failure to Give an Opening Statement*

14        Petitioner contends that counsel was ineffective because he gave no opening

15  statement.  He argues that due to this failure, "[t]he jury thus began to hear the evidence with

16  only the State's version of events on their minds, suggesting from the start that Petitioner had

17  no defense."  (Dkt. 65 at 9.)

18        Petitioner has cited no case law to support this claim.  On the contrary, "[t]he timing

19  of an opening statement, and even the decision whether to make one at all, is ordinarily a

20  mere matter of trial tactics and in such cases will not constitute the incompetence basis for

21  a claim of ineffective assistance of counsel."  *United States v. Rodriguez-Ramirez*, 777 F.2d

22  454, 458 (9th Cir. 1985).  Moreover, even where counsel reserves an opening statement, then

23  chooses not to put on witnesses, thereby losing "the opportunity to give an opening

24  statement," the failure will not constitute ineffective assistance if counsel's action is a

25  "reasonable strategic decision."  *LaGrand v. Stewart*, 133 F.3d 1253, 1275 (9th Cir. 1998).

26        Trial counsel presented no case-in-chief and called no witnesses.  His strategy

27  appeared to focus on attacking the credibility of the State's only eyewitness, Martin Norton.

28  Given the centrality of Norton's testimony with respect to the first degree murder charge, this

1   tactic was not unreasonable and counsel's failure to give an opening statement does not rise
2   to the level of ineffective assistance of counsel.

3           *ii. Counsel's Few Objections and Ineffectual and Harmful Cross-Examinations*

4           Petitioner fails to elaborate on what additional objections counsel should have made
5   or which cross-examinations of witnesses were ineffectual and harmful.  Such vague,
6   conclusory and unsupported assertions are insufficient to support a claim of IAC.  *See Shah*
7   *v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989) (holding that vague and conclusory
8   allegations of ineffective assistance do not warrant habeas relief).

9           *iii. Failure to Cross-Examine Detective Hackworth*

10          Petitioner claims ineffective assistance based on counsel's failure to cross-examine
11  Detective Jack Hackworth.  (Dkt. 65 at 9-10.)  Hackworth filed a report describing a
12  November 26, 1981 interview he had with Martin Norton.  The report recounts that Norton
13  admitted involvement in beating, robbing, abducting, and killing Juan Maya.  Norton also
14  describes Petitioner's participation in these crimes. (Dkt. 14, App., Ex. 14 at 2-4.) Petitioner
15  contends counsel's failure to cross-examine Hackworth "is especially significant because it
16  was Detective Hackworth who interviewed Norton on November 26, 1981, before Norton
17  gave his recorded statement to the State."  (Dkt. 65 at 10.)

18          Although the State called Hackworth to testify at trial, the prosecution questioned him
19  only about whether he had in fact interviewed Norton on November 26, 1981, whether
20  Norton was Mirandized, whether promises or threats were made in exchange for his
21  statement, and whether anyone else was present at the interview. (*See* RT 6/24/82 at 80-81.)
22  The State did not question Hackworth about the substance of Norton's statements, and his
23  report was not in evidence.  Petitioner does not challenge the veracity of Hackworth's
24  answers to any of these questions.  As a result, Petitioner has failed to support his assertion
25  that cross-examining Hackworth was crucial.

26          Moreover, in cross-examining Norton, defense counsel brought out discrepancies
27  between Norton's trial testimony and his November 26, 1981 statement to police.  (*See* RT
28  6/29/82 at 164, 174-77.)  Petitioner's conclusory and unsupported assertion that Hackworth's

1   cross-examination was crucial is not supported by the trial record; therefore, counsel's failure
2   to conduct it did not prejudice Petitioner.

3   ### c. Failure to Oppose Admission of Petitioner's Priors and References Thereto

4   Petitioner contends that counsel was ineffective for stipulating to admission of
5   Petitioner's "unrelated prior class 5 and 6 felony convictions for attempted burglary and
6   attempted theft." (Dkt. 65 at 10.) Petitioner asserts that defense counsel should have
7   objected pursuant to Arizona Rule of Criminal Procedure 403, on the basis that "such
8   evidence . . . would unfairly prejudice [him]." He contends counsel's failure to object
9   "willingly exposed [Petitioner] to damaging cross examination if he decided to testify on his
10  own behalf, which he ultimately did not do." (*Id.* at 11.) Petitioner alleges that this affected
11  his decision not to testify.

12  Petitioner fails to explain why the trial court's decision to admit these priors for
13  purposes of impeachment was improper. Arizona allows admission of prior convictions into
14  evidence for that purpose under certain conditions. *See* Ariz. R. Evid. 609(a). Petitioner
15  does not explain why a Rule 403 objection would have succeeded. The mere fact that
16  impeachment of Petitioner with his priors would have been "damaging" is an insufficient
17  basis for objection. Petitioner's conclusory assertion that counsel should have made a 403
18  objection, without more, fails to support a claim of IAC.

19  Petitioner also contends that counsel was ineffective for failing to object when the
20  prosecutor "delved into [his] furlough status and convictions in its case-in-chief" and when
21  the prosecutor stated during closing argument that Petitioner was "AWOL from the work
22  furlough program." (Dkt. 65 at 11.) As discussed in addressing Claim 6, references to
23  Petitioner's status as a escapee/convict were deemed admissible by the trial court to show
24  motive. *See Libberton*, 141 Ariz. at 137-38, 685 P.2d at 1289-90. As a result, Petitioner
25  cannot show that counsel's failure to object to prosecution references to this status during its
26  case-in-chief and at closing amounted to deficient performance, let alone that he was
27  prejudiced thereby. As a result, the PCR court's denial of relief was not objectively
28  unreasonable under *Strickland*.

1          d. Failure to Object to or Adequately Impeach Norton's testimony

2          Petitioner contends that counsel rendered ineffective assistance when he "failed to

3    object or impeach adequately" Norton's trial testimony. (Dkt. 65 at 12.) He also asserts that

4    counsel was ineffective for failing to seek a cautionary instruction about Norton's testimony

5    or his plea agreement. (*Id.*)

6          Petitioner provides no specific examples of the alleged inadequacies of counsel's

7    impeachment of Norton. As previously noted, counsel cross-examined Norton extensively.

8    Counsel attacked Norton's credibility by noting inconsistencies between his various

9    statements to police and his trial testimony; he cross-examined Norton on any benefits he

10   received in return for his testimony against Petitioner; and the plea agreement was admitted

11   in evidence. (*See* RT 6/28/82 at 54, 55-89; RT 6/29/82 at 90-180.) As a result, counsel was

12   able to inform the jury that Petitioner would be tried as a juvenile and given a

13   correspondingly light sentence if he testified consistent with his December 29, 1981

14   statement. For these reasons, Petitioner's conclusory allegation of a failure by counsel to

15   "adequately" impeach Norton is insufficient to support a claim of deficient performance, let

16   alone establish prejudice.

17         Petitioner's contention that counsel was ineffective for failing to object to the

18   admission of Norton's plea agreement into evidence during his direct examination is also

19   without merit. In addressing Claims 9 and 41, the Court concluded that admission of the plea

20   agreement, and references to its contents on direct examination, did not rise to the level of

21   a due process violation. As a result, counsel's failure to object to its admission was not

22   deficient. Moreover, in light of the fact that a key tactic of the defense was to attack

23   Norton's testimony, counsel could reasonably have concluded that admitting the plea into

24   evidence would aid in challenging Norton's credibility because it was evidence that Norton

25   had an ulterior motive to implicate Petitioner in Maya's murder.

26         Regarding the claim that counsel was ineffective in failing to seek a cautionary

27   instruction about Norton's testimony, the Court addressed this issue in Claim 10 and found

28   such an instruction unwarranted under Arizona law. Thus, any claim of deficiency based on

1   counsel's failure to seek such an instruction is without merit.  In sum, the PCR court's denial

2   of relief on these claims was not objectively unreasonable in light of the principles outlined

3   in *Strickland*.

4          e. Jury Questionnaire

5          Petitioner next contends that trial counsel was ineffective for failing to object to the

6   jury questionnaire.  (Dkt. 65 at 12.)  He argues that the questionnaire prejudiced the jury by

7   vouching for the credibility of a prosecution witness and amounted to a comment on the

8   evidence.  In denying Claims 9 and 41, the Court rejected Petitioner's substantive challenges

9   to the use of the questionnaire.  As a result, Petitioner cannot show that counsel's failure to

10  object to the questionnaire constituted deficient performance or was prejudicial.  Therefore,

11  the PCR court's denial of relief was not objectively unreasonable.

12         f.  Failure to Object to Prosecutor's Closing Comment on Petitioner's Silence

13         Petitioner asserts that counsel was ineffective for failing to object to the prosecutor's

14  alleged comment on Petitioner's silence.  (Dkt. 65 at 12.)  The Court discussed this issue in

15  addressing Claims 4 and 16.  For the reasons discussed therein, the Court believes the

16  comments challenged by Petitioner did not violate his rights.  As a result, the claim that

17  counsel rendered deficient performance for failing to object is without merit.  *See Beardsley*

18  *v. Woodford*, 358 F.3d 560, 586 (9th Cir. 2004) ("because the prosecutor's comments were

19  not outside the bounds of permissible argument, competent counsel might have decided not

20  to object").

21         g. Failure to Request Instruction on Voluntariness of Statements to Police

22         Petitioner acknowledges that the trial court denied his motion to suppress his pre-trial

23  statements to police.  (Dkt. 65 at 12.)  However, he alleges that counsel rendered ineffective

24  assistance when counsel "failed to request that the judge instruct the jury that the State still

25  had the burden to prove beyond a reasonable doubt the voluntariness of Petitioner's statement

26  when those statements were offered at trial."  (*Id.*)

27         Petitioner cites no case law to support his assertion that he was entitled to an

28  instruction that the State prove the voluntariness of Petitioner's statements to police beyond

1   a reasonable doubt if those statements are offered at trial.  In fact, the Arizona Supreme Court

2   has held that, although confessions in Arizona are presumed to be involuntary, the State has

3   the burden of proving voluntariness only by a preponderance of the evidence.  *State v.*

4   *Trostle*, 191 Ariz. 4, 14, 951 P.2d 869, 879 (1997).  This standard was in place at the time

5   of Petitioner's trial in 1982.  *See State v. Arnett*, 119 Ariz. 38, 42, 579 P.2d 542, 546 (1978).

6   Because the State did not have to establish the voluntariness of Petitioner's statements

7   beyond a reasonable doubt, the trial court would not have given such an instruction and

8   counsel may not be deemed ineffective for not requesting it.  The PCR court's denial of relief

9   on this claim was not objectively unreasonable.

10          h. Failure to Request Instruction on Effect of Voluntary Intoxication

11          Finally, Petitioner contends that trial counsel rendered ineffective assistance because

12  he "failed to request an instruction on the effect of voluntary intoxication on the required

13  culpable mental state for first degree murder despite evidence in the record that Petitioner

14  was under the influence of alcohol and drugs at the time of the crime."  (Dkt. 65 at 12.)

15  Petitioner contends evidence of his voluntary intoxication supported a defense that he could

16  not premeditate or intentionally commit first degree murder.  (*Id.*)

17          The trial court instructed the jury that the requisite culpable mental state for first

18  degree premeditated murder was that "[t]he defendant *intended or knew* that he would cause

19  the death of another person."  (RT 6/30/82 at 41 (emphasis added)); *see also* A.R.S. § 13-

20  1105(A)(1).  As discussed in Claim 11, at the time of Maya's murder, based on A.R.S. § 13-

21  503,  "the jury [could] consider voluntary intoxication in determining culpable mental state

22  only when the culpable mental state of "'intentionally or with the intent to' is a necessary

23  element of the offense."  *Schurz*, 176 Ariz. at 54-55, 859 P.2d at 164-65; s*ee also Ramos*, 133

24  Ariz. at 5, 648 P.2d at 120.  Thus, the Arizona Supreme Court concluded that "the giving of

25  a voluntary intoxication instruction in a murder case in which both intent and knowing are

26  alleged would be improper."  *Id.* at 55, 859 P.2d at 165; *see also Ramos*, 133 Ariz. at 6, 648

27  P.2d at 121 (upholding federal due process challenge to A.R.S. § 13-503).

28          In light of this precedent, and the fact that the trial court instructed the jury that the

1   proper mental state for premeditated first degree murder is that the defendant "intended or

2   knew" his conduct would cause the death of another, Petitioner was not entitled to a

3   voluntary intoxication instruction.  Because the trial court would not have given such an

4   instruction, counsel's failure to request a voluntary intoxication instruction was not deficient

5   performance nor was Petitioner prejudiced thereby.

6       Cumulative Error

7       None of Petitioner's claims of ineffective assistance of counsel at the guilt stage

8   warrant habeas relief.  In each instance, Petitioner has failed to demonstrate that counsel's

9   performance was deficient and that he was prejudiced by counsel's alleged shortcomings.

10  Therefore, Petitioner's allegations, considered cumulatively, cannot amount to deficient

11  performance or establish prejudice.  *See Davis v. Woodford,* 384 F.3d 628, 654 (9th Cir.

12  2004).

13      Evidentiary Hearing

14      Even if Petitioner diligently sought to develop these claims in state court, to warrant

15  an evidentiary hearing he must demonstrate that there are material facts in dispute and that

16  the facts he alleges would, if proved, entitle him to relief.  *Townsend*, 372 U.S. at 312-13.

17  In addition, a hearing is not warranted if Petitioner's claims can "be resolved by reference

18  to the state court record and the documentary evidence."  *Griffey v. Lindsey*, 345 F.3d 1058,

19  1067 (9th Cir. 2003); *see also Cardwell*, 152 F.3d at 338-39 (denying an evidentiary hearing

20  on IAC claims where the petitioner "failed to forecast any evidence beyond that already

21  contained in the record, or otherwise explain how his claim would be advanced by an

22  evidentiary hearing.").

23      The Court finds that the allegations in Claim 18a (failure to interview witnesses and

24  conduct pretrial investigation) may be disposed of based on the record.  That record,

25  including the 1981 deposition of Daniel McIntosh, the pre-trial statements and trial testimony

26  of Martin Norton, the affidavits of Diane Rhea Hodge and Daniel Severance, the pre-

27  sentence reports and 1987 affidavits of Drs. Dee and Bindelglas, and the 1992 deposition of

28  Dr. Dee, is sufficient to dispose of the claim that counsel failed to interview witnesses and

1   investigate the case pre-trial. *See Bashor*, 730 F.2d at 1233 (upholding the denial of an

2   evidentiary hearing where "[t]he state court records for this case are adequate to review these

3   allegations of ineffectiveness.") Given the information already in the record, Petitioner has

4   not explained how this claim would be advanced by an evidentiary hearing.[16] *See Cardwell*,

5   152 F.3d at 338.  In addition, as noted in addressing the substance of these claims, nothing

6   in the documentary evidence supports the conclusion that if counsel had interviewed these

7   individuals, there is a reasonable probability Petitioner would not have been convicted of first

8   degree murder.  Thus, Petitioner has not alleged facts with respect to Claim 18a which, if

9   proved, would entitle him to relief.  *See Townsend*, 372 U.S. at 312-13.  Therefore, an

10  evidentiary hearing on this claim will be denied.

11        Similarly, regarding Claim 18b (counsel developed no defense), Petitioner does not

12  delineate what facts need further development.  The Court finds the current record is

13  sufficient to resolve these issues.  Moreover, as noted in addressing the merits of this claim,

14  Petitioner can not demonstrate prejudice from counsel's alleged shortcomings and, thus, he

15  has not alleged facts, which if proved, would entitle him to relief. *See Townsend*, 372 U.S.

16  at 312-13.

17        With respect to the remaining IAC guilt-phase claims, 18c-18h, the Court finds that

18  an evidentiary hearing is not warranted.  Petitioner has not demonstrated that any additional

19  material facts need to be developed with respect to these claims.  For the reasons discussed

20  in addressing the substance of these claims, they fail as a matter of law.  Even if the facts as

21  alleged by Petitioner are true, he has not established that he would be entitled to relief. *See*

22  *Townsend*, 372 U.S. at 312-13.  Therefore, Petitioner is not entitled to an evidentiary hearing

23  on these claims.

24

25        [16]    As already discussed, to the extent Petitioner relies on Martin Norton's 1991
26  affidavit, Petitioner was not diligent in presenting this affidavit in state court with respect to
    his IAC claims and, as a result, he is not entitled to expansion of the record to include this
27  affidavit.  Because Petitioner failed to develop this aspect of his IAC claim concerning the
    failure to interview Norton pre-trial he is not entitled to an evidentiary hearing based on the
28  1991 affidavit.

1       **Claim 19 - IAC at Sentencing**

2       Petitioner presents several specific allegations of IAC at sentencing.  He alleges that

3 counsel failed (a) to investigate and present mitigation evidence from Petitioner's close

4 relatives and a childhood friend; (b) to interview the author of the presentence report and

5 investigate its contents; (c) to present experts and mitigating psychiatric evidence; (d) to

6 present evidence of substance abuse and chemical dependency; (e) to offer evidence that the

7 death sentence was excessive; (f) to develop evidence that accomplices were more culpable;

8 (g) to present evidence from Henry Dean; and (h) to present evidence of the stable

9 environment provided by prison. (Dkt. 65 at 14-17.)

10       <u>Background</u>

11       Prior to the mitigation hearing, the trial court permitted two mental health experts,

12 Drs. Bindelglas and Dee, to examine Petitioner. (*See* ROA-PCR, Vol. 1 of 1, ME 7/16/82,

13 ME 9/15/82.)  Both filed reports on October 18, 1982. (*See* Dkt. 70, Exs. D, E.)  The Court

14 has recounted their findings in addressing the issues raised in Claims 17 and 18a.

15       In addition, a Presentence Report was filed prior to the mitigation hearing. (ROA,

16 Vol. 2 of  2.)  The author of the PSR recounted statements from several interested parties.

17 Juan Maya's two sisters and brother, as well as a sister-in-law, recounted that Maya's death

18 had been extremely difficult for his family.  One sister, Rosa Martinez, noted that Maya was

19 the youngest of nine siblings, that he resided with their parents, and that he was "primarily"

20 responsible for looking after them. (*Id.* at 2.)  Each relative recommended that Petitioner be

21 sentenced to death. (*Id.* at 2-3.)  Detective Thomas Neus characterized Petitioner as "cocky

22 and arrogant" at times during interviews and stated his belief that "he seemed to be playing

23 games." (*Id.* at 3.)  Detective Russ Davis noted the heinous nature of the murder, including

24 the fact that Maya was tortured over a period of hours, and his belief the murder was cold-

25 blooded and senseless. (*Id.*)

26       Petitioner's father, David, recounted his belief that Petitioner did not deserve death

27 and stated that Petitioner could thrive in prison and rehabilitate himself.  He also stated that

28 although he believed the killing of Maya was out of character, he also had no doubt

1   Petitioner was involved and "may have been the leader in planning the crime." (ROA, Vol.

2   2 of 2, PSR at 3.)  The State asserted three "aggravating factors," including the fact that the

3   crime was committed for pecuniary gain, that it was committed in an especially cruel and

4   heinous manner, and that Petitioner was an escapee from the prison work furlough program.

5   (*Id.* at 4.)  Finally, Petitioner's trial counsel recounted to the PSR author that he did not

6   believe the death penalty was warranted because Petitioner was not a "hardened" criminal.

7   Counsel also cited Petitioner's relative youth as a factor weighing against imposition of the

8   death penalty.  (*Id.*)

9       The PSR author noted that Petitioner was treated for psychological problems as an

10  adolescent, which Petitioner described as mostly due to his "ambivalent" relationship with

11  his father.  (ROA, Vol. 2 of 2, PSR at 6.)  Petitioner told the author that he drank alcohol but

12  denied he was an abuser.  He also said he had "experimented" with a variety of drugs in the

13  past but used no drugs except marijuana at the time of his arrest.  (*Id.*)  The author concluded

14  by stating his belief that the crimes against Maya were motivated by the prospect of financial

15  gain and that the pecuniary basis for the murder, as well as the "senseless, unnecessary and

16  . . . particularly cruel and depraved manner" in which it was committed, warranted the

17  maximum penalty prescribed by law.  The PSR recommended that the mental and physical

18  suffering experienced by Maya should be considered in determining the appropriate sentence.

19  (*Id.* at 7.)   The record is devoid of any indication that the parties filed presentence

20  memoranda.

21      At the mitigation hearing, the State called two witnesses, Carl Edward Haas and Bill

22  Fitzgerald.  Haas was a detention officer with the Maricopa County Sheriff's Office who

23  worked at the Durango Jail.  (RT 10/20/82 at 5.)  His duties included accounting for inmates

24  on work furlough.  He stated that Petitioner was scheduled for work furlough from 6:00 a.m.

25  to 6:00 p.m.  He testified he was on duty on November 12, 1981, at approximately 4:00 a.m,

26  and he determined Petitioner was not present.  (*See id.* at 6.)

27      Fitzgerald was the work furlough coordinator with the Maricopa County Adult

28  Probation Department.  He testified that Petitioner was in the work furlough program based

1    on charges of burglary and attempted theft.  (RT 10/20/82 at 8.)  Fitzgerald stated that

2    Petitioner was reported escaped on November 12, 1981.  (*Id.* at 9.)  On cross-examination,

3    Petitioner's counsel elicited that a prisoner was considered escaped if he did not report back

4    from work release.  (*Id.*)

5        Petitioner's counsel called two witnesses, Nancy Henry and Geraldine Smith.  Henry

6    testified she had known Petitioner since he was born, as a friend and a friend of his mother.

7    (RT 10/20/82 at 13.)  She stated she never knew Petitioner to be violent when he was

8    younger, just that his mother indicated he had troubles with grades and school work.  She

9    described Petitioner as having a "love-hate relationship" with his father and stated he

10   couldn't get along with him.  She testified that Petitioner's father was "difficult to

11   understand" and had disappointed Petitioner a lot.  (*Id.* at 14-15.)

12       Henry indicated that Petitioner used drugs.  She further stated that she did not believe

13   Petitioner to be a violent person and that if he was involved in the murder of Maya, he could

14   not have acted on his own.  She described Petitioner as a "follower [who] would get into

15   something and then he would just follow it through, go along with the crowd."  (RT 10/20/82

16   at 16.)

17       Geraldine Smith testified that she knew Petitioner because he dated her daughter for

18   about six months approximately a year prior to the crimes and lived in her home for

19   approximately a month.  (RT 10/20/82 at 19-20.)  Smith also testified that Petitioner had

20   great difficulties with his father.  She testified that Petitioner told her that every time he tried

21   to go forward his father would knock him down.  She also stated that his prior convictions,

22   for which he was in custody at the time of Maya's murder, were based on his breaking into

23   his father's business and taking money he believed his father owed him but refused to pay.

24   (*Id.* at 21.)  Smith recounted Petitioner describing his stormy relationship with his father:

25       His father was always telling him to do right, do things right, but his
         father wasn't actually doing things right in a lot of different directions.
26       [Petitioner] tried very hard to follow in his footsteps.  He would liked to have
         gone places with his father, but was never allowed to.  And other times he
27       would have a brainstorm about how to make something go at [his father's
         business] West World, his father wouldn't go along with it and it was just, no
28       matter what Larry did, his dad would knock the pins out from under him.

(*Id.* at 22.)

Smith further testified that she knew Petitioner used drugs, which made her unhappy because he was dating her daughter,  but noted that he "was desperately trying to quit." Smith stated Petitioner was never violent toward her daughter.  She stated that she did not believe Petitioner could have murdered Maya because he is "very tender hearted."  She described Petitioner as a follower who wanted to belong.  (RT 10/20/82 at 22-23.)

At the end of this testimony, Petitioner's counsel asked the court to note that Petitioner's only priors were based on his breaking into his father's place of business and were predicated on his difficult relationship with his father.  (RT 10/20/82 at 27.)  Counsel also asked the court to consider that Petitioner had no previous record of violence and was only twenty years old at the time of the crimes.  Counsel further argued that Petitioner sought psychological care while on the jail furlough program but, in spite of  promises, he did not receive any treatment.  (*Id.*)  Counsel emphasized that Petitioner "appeared to be a follower rather than the instigator and that Mr. James apparently wanted [Maya] killed."  (*Id.* at 28.) Counsel argued Petitioner "went along with Mr. James . . . he was a follower at all times involved in the killing.  The initial steps were taken by James and the only thing [Petitioner] did was just follow along like a blind sheep that he is . . . "  (*Id.*)

Counsel for the State emphasized that Petitioner "is the one who held the gun on Mr. Maya in the back seat of the car the entire time Mr. Maya was held hostage while being transported out to the [murder] scene."  She noted that although Petitioner was only twenty, "he has had numerous other contacts with the law" and whether or not his father caused some of his actions, "he took no course of action that would have kept him out of those problems." (RT 10/20/82 at 28-29.)  Counsel noted that Petitioner blamed others, including the State, his father, and accomplices James and Norton for his problems and showed no remorse or compassion for the victim.  (*Id.* at 29.)  She also noted that Dr. Dee concluded in his report that Petitioner was "a time bomb waiting to go off  . . . . he places distance between himself and his troubles.  He doesn't relate to the trouble he is in and he doesn't learn from experience."  (*Id.*)

Finally, the prosecutor discounted Dr. Bindelglas's opinion that he didn't think Petitioner could have premeditated the murder because of his tendency to act impulsively and without reflection.  She noted that Dr. Bindelglas's conclusions must be weighed against the undisputed evidence that the length of time between Maya's arrival at James's mobile home and his murder in Salome was "in the vicinity of five to six to seven hours or plenty of time for premeditation."  (RT 10/20/82 at 29-30.)

In its Special Verdict, the sentencing court found two aggravating factors:

5. The defendant did commit the offense as consideration for the receipt or in expectation of the receipt of pecuniary value in that "the hope of financial gain was a cause of the murder." [Citation omitted.]

6. The Court finds that the defendant committed the offense in an especially heinous, cruel and depraved manner.

(ROA, ME 10/25/82 at 1-2.)  Concerning mitigating factors, the court found as follows:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was not significantly impaired and certainly not so impaired as to constitute a defense to the prosecution.

2. The defendant was not under unusual or substantial duress.

3. The defendant was one of the individuals who actually committed the offense and was not found guilty by reason of being legally accountable for the conduct of another under the provisions of A.R.S. 13-303.  Therefore, this mitigating circumstance does not exist.

4. The defendant could have foreseen that his conduct in the course of the commission of the offense for which the defendant was convicted would cause or would create a grave risk of causing, death to another person.  Therefore, this mitigating circumstance does not exist.

5. The Court does not find the defendant's age, to-wit: 20 years of age at the time of the offense and 21 years of age at the time of sentencing to be a mitigating factor circumstance.

6. The Court does not find any other mitigating circumstances.

The Court having taken into account the aggravating and mitigating circumstances, the Court finds that two aggravating circumstances exist, to-wit: the offense was committed in expectation of the receipt of something of pecuniary value and defendant did commit the offense in an especially heinous, cruel and depraved manner; and the Court further finds that there are no mitigating circumstances significantly substantial to call for leniency.

(*Id.* at 2-3.)

- 88 -

a. Lack of Mitigation Investigation

Petitioner contends that counsel rendered ineffective assistance because he "failed to investigate and prepare adequately for the capital sentencing proceeding following the trial." (Dkt. 65 at 14.)  He asserts that counsel presented only two mitigation witnesses, a neighbor and the mother of an ex-girlfriend.  (*Id.*)  Conversely, counsel failed to call close relatives, including Petitioner's mother, Jo Ann Donaldson; his sister, Susan Farias; and a childhood friend, Helen Robichaux.  Petitioner contends that these persons were more familiar with his personality and background and "would have testified about [his] physically and emotionally abusive father, [his] unstable childhood, his history of substance abuse and chemical dependency, his inability to commit such a crime on his own, and his literary talent."  (*Id.*)  Petitioner presented affidavits from these individuals in support of his 1987 PCR petition. (*See* Dkt. 26, Attach., Exs. 8, 9, 10; Dkt. 14, App., Exs. 18, 19, 20.)

A habeas petitioner facing a death sentence for capital murder has a "right – indeed, a constitutionally protected right – to provide the jury with . . . mitigating evidence." *Williams*, 529 U.S. at 393.  "To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'" *Id*. at 399.  Part of this duty is an "obligation to conduct a thorough investigation of [the defendant's] background." *Id.* at 396.  "Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments." *Mayfield v Woodford*, 270 F.3d 915, 927 (9th Cir. 2001).  "Defense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial to persuading [the sentencing court] that the life of the capital defendant is worth saving." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005).  Thus, "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* at 1001 (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)).

1      In her affidavit, Jo Ann Donaldson described Petitioner's father, David, as being "very

2   difficult . . . not an easy person to live with." (Dkt. 26, Attach., Ex. 8 at 1.)  In particular, she

3   pointed to Petitioner's love-hate relationship with his father, which was compounded by

4   David's hostile attitude toward Petitioner; according to Donaldson, Petitioner's father often

5   criticized Petitioner but never praised him.  She stated that David's uncaring attitude toward

6   Petitioner had a bad effect on him emotionally.  (*See id.* at 2-3.)

7      Donaldson indicated that Petitioner suffered headaches in 1979 and, although she

8   wanted to have him checked medically, "money was very tight." (Dkt. 26, Attach., Ex. 8 at

9   3.)  She stated that after that Petitioner seemed "different" and was "unable to control his

10  temper." (*Id.*)  Donaldson also described Petitioner as a "follower" who wanted to be

11  "accepted" and would go along with what anyone else wanted him to do.  (*Id.* at 4.)  For this

12  reason, she did not believe Petitioner would have committed the crimes at issue if he had

13  been alone.  (*Id.*)  She described Petitioner as a "loving, sensitive, intelligent person." (*Id.*

14  at 5.)

15     Petitioner's sister, Susan Farias, reiterated how difficult Petitioner's father was and

16  that his "rejection" affected all of his children profoundly.  (Dkt. 26, Attach., Ex. 9 at 2-3.)

17  She described their childhood as unstable due to their parents' divorce and the fact that their

18  mother moved to the Pacific Northwest.  She recounted one particular incident in 1972, when

19  Petitioner's father discovered that Petitioner and his brother had taken go-cart parts from his

20  business.  She stated that her father beat them "very badly" and dropped them off at the

21  juvenile center.  (*Id.* at 4.)  This story was confirmed by Petitioner's mother.  (Dkt. 26,

22  Attach., Ex. 8 at 2-3.)

23     Farias stated that Petitioner "was easily influenced by others" and "would do anything

24  to [be] accepted by others." (Dkt. 26, Attach., Ex. 9 at 6.)  Farias recounted that she noticed

25  a change in Petitioner in the summer of 1980; he was unable to control his emotions and was

26  often "explosive." (*Id.* at 7.)  She stated he was using drugs "as often as he could" and "was

27  more seriously dependent on drugs than I had known." (*Id.*)  She stated that her mother

28  wanted Petitioner to see a neurologist due to his headaches but "money was very scarce."

1   (*Id.*)  Farias stated that she was shocked when she learned Petitioner was charged with first

2   degree murder.  She did not believe he was capable of it because he was not "cold or

3   calculating" but "act[ed] without thinking" and "follow[ed] others."  (*Id.* at 8.)

4        Childhood friend Helen Robichaux stated that she had known Petitioner since she was

5   about eight or nine years old.  She stated that Petitioner's father "had a violent temper . . .

6   was extremely impatient and impossible to believe.  He was very critical of everyone around

7   him."  (Dkt. 26, Attach., Ex. 10 at 1.)  She stated that Petitioner had an unstable home life

8   while growing up because his parents divorced.  She didn't believe Petitioner's father "ever

9   loved [him].  He never showed him any affection" and thought Petitioner was "worthless."

10   (*Id.* at 2.)

11        Robichaux further stated Petitioner was always seeking the approval of others and

12   wanted to be liked.  (Dkt. 26, Attach., Ex. 10 at 2.)  She recounted that Petitioner was a drug

13   user from an early age.  When she learned he was charged with first degree murder she could

14   not believe it.  She believed his mind "must have snapped" because he was a "follower" who

15   would not have done such a thing on his own.  (*Id.* at 3-4.)  She believed if he was free from

16   the influence of drugs and was alone he would not have committed such a crime.  (*Id.* at 4.)

17        The Court finds that even if counsel was deficient in not presenting testimony from

18   these individuals at the mitigation hearing, Petitioner cannot establish prejudice.  Much of

19   the information offered in the affidavits of Petitioner's mother, sister, and childhood friend

20   – in particular, their characterization of his stormy relationship with his father, his substance

21   abuse, and his tendency to be follower – was similar to testimony presented at the mitigation

22   hearing by defense witnesses Henry and Smith.  The only "new" information is a statement

23   that Petitioner's father had been physically violent with him and the fact that in the year

24   before the crimes Petitioner was experiencing headaches and his sister and mother noticed

25   a change in his behavior.  The allegation of physical violence does not add substantively to

26   the information before the trial court concerning Petitioner's troubled relationship with his

27   father.  Regarding Petitioner's headaches, he was examined by two medical doctors prior to

28   trial and found to have no major mental illnesses; moreover, evidence of his impulsive

behavior traits was already before the court by way of the affidavits of Drs. Dee and Bindelglas.  The Court acknowledges that Petitioner's mother, sister, and childhood friend were closer to Petitioner and knew him better than Henry or Smith, and that additional testimony from these individuals would not have harmed his case.[17]  However, when weighed against the evidence presented at trial and the facts as recounted in the PSR, the Court believes that the cumulative nature of their testimony would have had limited impact.

The evidence presented at trial showed Petitioner planned this crime with James over a period of several hours, then executed the plan in a particularly cruel and cold-blooded manner.  Evidence further shows the murder was motivated by pecuniary gain as well as a desire to obtain transportation so Petitioner could escape from serving a jail sentence.  There is not a reasonable probability that testimony from Petitioner's mother, sister, and friend – essentially character evidence similar to testimony presented at the mitigation hearing – would have resulted in a different sentence.  For the above reasons, the PCR court's denial of relief was not objectively unreasonable in light of the principles outlined in *Strickland*.

### b. Failure to Interview Author of PSR or Investigate its Contents

Petitioner contends that counsel was ineffective for failing to interview the PSR author and failing to investigate the report's contents.  Petitioner fails to explain why counsel should have conducted such an interview and what counsel should have investigated.  Without more, this conclusory assertion is insufficient to support a claim of IAC.

### c. Failure to Present Experts and  Mitigating Psychiatric Evidence

Petitioner contends that counsel was ineffective for failing to present available mitigating psychological evidence.  Specifically, Petitioner cites counsel's failure to call Drs. Bindelglas and Dee to testify at the mitigation hearing.  (Dkt. 65 at 15.)

As the Court noted in addressing Claim 17, both doctors opined in their pre-sentence reports that Petitioner's mental makeup made him prone to act impulsively and reflexively

---

[17]     Dr. Bindelglas interviewed Petitioner's mother and noted in his pre-sentence report that she had not seen him in a year and a half.  (Dkt. 70, Ex. D at 2.)

1   and concluded that he likely could not have premeditated Maya's murder.  (*See* Dkt. 70, Ex.

2   D at 3, Ex. E at 3.)  Both doctors also filed affidavits in support of Petitioner's 1987 PCR

3   petition.

4           In addition to reiterating and emphasizing the conclusions in his 1982 report, Dr. Dee

5   stated in his affidavit that if he'd been called to testify at the mitigation hearing he "could

6   also have explained that my finding was not inconsistent with the lapse of time between the

7   time that Mr. Maya first appeared at James' trailer and the time of Mr. Maya's killing at the

8   mine." (Dkt. 26, Attach., Ex. 2 (Dee Aff.) at 1, 2.)  Similarly, in his affidavit Dr. Bindelglas

9   reiterated his findings that Petitioner had defective judgment, was prone to act impulsively,

10  and was unlikely to have premeditated Maya's killing.  Like Dr. Dee, he stated that if called

11  to testify at the mitigation hearing, he could have explained that the "lapse of time" between

12  Maya's arrival at James' trailer and his murder in Salome "does not necessarily mean that

13  Mr. Libberton acted with premeditation."  (*Id*., Ex. 3 (Bindelglas Aff.) at 4.)

14          A state court has broad discretion in determining the credibility of mitigation evidence

15  offered by mental heath experts.  *See State v. Kayer*, 194 Ariz. 423, 437, 984 P.2d 31,45

16  (1999); *State v. Doerr*, 193 Ariz. 56, 69, 969 P.2d 1168, 1181 (1998).  The court is not

17  compelled to find expert testimony credible if it believes the experts' opinions are refuted by

18  the facts and common sense.  *See State v. Martinez*, 196 Ariz. 451, 463-64, 999 P.2d 795,

19  807–08 (2000); *see also Ceja*, 97 F.3d at 1251 (citing *Eddings*, 455 U.S. at 114-15, for the

20  proposition that "[i]t was for the Arizona courts to 'determine the weight to be given

21  [mitigating] evidence.'")

22          In light of the evidence presented at trial of the planning and execution of the crime,

23  its cruel and cold-blooded nature, Petitioner's active participation at all stages, the fact that

24  he was motivated by pecuniary gain and a desire to obtain transportation so he could escape

25  from serving a jail sentence, and the fact that the written  reports of Dee and Bindelglas were

26  submitted to the sentencing court, the Court does not believe there is a reasonable probability

27  that if Dee and Bindelglas had testified, the court  would not have sentenced Petitioner to

28  death.  As a result, Petitioner cannot establish prejudice from counsel's failure to call Drs.

1    Dee and Bindelglas to testify at the mitigation hearing and the PCR court's denial of relief
2    was not objectively unreasonable under *Strickland*.

3            d. Failure to Present Evidence of Substance Abuse or Chemical Dependency

4            Petitioner next contends that counsel was ineffective at sentencing because he "failed
5    to develop or present any evidence, expert or otherwise on the effect of substance abuse or
6    chemical dependency . . . despite evidence of a history of substance abuse and Petitioner's
7    ingestion of alcohol and drugs before the crime." (Dkt. 65 at 15.)

8            Voluntary intoxication may be considered a mitigating factor "if the defendant proves
9    by a preponderance of the evidence that his 'capacity to appreciate the wrongfulness of his
10   conduct or to conform his conduct to the requirements of the law was significantly impaired,
11   but not so impaired as to constitute a defense to prosecution.'" *State v. Stokley*, 182 Ariz.
12   505, 520, 898 P.2d 454, 469 (1995) (citing A.R.S. § 13-703(G)(1)).  Voluntary intoxication
13   may also be considered as a non-statutory mitigating factor. *See State v. Gallegos*, 178 Ariz.
14   1, 870 P.2d 1097, 1117 (1994).  It is for the state court to weigh any mitigating evidence and
15   determine its significance. *See Ceja*, 97 F.3d at 1251; *see also Eddings*, 455 U.S. at 114-15.

16           Counsel did not specifically argue at the mitigation hearing that Petitioner's history
17   of alcohol and drug use, as well as his use of alcohol and marijuana the day of the crime,
18   should be considered mitigating factors in sentencing.  However, irrespective of the quality
19   of counsel's performance, Petitioner cannot establish prejudice.  Evidence on this point was
20   presented at trial and at the mitigation hearing.  At trial, Daniel McIntosh testified that he was
21   with Petitioner most of the day prior to the murder until early evening.  He recounted that he,
22   Petitioner, and James drank as much as two twelve packs of beer between them and smoked
23   as much as "half a bag" of marijuana.  (*See* RT 6/28/82 at 6-7, 26-27, 28, 30-33, 46-48.)
24   Martin Norton also testified that James, McIntosh, and Petitioner drank beer that evening
25   (though he describe a smaller amount).  At the mitigation hearing, the witnesses called by
26   Petitioner, Nancy Henry and Geraldine Smith, testified that he had a history of drug abuse.

27           Conversely, other evidence supported the court's determination that Petitioner was
28   not so impaired that he was unable to appreciate his actions on the night of the murder.

1  Norton testified that neither Petitioner nor James drank alcohol or took drugs from the time

2  of his arrival at James's trailer with Maya until the time they murdered Maya in Salome, a

3  period of several hours.  (RT 6/28/82 at 31.)  Following a pre-trial mental examination, Dr.

4  Merton Berger recounted that although Petitioner told him he had a history of drug use,

5  Petitioner insisted he was not under the influence of drugs or alcohol during the time in

6  question.  (Dkt. 70, Ex. C at 2.)  Dr. Berger specifically opined, "it is doubtful that this man

7  was out-of-touch with reality" at the time of the murder.  (*Id.*)  Dr. Maier Tuchler also found

8  no mental impairment.  (*Id.* at Ex. B.)

9          The sentencing court heard, both at trial and during the mitigation hearing, that

10  Petitioner had a history of substance abuse and that he had been drinking alcohol and

11  smoking some marijuana the day of the murder.  Nevertheless, the court did not find this

12  evidence sufficient to establish the (G)(1) statutory mitigator nor substantial enough to

13  warrant leniency.  As noted, it is for the state court to weigh any mitigating evidence and

14  determine if it warrants leniency.  *See Ceja*, 97 F.3d at 1251; *see also Eddings*, 455 U.S. at

15  114-15.  To the extent Petitioner contends there should have been expert evidence regarding

16  the effects of substance abuse, he does not point to any specific evidence that should have

17  been presented.  For these reasons, this Court concludes that Petitioner cannot establish a

18  reasonable probability that the trial court would not have sentenced him to death if counsel

19  had offered further evidence at the mitigation hearing of Petitioner's history of substance

20  abuse and his use of alcohol and marijuana the day of the crime.  Thus, the PCR court's

21  denial of relief on this claim was not objectively unreasonable under *Strickland*.

22          e. Failure to Offer Evidence Death Sentence was Excessive

23          Petitioner contends that counsel was ineffective for failing "to present any evidence

24  or legal argument at sentencing as to whether a death sentence . . . would be excessive when

25  compared to sentences imposed for similar crimes and for similar offenders."  (Dkt. 65 at 15.)

26  At that time, it was the Arizona Supreme Court and not the trial court that performed

27  "proportionality review . . . considering similarly situated defendants."  *State v. Greenway*,

28  170 Ariz. 155, 171, 823 P.2d 22, 38 (1991).  Therefore, failure to make a proportionality

1   argument to the trial court did not constitute ineffective assistance.

2         Moreover, the Arizona Supreme Court conducted a proportionality review of

3   Petitioner's sentence on direct appeal. *See Libberton*, 141 Ariz. at 140-41, 685 P.2d at 1292-

4   93. Citing several examples of "analogous" cases where death was imposed, the court held

5   that "the imposition of the death penalty in this case is not disproportionate to the penalty

6   imposed in similar cases." *Id.* Because the Arizona Supreme Court found Petitioner's death

7   sentence justified following a proportionality review, Petitioner cannot show prejudice from

8   counsel's failure to request such review by the trial court. The state PCR court's denial of

9   relief was not objectively unreasonable.

10        f. Failure to Develop Evidence Accomplices were More Culpable

11        Petitioner argues that counsel was ineffective for failing "to develop the evidence . .

12  . that James and Norton were far more culpable than Petitioner." (Dkt. 65 at 15.) Petitioner

13  fails to explain what additional evidence was available but not discovered. In fact, counsel

14  did argue that Petitioner was not as culpable: "the Court has heard all the evidence, I think

15  the Court will recall that during that time the crime was being committed that at all times Mr.

16  Libberton appeared to be a follower rather than the instigator and that Mr. James apparently

17  wanted the person killed . . . ." (RT 10/20/82 at 28.)

18        Both mitigation witnesses presented by counsel supported Petitioner's claim that he

19  was a "follower" and emphasized that Petitioner would not have committed the crime by

20  himself. This view was also echoed in the reports of Drs. Dee and Bindelglas. Petitioner's

21  conclusory assertion is factually erroneous and without merit.

22        g. Failure to Present Testimony from Henry Dean

23        Petitioner alleges that counsel was ineffective at sentencing for failing to present the

24  testimony of Henry Dean. Dean was a detention officer at the Durango Jail "who guarded

25  the work furlough prisoners" like Petitioner at the time of Maya's murder. Petitioner

26  contends that Dean could have testified at the mitigation hearing "that Petitioner did not give

27  him any trouble but was subject to personality changes that Petitioner's fellow inmates

28  attributed to Petitioner's drug use." (Dkt. 65 at 16-17; *see* Dkt. 14, App., Ex. 23 at 4-12.)

1    Even assuming that counsel should have called Dean as a witness at the mitigation

2    hearing, Petitioner cannot establish prejudice.  Dean rested his belief that Petitioner was

3    under the influence of drugs at the time of the murder on hearsay from unnamed inmates at

4    the jail. He specifically stated that he had no personal knowledge that this was true and could

5    not recall noting any personality changes in Petitioner during the time they were in contact.

6    (*See* Dkt. 14, App., Ex. 23 at 14, 16.)  Conversely, in his pre-trial examination of Petitioner,

7    Dr. Berger recounted Petitioner telling him that he was not under the influence of alcohol or

8    drugs at the time of Maya's murder.  (*See* Dkt. 70, Ex. C at 2.)  For these reasons, the Court

9    does not believe there is a reasonable probability that if the state court had heard Dean's

10   testimony it would not have sentenced Petitioner to death.  The PCR court's denial of relief

11   was not objectively unreasonable under *Strickland*.

12            h. Failure to Present Evidence of Stable Environment Provided by Prison

13   Petitioner contends that counsel was ineffective for not raising as a mitigating

14   circumstance Petitioner's "need for psychological counseling, the state's recognition of that

15   need, and the state's failure to meet it." (Dkt. 65 at 16.)  Petitioner also argues that counsel

16   should have provided evidence that there was a "high" probability that a stable environment

17   in prison and the "therapeutic effect of the passage of time and [his] resultant maturation .

18   . . would resolve his significant psychological and emotional problems." (*Id.* at 17.)

19   In fact, counsel made the first argument at the mitigation hearing:

20              I would also like the Court to take notice that in previous hearings the
     defendant had attempted to have psychological care while he was on the work
21   furlough program, while he was in custody, and in fact had been promised at
     least in his estimate by the state that he would get this particular treatment.
22   And one of the reasons he gives which is unfortunate to me, I think it is a fact
     to be considered, he did not get any of this treatment while he was
23   incarcerated.  And [it was] one of the main reasons he walked off the work
     furlough program . . . .

24
25   (RT 10/20/82 at 27-28.)  In addition, Dr. Bindelglas's 1982 report noted that Petitioner

26   sought but did not receive psychological treatment. (Dkt. 70, Ex. D at 2.)  For these reasons,

27   there is no merit to Petitioner's claim that counsel failed to urge Petitioner's need for

28   psychological counseling as a mitigating circumstance.

1    To bolster this claim in his 1987 PCR petition, Petitioner included an affidavit from

2  Dr. Francis Enos, a psychologist.  Dr. Enos stated in his affidavit that Petitioner's long period

3  of incarceration (by that time more than five years) had had a salutary effect on his mental

4  and emotional problems; he concluded that Petitioner no longer has "any significant

5  emotional pathology" and opined that Petitioner "has come to grips with all the things that

6  have bothered him in the past and is now doing what he can to make his life as productive

7  as possible, considering the present circumstances."  (Dkt. 26, Attach., Ex. 13.)

8    The Court concludes that adding Dr. Enos's affidavit to the evidence heard by the

9  sentencing court concerning Petitioner's psychological problems and his failure to get

10  counseling while in jail, does not establish a reasonable probability of a different outcome,

11  particularly when weighed against the evidence presented at trial of Petitioner's active

12  participation in the brutalization and murder of Maya.  First, Dr. Enos's conclusion that

13  "thousands of hours of incarceration" have had a beneficial effect on Petitioner's mental

14  health (*see* Dkt. 26, Attach., Ex. 13 at 1) is an assessment that could not have been made at

15  the time of sentencing, and any testimony by him at that time would have been prospective

16  and highly speculative.  Moreover, as noted, at the mitigation hearing the sentencing court

17  heard evidence and argument from counsel of Petitioner's need for psychological treatment

18  and the jail system's failure to provide it.  Nevertheless, the sentencing court did not

19  consider this evidence sufficiently mitigating to warrant leniency.  The Court does not

20  believe there is a reasonable probability that testimony from Dr. Enos would have changed

21  that calculation.  Thus, even if counsel was deficient for not calling Dr. Enos to testify,

22  Petitioner cannot establish prejudice.  As a result, the PCR court's denial of relief was not

23  objectively unreasonable under *Strickland*.

24    Cumulative Error

25    None of Petitioner's claims of IAC at sentencing warrant habeas relief.  In each

26  instance Petitioner has failed to demonstrate that counsel's performance was deficient and/or

27  show that he was prejudiced by counsel's alleged shortcomings.  Nor does the Court believe

28  that these allegations, considered cumulatively, amount to deficient performance or establish

1  prejudice.  *See Davis,* 384 F.3d at 654.

2       Finally, the Court's conclusion that Petitioner has failed to demonstrate prejudice with

3  respect to his claims of ineffective assistance at sentencing are reinforced by the fact that the

4  same judge who presided at his trial and sentencing also presided at the 1987 PCR

5  proceeding.  That judge specifically stated that nothing presented in support of Petitioner's

6  claims of IAC at sentencing would have caused him to reconsider the death sentence.  (ROA-

7  PCR, Vol. 1 of 1, ME 2/10/88 at 1.)  This finding, based on the judge's familiarity with the

8  trial record, the mitigating evidence presented prior to sentencing, and the additional

9  documentary evidence provided in support of the claims in the 1987 PCR petition, provides

10  the Court with additional reason to extend deference to the PCR court's denial of relief.  *See*

11  *Smith v. Stewart*, 140 F.3d 1263, 1271 (9th Cir. 1998) (stating that when the judge who

12  presided at the PCR proceeding was also the sentencing judge, the court "would be

13  considerably less inclined to order relief" for that might approach "a looking-glass exercise

14  in folly").

15      Evidentiary Hearing

16       As with his claims of IAC during the guilt phase, Petitioner has not established that

17  the current record is insufficient to resolve these claims.  Moreover, as noted in addressing

18  the substance of his claims of IAC at sentencing, Petitioner has not demonstrated prejudice

19  with regard to any of these claims.  For this reason, the Court believes the facts alleged in

20  support, even if proved, would not entitle him to relief.  *See Townsend*, 372 U.S. at 312-13.

21  Petitioner's request for an evidentiary hearing on these claims will be denied.

22      **Claim 39 – IAC on Appeal**

23       Petitioner asserts that appellate counsel rendered ineffective assistance.  (Dkt. 65 at

24  39-40.)  Specifically, Petitioner alleges that appellate counsel never met with him

25  "personally" and counsel alone decided what claims to raise.  (*Id.* at 39.)  In addition,

26  Petitioner contends that appellate counsel raised only four claims on direct appeal and "did

27  not raise trial counsel's ineffectiveness at either the guilt or sentencing phases of the trial."

28  (*Id.*)  Petitioner also asserts that all other claims presented in his amended federal habeas

1   petition should have been raised by appellate counsel on direct appeal.

2   The Fourteenth Amendment guarantees a criminal defendant the right to effective

3   assistance of counsel on his first appeal. *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). A

4   claim of ineffective assistance of appellate counsel is reviewed according to the standard in

5   *Strickland*. *See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). Petitioner must

6   show that counsel's appellate advocacy fell below an objective standard of reasonableness,

7   and that there is a reasonable probability that, but for counsel's deficient performance,

8   Petitioner would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86

9   (2000); *see also Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

10   Petitioner's unsupported assertions are simply too vague and conclusory to support

11   habeas relief. *See Shah*, 878 F.2d at 1161. Moreover, appellate counsel's failure to present

12   issues of ineffective assistance of counsel on direct appellate review is not deficient. In *State*

13   *v. Spreitz*, 202 Ariz. 1, 3, 39 F.3d 525, 527 (2002), the Arizona Supreme Court stated

14   unequivocally that "ineffective assistance of counsel claims are to be brought in Rule 32

15   proceedings. Any such claims improvidently raised in a direct appeal . . . will not be

16   addressed regardless of merit." Prior to *Spreitz*, it was common practice in Arizona to raise

17   ineffective assistance of counsel claims on collateral review. *See State v. Valdez*, 160 Ariz.

18   9, 15, 770 P.2d 313, 319 (1989) (citing Ariz. R. Crim. P. 31.4).

19   Further, Petitioner cannot show prejudice from counsel's failure to raise claims of

20   ineffective assistance of counsel on direct appeal. Counsel presented these claims in his 1987

21   PCR petition and they were considered on the merits. In sum, Petitioner has not alleged a

22   viable claim of ineffective assistance of appellate counsel. His only specific claim relates

23   to a failure to raise IAC claims on direct appeal; however, Petitioner has failed to

24   demonstrate he was prejudiced by this alleged failure. The PCR court's denial of relief was

25   not objectively unreasonable in light of the principles outlined in *Strickland* and *Robbins*.

26   Evidentiary Hearing

27   Petitioner makes no specific request for an evidentiary hearing on his claims of IAC

28   on appeal. In any event, for the reasons stated, Petitioner has not asserted any example of

1   prejudice flowing from counsel's failure to raise claims of ineffective assistance on direct

2   appeal.  Thus, to the extent Petitioner seeks an evidentiary hearing with respect to this claim,

3   the request will be denied.

4   **IV. Evidentiary Hearing**

5          Petitioner made a blanket request for an evidentiary hearing for all his claims.  (Dkt.

6   65 at 1.)  However, he made a specific request only as to the IAC claims, which are

7   addressed above, and Claim 17 (*see* Dkt. 83 at 71).  As discussed in the Court's analysis of

8   the merits of Claim 17, Petitioner has not, as a matter of law, established a constitutional

9   violation based on the trial court's failure to *sua sponte* grant a new trial based on the reports

10  of Drs. Dee and Bindelglas.  The Court concludes that the facts alleged in support of this

11  claim, even if established at a hearing, would not entitle Petitioner to relief; thus, his request

12  for a hearing will be denied.  *See Townsend*, 372 U.S. at 312-13.  As to the remaining claims,

13  the Court finds that an evidentiary hearing is neither warranted nor required.

14         Accordingly,

15         **IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus

16  (Dkt. 13) is denied.  The Clerk of Court shall enter judgment accordingly.

17         **IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

18  Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona

19  85007-3329.

20         DATED this 18th day of September, 2007.

21

22

23  _____

24  Earl H. Carroll
    United States District Judge

25

26

27

28